# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JORGE VILA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-02143 (RBW) |
| | ) | |
| INTER-AMERICAN INVESTMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure and Local Civil Rule 7, Defendant Inter-American Investment Corporation hereby moves to dismiss Plaintiff's complaint. As grounds for this motion, Defendant refers the Court to the Memorandum of Points and Authorities attached hereto. A proposed order accompanies the motion.

WHEREFORE, Defendant respectfully requests that this Honorable Court dismiss Plaintiff's complaint without leave to amend.

Respectfully Submitted,

/Nancy L. Perkins

*Of Counsel:*

Sarah Fandell
Rafael Díaz Loyola
Inter-American Investment Corporation
1300 New York Ave., N.W.
Washington, D.C. 20577
(202) 623-3947

January 26, 2007

Nancy L. Perkins (D.C. Bar No. 421574)
Jennifer Risen (D.C. Bar No. 486559)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000

*Counsel for Defendant*
*Inter-American Investment Corporation*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JORGE VILA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-02143 (RBW) |
| | ) | |
| INTER-AMERICAN INVESTMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

Defendant Inter-American Investment Corp. ("IIC") submits this memorandum in support of its motion to dismiss the complaint of Plaintiff Jorge R. Vila ("Vila").

## INTRODUCTION

In this action, Vila, an independent banking consultant, claims that the IIC failed to compensate him for services that he allegedly rendered to the IIC from January to August 2003. (Compl. ¶ 4.) Vila's complaint asserts four purported causes of action against the IIC: (1) breach of implied contract, (2) unjust enrichment, (3) defamation, and (4) tortious interference with prospective advantage. (Compl. at 1.)

The IIC is an international organization formed by its member nations under the Agreement Establishing the Inter-American Investment Corporation, Nov. 19, 1984 ("IIC Charter"). The purpose of the IIC, as stated in its Charter, is "to promote the economic development of its regional member countries by encouraging the establishment, expansion, and modernization of private enterprises, preferably those that are small and

medium-scale, in such a way as to supplement the activities of the Inter-American Development Bank."  IIC Charter art. I, § 1.  The IIC fulfills this purpose primarily by making loans to private enterprises in its regional borrowing countries.  *Id*. art. I, § 2.

The IIC Charter is a public international law instrument that provides the IIC with broad privileges and immunities, IIC Charter art. VII, §§ 2-9, which are expressly incorporated by statute into the law of the United States.  22 U.S.C. § 283hh.  In addition, the President of the United States has designated the IIC under the International Organizations Immunities Act, 22 U.S.C. §§ 288-288k (2001) ("IOIA"),[1] thereby granting the IIC absolute "immunity from suit and every form of judicial process" as a matter of U.S. statutory law.  *Id*. § 288a(b).  Although the IIC may waive its immunities at its discretion, absent an express waiver by the IIC, its immunities remain absolute.  *Id*. There has been no waiver of immunity in this case, and no such waiver is alleged.

As the IIC is immune to suit absent a waiver of immunity, and because there has been no waiver in this case, the Court lacks subject matter jurisdiction over Vila's complaint.  Accordingly, the complaint must be dismissed.  Fed. R. Civ. P. 12(b)(1).

The IIC's immunity itself is dispositive of this action.  However, Vila lacks a cause of action against the IIC for numerous other reasons as well.  The complaint fails to allege facts that could give rise to IIC liability under any of the four causes of action asserted.  The first cause of action, for breach of implied contract, fails because (1) it does not allege an agreement on all material terms and (2) it is barred by the applicable statute of limitations.  *See infra* Section II(A).  The second cause of action, for unjust

---

[1]    Executive Order No. 12,567, 51 Fed. Reg. 35,495 (Oct. 2, 1986).

enrichment, is also barred by the applicable statute of limitations. *See infra* Section II(B). The third cause of action, for defamation, lacks a legal or factual basis, as the alleged statements upon which it is based were not "defamatory" as a matter of law. *See infra* Section II(C). Likewise, there is no basis for the fourth cause of action, for tortious interference with prospective advantage, both because the alleged interference was by the same nondefamatory statements and because the complaint fails to allege any "prospective advantage" with which the statements allegedly interfered. *See infra* Section II(D). Even if the Court had jurisdiction over Vila's action, therefore, it would be compelled to dismiss the complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6).

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

The complaint alleges that, between January and August 2003, Vila took action "for and on behalf of Defendant," allegedly with authority from senior IIC officers with approval of senior IIC management, in order to assist the IIC in obtaining participants in financing of IIC loans to private enterprises in Latin America and the Caribbean. (Compl. ¶¶ 7-9.) According to the complaint, a number of the ICC's senior officers and senior management "requested, approved and accepted" services from Vila. (Compl. ¶ 11.) However, no specific compensation structure for such services was discussed; rather, at some point between January and August 2003, it was "verbally agreed" between Vila and IIC senior officers to complete "contractual documentation, including compensation, 'later.' " (Compl. ¶ 7.)

Vila contends that, between January and May 2003, he discussed his "compensation expectation" for the services allegedly performed with the IIC's

"Regional Head" and that he "confirmed" his "compensation expectation" in two e-mails

to the "Regional Head" on May 30, 2003 and June 2, 2003.  (Compl. ¶ 13.)  In an e-mail

to Vila sent on August 4, 2003, the "Regional Head" responded by "refus[ing] to

compensate" the alleged work.  (Compl. ¶ 14.)

Vila then allegedly appealed to the IIC's "Deputy General Manager."  (Compl.

¶ 14.)  The "Deputy General Manager," in an e-mail dated August 28, 2003, also "refused

to pay for [Vila's] services."  (Compl. ¶ 15.)  The "Deputy General Manager" noted that

Vila had "a different 'understanding' "of the alleged agreement between Vila and the IIC

and cited "the absence of a written contract" between the parties.  (Compl. ¶ 15.)

Thereafter, on October 9, 2003, Vila allegedly e-mailed to the IIC an $89,909.00

invoice for his services.  (Compl. ¶ 18.)  According to the complaint, "[t]his sum was

consistent with the nature and amount of the Services [he allegedly provided], Plaintiff's

experience, previous compensations paid to Plaintiff by Defendant and Defendant's

Consultant and Appointment Levels."  (Compl. ¶ 18.)  Vila allegedly "had to reiterate

this invoice twice" thereafter, prior to receiving a reply from the IIC on November 4,

2003, in which the IIC again refused to pay, citing, *inter alia*, the "absence of a contract

under 'defined terms and conditions.' "  (Compl. ¶ 19.)  Vila then allegedly reiterated his

claim for compensation in a letter dated December 29, 2003 to the "President" of the IIC

(Compl. ¶ 20) and subsequently reiterated that letter four times thereafter.  (Compl. ¶ 21.)

In response, the IIC General Manager sent Vila two letters reconfirming the IIC's

rejection of Vila's compensation demand.  These letters noted, *inter alia*, that there was

"no contract" between Vila and the IIC, that the IIC disagreed with "the 'meaning of the

contacts that (Plaintiff) had with (Defendant) employees,' " and that Vila's alleged services were therefore of a " 'voluntary and promotional' nature." (Compl. ¶ 21.)

Based on these allegations, the complaint asserts causes of action for breach of implied contract (Count 1) and unjust enrichment (Count 2).

Vila's complaint also advances claims for defamation (Count 3) and tortious interference with prospective advantage (Count 4), based on allegations of one statement made by a "member of Defendant" to "an Executive Director" and one statement made by a member of the IIC's Human Resources Department to an employee of the Inter-American Development Bank ("IDB").[2] (Compl. ¶¶ 24-25, 30-36.)  According to the complaint, the first statement, allegedly made in November 2005, was that Vila had "had 'a similar compensation problem' with the Private Sector Department of the IDB when Plaintiff worked for them as a consultant in 2000." (Compl. ¶ 24.)  The second statement, allegedly made "sometime in 2004," was that Vila "had used his 'influence and contacts' as a former IDB officer to obtain confidential information and documentation about the Projects" he allegedly worked on for the IIC. (Compl. ¶ 25.)

As redress for Defendant's alleged wrongful actions, Vila seeks nearly $1 million in compensatory and punitive damages, as well as attorney fees and costs.

---

[2]    Together with the Multilateral Investment Fund, the IIC and IDB make up the Inter-American Development Bank Group.  *See* http://www.iadb.org/exr/basicfacts/index.cfm?language=english.

**ARGUMENT**

**I.     The IIC Is Immune from Vila's Claims.**

Even if Vila's complaint stated facts sufficient to present a claim against the IIC -- which, as discussed in Section II below, it does not -- this Court would not have jurisdiction to adjudicate such claim, as the IIC is absolutely immune from suit by Vila.

As noted, the IIC is an international organization created in 1984 by treaty (the IIC Charter) among its original members, including the United States.[3]  The purpose of the IIC, as set forth in its Charter, is "to promote the economic development of its regional developing member countries by encouraging the establishment, expansion, and modernization of private enterprises, preferably those that are small and medium-scale, in such a way as to supplement the activities of the Inter-American Development Bank." IIC Charter art. I, § 1.  The IDB is also an international organization,[4] and the two organizations, together with the Multilateral Investment Fund, work to fulfill their shared objectives in development of their regional member countries by lending in the region.[5] In the case of the IIC, such lending is specifically directed to private enterprises in the IIC member countries.  IIC Charter art. I, § 2.  In particular, as agreed by its member nations, the IIC has the responsibility to "[a]ssist, alone or in association with other lenders or investors, in the financing of the establishment, expansion and modernization of enterprises."  *Id*. art. I, § 2(a).

---

[3]     The IIC Charter is available at http://www.iic.int/images/charterenglish.pdf.  Currently, forty-three countries are members of the IIC.  *See* http://www.iic.int/membercountries/.  The United States accepted membership in the IIC pursuant to statutory authorization in 1984.  22 U.S.C. § 283aa.

[4]     The IDB Charter is available at http://www.iadb.org/leg/Documents/Pdf/Convenio-Eng.Pdf.

[5]     *See* http://www.iadb.org/exr/basicfacts/index.cfm?language=english.

"To enable the Corporation to fulfill its purpose and the functions with which it is entrusted," the IIC's member nations granted to the IIC broad privileges and immunities, including immunity from judicial process. *Id*. art. VII, § 1. These privileges and immunities allow the IIC to carry out its functions in the various nations in which it operates, free of the distraction of local suits and proceedings not central to its purpose.[6] The IIC's immunities, like those of similar international organizations, also protect it from potentially conflicting judgments under the different laws of its various member nations, which would "undermine the ability of the organization to function effectively." *Broadbent v. Org. of Am. States*, 628 F.2d 27, 34-35 (D.C. Cir. 1980).[7]

Under the IIC Charter, each IIC member country is obligated to "take such action as is necessary to make effective in its own territories the [immunities] principles set forth in [the Charter]." IIC Charter art. VII, § 10. The United States has fulfilled that obligation by, *inter alia*, incorporating the IIC's immunities into a framework established under U.S. statutory law. 22 U.S.C. § 283hh.

Under this framework, the President of the United States has designated the IIC as an international organization entitled to immunities and privileges under the IOIA,

---

[6] Such immunities also extend to any IIC officials or employees and, thus, apply to any IIC employees referred to in Vila's complaint. *See* IIC Charter art. VII, § 8(a) ("All Governors, Executive Directors, Alternates, officers, and employees of the Corporation" shall be immune "from legal process with respect to acts performed by them in their official capacity, except when the Corporation waives this immunity."); 22 U.S.C. § 288d(b) (2001) ("officers and employees of [international] organizations shall be immune from suit and legal process relating to acts performed by them in their official capacity and falling within their functions as . . . officers, or employees except insofar as such immunity may be waived by the . . . organization concerned").

[7] The IIC Charter also provides for immunity from prejudgment attachment. IIC Charter art. VII, § 3(b) ("Property and assets of the Corporation shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Corporation.").

22 U.S.C. §§ 288-288k,[8] which was enacted in 1945 to facilitate the exercise within the United States of the functions of international organizations such as the United Nations, World Bank, IDB, IIC, and others.  The IOIA authorizes the President to designate international organizations as entitled to the privileges and immunities provided by the statute as a matter of domestic law, thereby reinforcing the immunities that such designated international organizations enjoy under international law (including their respective charters).  *Id*. § 288.  Pursuant to its designation under the IOIA, the IIC enjoys absolute "immunity from suit and every form of judicial process."  *Id*. § 288a(b).[9]  As the statute expressly states:

> International organizations, their property and their assets, wherever located, and by whomsoever held, shall enjoy the same immunity from suit and every form of judicial process as is enjoyed by foreign governments, except to the extent that such organizations may expressly waive their immunity for the purpose of any proceedings or by the terms of any contract.

*Id*. § 288a(b).

Under this provision, as recognized by the courts, the immunities of the IDB and the other international organizations under the IOIA are absolute,[10] subject to limitation by two sources only:  (1) *express* waiver by the organization itself or (2) Executive action

---

[8]    Executive Order No. 12,567, 51 Fed. Reg. 35,495 (Oct. 2, 1986).

[9]    The immunities of international organizations frequently are supplemented by agreements with individual member states, and by the domestic laws of member states, and are well established under customary international law.  *See* Restatement (Third) of the Foreign Relations Law of the United States ("Restatement") § 467 cmt. a (1987).

[10]    The immunities of the IIC and other international organizations designated under the IOIA are not restricted in the same manner as are the immunities of foreign sovereigns under the later-enacted Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602-1611.  *Atkinson v. Inter-Am. Dev. Bank*, 156 F.3d 1335, 1341-42 (D.C. Cir. 1998).

by the President of the United States.[11]  *See Mendaro v. World Bank*, 717 F.2d 610, 613

(D.C. Cir. 1983).  The President has the power to restrict an international organization's

IOIA immunity if, for example, he were to determine that the organization had abused its

privileges in the United States.  22 U.S.C. § 288 ("The President shall be authorized . . .

by appropriate Executive order to withhold or withdraw from [an international

organization] . . . any of the privileges, exemptions, and immunities" granted.).

However, the President has never restricted the immunities of the IIC.  Thus, absent an

express waiver of immunity by the IIC itself, the IIC is absolutely immune from suit.  *See

Mendaro*, 717 F.2d at 613-14.

        Notably, in prior cases brought against other international organizations, the

courts have found that certain language in the organizations' charters may be read as

providing an express waiver to suit where "an insistence on immunity would actually

prevent or hinder the organization from conducting its activities."  *Id*. at 617.

Specifically, the courts have interpreted language that commonly appears in the charters

of the World Bank (the International Bank for Reconstruction and Development)[12] and of

the IDB[13] as providing an express waiver of immunity in cases in which the organization

"would have to subject itself to suit in order to achieve its chartered objectives."

*Mendaro*, 717 F.2d at 615; *see also Dujardin v. Int'l Bank for Reconstr. & Dev.*,

---

[11]    *See* 22 U.S.C. § 288.

[12]    Articles of Agreement of the International Bank for Reconstruction and Development,
Dec. 27, 1945.  60 Stat. 1440; T.I.A.S. No. 1502; 3 Bevans 1390; 2 U.N.T.S. 134.

[13]    IDB Charter, *supra*, art. XI, § 3.

9 F. App'x 19, 20 (D.C. Cir. 2001) (same). The same substantive language exists in

Article VII of the IIC Charter, which states, in pertinent part, that:

> Actions may be brought against the Corporation only in a
> court of competent jurisdiction in the territories of a
> member country in which the Corporation has an office,
> has appointed an agent for the purpose of accepting service
> or notice of process, or has issued or guaranteed
> securities.[14]

As interpreted by the courts, this language may be read as an express waiver to

suit, but only in very limited circumstances consistent with the intentions of the

Corporation's member nations as they pertain to the Corporation and its mission.

> Since the purpose of the immunities accorded international
> organizations is to enable the organizations to fulfill their
> functions, applying the same rationale in reverse, it is likely
> that most organizations would be unwilling to relinquish
> their immunity without receiving a corresponding benefit
> which would further the organization's goals.

*Mendaro*, 717 F.2d at 617. Thus, in interpreting Article VII of the IIC Charter, "the

[Corporation's] immunity should be construed as *not waived* unless the particular type of

suit would *further* the [Corporation's] objectives." *Atkinson v. Inter-Am. Dev. Bank,* 156

F.3d 1335, 1338 (D.C. Cir. 1998). As the Court of Appeals for the D.C. Circuit found in

*Mendaro*, the pertinent charter language can be read as an express waiver of immunity

only to suits brought by the organization's "debtors, creditors, bondholders, and those

other potential plaintiffs to whom the [organization] would *have to subject itself to suit in*

---

[14]    IIC Charter art. VII, § 3(a). This provision is incorporated into U.S. statutory law providing, *inter alia*, that the district courts of the United States shall have original jurisdiction for purposes of any civil action which may be brought within the United States "by or against the Corporation in accordance with the [IIC Charter]." 22 U.S.C. § 283gg. Removal of this action from D.C. Superior Court to this Court was effected under this statutory section. *See* IIC Notice of Removal (filed Dec. 15, 2006).

*order to achieve its chartered objectives.*"  *Mendaro*, 717 F.2d at 615 (emphasis added).

*See also Atl. Tele-Network Inc. v. IDB*, 251 F. Supp. 2d 126, 132 (D.D.C. 2003);

*Aguado v. IDB*, 85 F. App'x 776, 777 (D.C. Cir. 2004); *Fazzari v. IDB*, 254 F.3d 315

(Table), 2000 WL 1838237, at *1 (D.C. Cir. Nov. 16, 2000); *cf Weinstock v. Asian Dev.*

*Bank*, No. Civ.A 105CV00174RMC, 2005 WL 1902858 (D.D.C. July 13, 2005).

This is not an action to which the IIC would "*have* to subject itself to suit in order

to achieve its chartered objectives."  *Mendaro*, 717 F.2d at 615 (emphasis added).

Allowing Vila's suit to proceed "is not *necessary* for the [IIC] to perform its functions."

*Id*.  Indeed, quite to the contrary:  permitting Vila to bring his claims here would

constitute a "disruptive interference" with the IIC's functions.  *Id*. at 618.  If Vila were

allowed to proceed here, presumably any other person or entity who has had some

dealings with the IIC also could invoke domestic law (whether federal, state, or local) as

a basis for judicial proceedings against the IIC.  This would open the door to a plethora of

actions that could entail protracted litigation involving the local law of a member nation

"without any 'corresponding benefit' accruing thereby to the [IIC] whatsoever."  *Atl.*

*Tele-Network*, 251 F. Supp. 2d at 132 (citing *Atkinson*, 156 F.3d at 1338).  This is

precisely what the immunities of international organizations were establish to preclude.

Embroiling the IIC in litigation such as this case could significantly impede the IIC from

fulfilling its mission and the dictates of the IIC Charter.

Clearly the IIC has authority to waive its immunities at its discretion.  IIC Charter

art. VII, § 11.  The IIC can and may execute such a waiver in a variety of circumstances

for various reasons.  However, as explicitly provided in the IOIA, such waivers must be

*express* to be effective. 22 U.S.C. § 288a(b). In this case, Vila does not -- and could not -- allege that the IIC has granted an express waiver to his claims.

Because there has been no express waiver of the IIC's immunity from this suit, Vila is barred from pursuing his complaint against the IIC. Accordingly, the Court lacks subject-matter jurisdiction in this case. *See, e.g.*, *Chiriboga v. Int'l Bank for Reconstr. & Dev.*, 616 F. Supp. 963, 966 (D.D.C. 1985) (holding that a court has jurisdiction over the World Bank only if the "suit against the Bank is proper under the Articles of Agreement") (applying 22 U.S.C. § 286g, the World Bank jurisdictional provision that is substantively identical to the IIC's jurisdictional provision, 22 U.S.C. § 283gg).

## II.    Even Absent the IIC's Immunities, Vila Could Not Pursue This Action.

The IIC's immunity to this suit is dispositive of this action in itself. However, even if there were no such immunity, Vila's complaint should be dismissed because, with respect to each of its four Counts, it fails to state any cognizable claim upon which relief may be granted.

### A.    There Are No Grounds for a Breach of Implied Contract Claim.

#### 1.    Vila Concedes There Was No Agreement on Compensation, a Material Contractual Term.

Vila's complaint purports to assert a cause of action for breach of implied contract. "To establish the existence of a contract implied-in-fact in the District of Columbia, a party must initially demonstrate, (1) that valuable services were rendered, (2) to the person from whom recovery is sought, (3) which services were accepted by that person, and (4) under such circumstances as reasonably notified the person that the plaintiff expected to be paid by that person." *Perles v. Kagy*, 362 F. Supp. 2d 195, 198

(D.D.C. 2005).  Assuming the foregoing four elements can be established, the plaintiff must then prove that there was an implied agreement on all material terms of the alleged contract.  "Agreement as to all material terms is a prerequisite to finding an implied-in-fact contract between the parties."  *Id*. at 199; *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 102 (D.D.C. 2004) (Walton, J.) ("For an enforceable contract to exist, there must be . . . agreement as to *all* material terms. . . .").  Compensation is a material term of a contract for services; thus, there can be no implied contract absent an agreement on compensation. *See Malone v. Saxony Coop. Apartments, Inc.*, 763 A.2d 725, 729-30 (D.C. 2000); *Perles*, 362 F. Supp. 2d at 200; *Calvetti*, 346 F. Supp. 2d at 102.

In this case, Vila explicitly concedes that the terms of his compensation for the services he claims to have provided were *not* agreed to.  The complaint alleges that Vila and IIC senior officers "verbally agreed to complete contractual documentation, including compensation, 'later,' " but never followed through on that alleged agreement. (Compl. ¶ 7.)  To the extent that Vila and the IIC allegedly discussed a contract for his services, "no *specific* compensation structure was discussed."  (Compl. ¶ 7.)  In fact, Vila only asserts that Defendant's officers *acknowledge*d his expectation of compensation, not that they *agreed* to compensate him.  (Compl. ¶¶ 7, 13.)  The parties had not established a specific compensation structure through previous experience.  (Compl. ¶ 6 ("On several occasions from early 2001 to December 2002, Defendant requested Plaintiff's consulting services . . . .  Plaintiff's compensation *varied* from a monthly retainer plus a success fee (a percentage of the nominal amount in participations obtained) to a success fee only.") (emphasis added).)  Thus, they could not have agreed to the terms of compensation for

- 13 -

the services allegedly provided in 2003, since no such terms were discussed.  (Compl. ¶ 7.)

This Court has previously determined that claims of implied breach of contract cannot be sustained when there is no agreement on specific compensation.  In *Perles v. Kagy*, the defendant made a counterclaim for breach of contract stemming from legal work she provided for the plaintiff.  362 F. Supp. 2d at 197.  Although the parties had entered into a contract for previous work, there was no express contract for the services in dispute, and thus the question before the Court was whether an implied-in-fact contract existed with respect to the defendant's obligation to pay for those services.  *Id*. at 198.  In examining that question, the Court noted that the defendant had "initiated discussions with [the plaintiff] regarding her expectation of payment for her services and her desire to formalize a fee arrangement," which, the Court found, made clear that the defendant "was aware of the [the plaintiff's] expectation of payment for her work."  *Id*. at 199.  However, that did not mean there was "an agreement between the parties as to the material term of compensation for the work that [the plaintiff] did for [the defendant]."  *Id*.  As there was no evidence of agreement on that material contractual term, there could be no implied-in-fact contract:  "Under well settled contract law, the lack of precision as to material terms such as remuneration are fatal to the existence of an enforceable contract."  *Id*. at 200.

*Perles* firmly establishes that a court "must find that there was an agreement between the parties as to the *amount* of remuneration to be received" in order to conclude -- assuming all other contractual elements are evident -- that an implied-in-fact contract exists.  *Id*. at 199 (emphasis added).  Thus, even where both parties expect that there will be remuneration for services provided, unless there is a precise agreement

between the parties as to the *amount* that will be paid, there is no enforceable contract. *Id*. at 200 ("An agreement to provide [services] without a clear expression as to the amount of payment in consideration of these services is too indefinite to allow for 'contractual' recovery."). *See also Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990) ("Reasonable definiteness in the essential terms of a purported contract must, however, be a precondition for its enforceability, for otherwise the court has no adequate means of identifying the obligations which it should enforce."); *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1493 (D.C. Cir. 1984) (stating that no implied-in-fact contract could be found where the parties failed to supply an essential term (the duration of the project)).

Vila alleges that the invoice he submitted to the IIC for his alleged services was created using "terms *similar* to those the parties had *previously* agreed to and operated under." (Compl. ¶ 5 (emphasis added).)  Yet as noted above, the complaint states that Vila's compensation for work for the IIC prior to 2003 (*i.e.*, before the period at issue here) "*varied* from a monthly retainer plus a success fee (a percentage of the nominal amount in participations obtained) to a success fee only." (Compl. ¶ 6) (emphasis added).)  The invoice Vila allegedly submitted, therefore, as well as his claim for damages, could not be based upon a specific compensation structure agreed to by the parties.  As Vila's complaint concedes there was a "lack of an agreement as to a material term in the relationship," *Perles*, 362 F. Supp. at 200, his breach of implied contract claim must be dismissed.

### 2. Vila's Breach of Contract Claim Is Barred by the Statute of Limitations.

Even if Vila had stated a cognizable claim for breach of implied contract, the claim would be barred by the statute of limitations. The statute of limitations for a breach of implied contract claim in the District of Columbia is three years. *Allison v. Howard Univ.*, 209 F. Supp. 2d 55, 60 (D.D.C. 2002); D.C. Code § 12-301 (2001). The limitations period begins to run upon the breach. *Gandal v. Telemundo Group, Inc.*, 23 F.3d 539, 542 (D.C. Cir. 1994). A breach of contract is " 'an unjustified failure to perform all or any part of what is promised in a contract.' " *Bembery v. District of Columbia*, 758 A.2d 518, 520 (D.C. 2000) (quoting *Fowler v. A&A Co.*, 262 A.2d 344, 347 (D.C. 1970)).

Vila claims that the IIC breached an implied contract by failing to remit payment for work he allegedly performed from January to August 2003. (Compl. ¶ 4.) According to the complaint, Vila "confirmed" his expectation of compensation for this work in two e-mails sent to Victor Moscoso, IIC "Regional Head," on May 30, 2003 and June 2, 2003, respectively. (Compl. ¶ 13.) Mr. Moscoso allegedly "acknowledg[ed]" Vila's compensation expectation, (Compl. ¶ 13), but he did not agree to it: in an e-mail sent to Vila on August 4, 2003, Mr. Moscoso "refused to compensate" Vila for his alleged work. (Compl. ¶ 14.) Then, after Vila allegedly "appealed" to IIC "Deputy General Manager" Steven Reed, he was again informed, in an e-mail from Mr. Reed sent on August 28, 2003, that the IIC "refused to pay for [Vila's] Services." (Compl. ¶ 15.) Mr. Reed noted the absence of a written contract and said that the IIC had a "different 'understanding.' " (Compl. ¶ 15.)

Plainly, Vila knew, or should have known, upon being twice informed that the IIC "refused to compensate" him, that there was a dispute between him and the IIC regarding the IIC's alleged obligation to compensate him. The complaint states that IIC "Deputy General Manager" Reed expressly told Vila that the IIC did " 'not have a contract' " with him. (Compl. ¶ 16.) Vila bases his breach-of-contract claim on the IIC's refusal to pay for his alleged services, (Compl. ¶ 27(viii)), which refusal, by his own admission, occurred in August of 2003. (Compl. ¶¶ 14-16.) Under the statute of limitations, therefore, Vila had until the end of August 2006 to file his claim. *See Cunningham & Assocs. v. Dugan*, 909 A.2d 1001, 1002 (D.C. 1996) ("It is a long-established principle of law that fees for services rendered, in the absence of an agreement to the contrary, are due and payable at the time performance is completed or of breach by one of the parties."); *Toomey v. Cammack*, 345 A.2d 453, 455 (D.C. 1975) ("As a general rule, an actionable claim accrues, and the statute of limitations begins to run, when a suit thereon could first be maintained to a successful conclusion."). But Vila did not file his complaint until October 26, 2006. Therefore, Vila's claim for breach of implied contract is barred.

The IIC's refusal to compensate Vila, as alleged in the complaint, was considerably more definitive than other defendants' actions in prior cases that the courts have found sufficient to trigger commencement of the statute-of-limitations period. For example, in *Bembery*, the plaintiff sued the District of Columbia under the theory of breach of contract for allegedly failing to pay overtime rental charges associated with the District's use of her real estate properties. 758 A.2d at 520. Pursuant to a written contract, the District had agreed to pay rent plus an hourly overtime fee for use of the

property after normal business hours, due monthly.  *Id.* at 519.  The plaintiff sent bills to collect overtime use fees on December 1992, April 1993, and monthly thereafter until end of 1994.  The District did not respond to these requests until March 30, 1994, when it sent plaintiff a letter denying the payment for the charges.  *Id*.  Plaintiff filed suit on November 15, 1996.  Ruling on the District's motion for summary judgment on statute-of-limitations grounds, the trial court dismissed plaintiff's breach of contract claims for any charges submitted more than three years before November 1996, finding that the cause of action for breach of contract "began to run on the date the District received the successive bills for overtime usage," even though the plaintiff received no response from the District until March 30, 1994.  *Id*.  The Court of Appeals affirmed the lower court's decision, finding that "[n]o statute or provision of the lease prevented [the plaintiff and her company] from pursuing their right to sue once they had made the successive demands and received no payment from the District."  *Id*. at 520.

Similar circumstances led to dismissal on statute-of-limitations grounds of a breach of contract claim in *Pardue v. Center City Consortium Schools of the Archdiocese of Washington, Inc*, 875 A.2d 669 (D.C. 2005).  In that case, the plaintiff sued her employers for, *inter alia*, allegedly breaching their contract with her by failing fully to pay her salary for July 1998.  The plaintiff asserted that, due to overlapping contracts, the defendants agreed to pay her twice for the month of July.  *Id.* at 679.  She did not file her complaint until July 3, 2002.  She argued that because the defendants continued to pay her until January 2002, the breach that triggered the start of the statute-of-limitations period was not final until she was terminated in that month; *i.e*., the defendant was in continual breach because it was " 'always behind one [month's] payment.' "  *Id*.  The

court rejected her argument, holding that the failure to pay her double in July 1998

marked the accrual of her cause of action.  "Appellant does not contend that she could not

reasonably have discovered the claim at that time; rather she knew, or reasonably should

have known, when she received her paycheck for that month that it did not reflect a

double payment."  *Id*.  Determining that plaintiff's claim had expired in July 2001, the

court affirmed the lower court's decision dismissing the claim.[15]

Vila had at least as much notice as the plaintiffs in *Bembery* and *Pardue*, well

before October 26, 2003, that the IIC refused to compensate him for the services he

alleges to have provided between January and August of that year.  His claim for breach

of contract is therefore barred by the statute of limitations.

**B.    Vila's Unjust Enrichment Claim Is Barred by the Statute of Limitations.**

Vila's unjust enrichment claim is similarly barred by the statute of limitations.

The three-year statute of limitations period for breach of contract claims "would also

apply to any equitable claims, such as *unjust enrichment*, arising from the same conduct."

*Constr. Interior Sys., Inc. v. Donohoe Cos.*, 813 F. Supp. 29, 33 n.4 (D.D.C. 1992)

(emphasis added).

The District of Columbia Court of Appeals first addressed the issue of when the

limitations period begins to run in unjust enrichment claims in *News World*

*Communications, Inc. v. Thompsen*, 878 A.2d 1218 (D.C. 2005).  The facts of that case

merit some detailed discussion here, as they are not dissimilar to those alleged by Vila.

---

[15]    *See also News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218 (D.C. 2005), discussed in Section II.B, *infra*.

In *Thompsen*, the plaintiff sued for, *inter alia*, breach of contract, breach of implied contract, and breach of quasi-contract (or unjust enrichment), alleging that the defendant newspaper company based its weekly newspaper supplement, the "Family Times," on her ideas and work without compensating her. More specifically, the plaintiff alleged that, at the request of the defendant's advertising director, she faxed him a proposal for launching "Family Times," on November 17, 1994, and that the two met along with other representatives of the defendant to discuss her ideas, on November 29, 1994. *Id*. at 1220. According to the complaint, monetary remuneration was discussed but not finalized at this meeting. *Id.* (it was stated at the meeting that "the amount of the remuneration would be discussed later"). During the next several months, the plaintiff submitted ideas for "Family Times," including marketing strategies and commercial plans. *Id*. According to the complaint, on three occasions from December 2004 to early February 1995, the defendant's advertising director confirmed that that the defendant wanted to go forward with the plaintiff's proposed plans. *Id*.

Approximately two months later, however, on April 4, 1995, the defendant's advertising director informed the plaintiff over the telephone that the defendant would not pay her for the work that she had done as "her ideas had not been novel." *Id*. In June 1997, the defendant published the first edition of the "Family Times." *Id.*

On July 28, 1998, the plaintiff filed suit. The defendant filed a motion to dismiss, claiming the plaintiffs' claims were time-barred. Its motion was granted as to the express and implied contract claims, but denied on the claim for unjust enrichment on the ground that a cause of action for unjust enrichment cannot accrue until the alleged enrichment

has occurred, which, the trial court found, could not have been before June 1997, when the first edition of "Family Times" was published.  *Id.* at 1221.

The Court of Appeals reversed, stating:

> We conclude that the statute of limitations began to run no later than April 4, 1995, when according to [plaintiff], the [defendant], having encouraged [plaintiff's] efforts, having received the benefit of her work and ideas, having expressed the intention to use her work product, and having already begun to utilize it, *nevertheless informed her that she would not be compensated*.

*Id*. at 1222 (emphasis added).  The Court reasoned that, by the time the plaintiff submitted all her work to the defendant and had been informed by the defendant that no compensation was forthcoming, her claim was ripe because the defendant had received services in a manner that was unjust (*i.e.*, without paying for the services it had solicited).  *Id*. at 1225.  Because the defendant's representation that the plaintiff "would not be compensated for her efforts, when the newspaper had the benefit of her ideas and proposals," qualified as an unjust act, the plaintiff's unjust enrichment claim filed more than three years thereafter was time-barred.  *Id*.

In this case, Vila alleges that the IIC, after having received and "accepted" the benefit of his services over a period of seven months -- from January to August 2003 -- told him in express communications in August 2003 that it "refused" to compensate him. (Compl. ¶¶ 14-15.)  Like the plaintiff in *Thompsen*, Vila had a claim for unjust enrichment as soon as that refusal occurred.  At that point, Vila's unjust enrichment claim could "be maintained to a successful conclusion," because he had provided the alleged services, thereby enriching the IIC, and he knew that compensation had -- in his mind unjustly -- been refused.  *Toomey v. Cammack*, 345 A.2d at 455.  Because Vila did not

sue until more than three years later, his claim for unjust enrichment is barred by the statute of limitations.

### C.    Vila Has Failed To State a Claim for Defamation.

Vila's third purported cause of action is for defamation.  (Compl. ¶¶ 30-33.)  To establish a claim for defamation, a plaintiff must show: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter or law irrespective of special harm or that its publication caused the plaintiff special harm."  *Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. 2001).

A motion to dismiss a claim of defamation should be granted unless the statement is "reasonably capable of defamatory meaning."  *Jankovic v. Int'l Crisis Group*, 429 F. Supp. 2d 165, 174 (D.C. 2006) (Walton, J.).  "Whether a statement is capable of defamatory meaning is a question of law for the court to determine."  *Kreuzer v. George Washington Univ.*, 896 A.2d 238, 248 (D.C. 2006) (internal quotation marks and citations omitted).  As the courts have found, to be defamatory, a statement "must be more than unpleasant or offensive; the language must make the plaintiffs appear 'odious, infamous, or ridiculous.' "  *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984) (quoting *Johnson v. Johnson Publ'g Co.*, 271 A.2d 696, 697 (D.C. 1970)); *see also Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (noting that "not every uncomplimentary publication is libelous").

Vila's defamation claim is based solely upon the following alleged statements: (1) that Vila experienced "'a similar compensation problem'" when he performed consulting work for the IDB and (2) that he "used his 'influence and contacts' as a former IDB officer to obtain confidential information and documentation about the Projects." (Compl. ¶¶ 24, 25.) These statements, while clearly critical, do not portray Vila as "odious, infamous, or ridiculous." They might raise doubts about Vila, but they do not condemn him or ridicule him. *See Guilford Transp. Indus.*, 760 A.2d at 594 (holding that statement that a person is a Republican was not defamatory despite possibly arousing adverse feelings against him).

Even if the alleged statements could be construed as defamatory, they are nonetheless not actionable, because they are subject to the qualified "common interest privilege." To come within the protection of this privilege, "the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest." *Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990)). "Th[is] privilege is an important one, because '[i]f [its] protection were not given, true information that should be given or received would not be communicated because of fear of the persons capable of giving it that they would be held liable in an action of defamation if their statements were untrue.' " *Millstein v. Henske*, 722 A.2d 850, 856 (D.C. 1999) (quoting Restatement (Second) of Torts, Ch. 25, Topic 3, Tit. A Scope Note (1977)).

An illustrative and pertinent case in which the common interest privilege precluded claims of defamation is *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843,

847 (D.C. Cir. 2006). In *Mastro*, the plaintiff filed suit against his former employer

("Pepco") and two supervisors for (*inter alia*) defamation, alleging that, while working

for Pepco, he became involved in a dispute with one of the people he supervised about

whether that employee had provided him with accurate information when requesting

leave. Due to conflicting statements, Pepco conducted an internal investigation and

ultimately concluded that the plaintiff had engaged in dishonest behavior. *Id*. at 848-49.

The defendants documented the issues surrounding the investigation and their ultimate

findings in a memorandum, which they allegedly shared with Pepco's management and

employee relations department, as well as with the District of Columbia Department of

Employment. *Id*. at 849. The court determined that the defendants' publication of the

termination memoranda was protected by the "common interest privilege" because the

recipient "individuals and entities possess a legitimate interest in knowing about the

nature and outcome of personnel actions at Pepco, and, therefore, their receipt of the

memoranda falls within the purview of the common interest privilege." *Id*. at 858.

The statements that Vila claims were defamatory allegedly were made by two IIC

employees, in one case to an "Executive Director" (apparently of the IIC or IDB) and in

the other case to a former IDB manager. (Compl. ¶¶ 24, 25, 31.) Vila also alleges, on

information and belief, that these statements were published to "other members of the

Defendant's Board of Directors and staff." (Compl. ¶ 32.) As explained above in

Section I, the IIC, together with the Multilateral Investment Fund, works with the IDB to

fulfill their shared objectives in development of their regional member countries by

lending in the region. The Executive Directors and managers of the IDB would certainly

share with the IIC a legitimate interest in knowing whether Vila was improperly

obtaining confidential information through his "influence and contacts" as a former IDB officer.  (Compl. ¶ 25.)  The Executive Directors and managers of the IDB also would share a common interest in knowing whether Vila, having performed consulting services for both entities, had had "similar compensation problem[s]" in the past.  (Compl. ¶ 24.)[16] Accordingly, even if the statements Vila calls "defamatory" could be construed as such, they would be justified under the common interest privilege.  Vila's defamation claim must therefore be dismissed for failure to state a claim upon which relief may be granted.

   **D.     Vila Has Failed To State a Claim for Tortious Interference with Prospective Advantage.**

   Vila's final purported cause of action, for tortious interference with prospective advantage, is intertwined with his defamation claim.  Vila asserts that the two statements that he alleges were defamatory "damaged Plaintiff's professional and personal reputation and standing in the community."  (Compl. ¶ 36.)  However, as discussed above, these statements cannot support a claim for defamation.  *See supra* Section II(C).  Accordingly, the same statements cannot be the basis of a cognizable claim for tortious interference with prospective advantage.  *See Jankovic*, 429 F. Supp. 2d at 179 (stating that because plaintiffs' claim for tortious interference was "rooted in the same alleged defamatory conduct, [it] must [be] dismissed for the reasons their defamation claims cannot be maintained").

   Even if, arguendo, the statements Vila claims were defamatory could be construed as such, his tortious interference claim still would have no merit.  "To prevail on a claim

---

16     The common interest privilege applies to statements made concerning independent contractors.  *See Graham v. James*, 144 F.3d 229 (2d Cir. 1998); *Danawala v. Houston Lighting & Power Co.*,14 F.3d 251, 254-55 (5th Cir. 1993).

for tortious interference with prospective economic advantage, a plaintiff must show: (1)

the existence of an established business relationship or expectancy, (2) knowledge of the

relationship or expectancy on the part of the interferor, (3) intentional interference

inducing or causing a breach or termination of the relationship or expectancy, and (4)

resultant damage." *Bannum, Inc. v. Citizens for a Safe Ward Five*, *Inc*., 383 F. Supp. 2d

32, 45 (D.D.C. 2005).

Vila has failed adequately to allege any of these necessary elements of a tortious

interference claim. First, he has not identified any specific business relationships or

expectancies with which the allegedly defamatory statements interfered (and thus has not

alleged knowledge of any such specific relationship or expectancy by the IIC). "To

survive a motion to dismiss for intentional interference with prospective economic

advantage 'a plaintiff must allege business expectancies, not grounded in present

contractual relationships, but which are commercially reasonable to expect.' "

*Sheppard v. Dickstein, Shapiro, Morin & Ochinsky*, 59 F. Supp. 2d 27, 34 (D.D.C. 1999)

(quoting *Democratic State Comm. of D.C. v. Bebchick*, 706 A.2d 569, 572 (D.C. 1998)).

*See also McManus v. MCI Commc'ns Corp.*, 748 A.2d 949, 957 (D.C. 2000) ("This court

never has held that an employee can maintain a suit for interference with prospective

advantage where her expectancy was based on an at-will relationship, and we do not do

so now."). This failure alone is a sufficient basis for dismissing Vila's tortious

interference claim. *See Ali v. Medstar Health*, No. Civ. A. 99CA1753, 2003 WL

22005014, at *9 (D.C. Super. Ct. Aug. 15, 2003) ("Plaintiff's failure to sufficiently

identify the relevant business expectancy is a failure to satisfy the first two elements of

the claims."); *Winder v. Erste*, No. 03-2623, 2005 WL 736639, at *14 (D.D.C. Mar. 31,

2005) (dismissing claim where plaintiff "failed to allege any facts whatsoever indicating that he had a valid expectation that he would receive the job"); *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003) ("Failure to allege any specific, existing economic interest is fatal to the claim."); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F. Supp. 2d 385, 391 (E.D. Va. 2002) ("Because plaintiffs do not identify the specific business relationships with which defendant has interfered, plaintiffs' tortious interference claim fails.").

Second, Vila has failed to allege any facts that could possibly support a finding of *intentional* interference on the part of the IIC with respect to the purpose of the allegedly defamatory statements. "[A] general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability." *Bannum, Inc.*, 383 F. Supp. 2d at 45 (internal citations omitted). Activity will not be deemed tortious interference with business relations unless it was accomplished by "wrongful or improper means, such as fraud, [violence, or civil suits.]" *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 56 (D.D.C. 2001) (quoting *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 239 (D.D.C. 1996)). Vila vaguely alleges that "employees of the Defendant . . . made statements to third parties . . . intending to cause injure [sic] to Plaintiff's professional and personal reputation as understood by the third parties." (Compl. ¶ 35.) He nowhere claims that the IIC, by virtue of these two alleged statements made by two different IIC employees to two separate IIC/IDB officials *a year apart*, had a concerted intent to interfere with business relationships that the IIC knew Vila had. "Plaintiff cannot establish liability without a 'strong showing of intent' to disrupt ongoing business

relationships." *Bannum*, 383 F. Supp. 2d at 45. Vila has failed to allege any other wrongful activity by the IIC that would support his claim.

Since Vila has failed to allege virtually every element of this cause of action, it must be dismissed for failure to state a claim.

**III.    Vila's Claims Should Be Dismissed with Prejudice.**

The IIC is immune from Vila's suit, and the Court therefore lacks subject-matter jurisdiction in this case. Moreover, Vila has failed to state claims that could possibly support any of his purported causes of action against the IIC. The pervasive infirmities of Vila's claims discussed above are not linguistic pleading problems that could possibly be cured through an amended complaint. Accordingly, any attempt to amend the complaint would be futile. Plaintiff's claims should therefore be dismissed with prejudice. *See Zhu v. United States*, No. Civ. A. 04-1216(RMC), 2006 WL 13240, at *2 (D.D.C. Jan. 3, 2006) ("Because the United States has not waived its sovereign immunity . . . [Plaintiff]'s Motion for Reconsideration will be denied and her Motion to File a Second Amended Complaint will similarly be denied, as it would be a futile gesture."); *Crist v. Republic of Turkey*, 995 F. Supp. 5, 8-11 (D.D.C. 1998) (noting that amendment to plaintiffs' complaint would be futile where court did not have subject matter jurisdiction over the Republic of Turkey due to immunity under Foreign Sovereign Immunities Act); *Rothenberg v. Ralph D. Kaiser Co. (In re Rothenberg)*, 173 B.R. 4, 12 (Bankr. D.D.C. 1994) ("[Plaintiff's] claim for abuse of process is barred by the statute of limitations. Accordingly, the court finds it futile to allow [Plaintiff] to amend her complaint."); *Taho v. Red Top Cab Co.*, 203 F.3d 53 (Table), 2000 WL 60250, at *1 (Jan. 4, 2000) (noting that claim was barred by the statute of limitations and that district court did not

abuse its discretion in failing to grant leave to amend the complaint because amendment would have been futile); *Mount v. Baron*, 154 F. Supp. 2d 3, 8 (D.D.C. 2001) (denying plaintiffs' motions to amend as futile in suit for legal malpractice because plaintiffs failed to allege any facts showing a necessary element, proximate cause).

### CONCLUSION

For all the foregoing reasons, the complaint should be dismissed without leave to amend.

Respectfully Submitted,

*Of Counsel:*

Sarah Fandell
Rafael Díaz Loyola
Inter-American Investment Corporation
1300 New York Ave., N.W.
Washington, D.C.  20577
(202) 623-3947

January 26, 2007

/Nancy L. Perkins
Nancy L. Perkins (D.C. Bar No. 421574)
Jennifer Risen (D.C. Bar No. 486559)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
(202) 942-5000

*Counsel for Defendant*
*Inter-American Investment Corporation*

- 29 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of January, 2007, a copy of the

Defendant's Motion to Dismiss and attached Memorandum of Law was filed and served

by operation of the Court's electronic filing system on:

F. Douglas Hartnett
Elitok & Hartness, LLC
2428 Wisconsin Ave., NW
Washington, D.C.  20007

*Attorney for the Plaintiff*


         /s/ Nancy L. Perkins
         Nancy L. Perkins

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
JORGE VILA,                               )
                                          )
                Plaintiff,                )
                                          )
        v.                                )       Case No. 1:06-CV-02143 (RBW)
                                          )
INTER-AMERICAN INVESTMENT                 )
CORPORATION,                              )
                                          )
                Defendant.                )
_____   )


## [PROPOSED] ORDER GRANTING
## DEFENDANT'S MOTION TO DISMISS

Having read and considered Defendant's Motion to Dismiss, and having

considered the arguments of all parties and the authorities in support thereof, the

Court in its discretion finds that just cause exists for the granting of such motion.

It is, therefore:

**ORDERED** that Defendant's Motion to Dismiss is hereby **GRANTED**

and this case is dismissed with prejudice.

**SO ORDERED** on this ____ day of _____, 2007.


_____
Reggie B. Walton
United States District Court Judge

COPIES TO:

F. Douglas Harnett (D.C. Bar No. 466851)
Elitok & Hartnett, LLC
2428 Wisconsin Ave., NW
Washington, D.C.  20007

Nancy L. Perkins (D.C. Bar No. 421574)
Jennifer Risen (D.C. Bar No.486559)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C.  20004

Sarah Fandell
Rafael Díaz Loyola
Inter-American Investment Corporation
1300 New York Ave., N.W.
Washington, D.C.  20577