# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                        )
JORGE VILA,                             )
            Plaintiff,                  )
                                        )
        v.                              )   Case No. 1:06-CV-02143 (RBW)
                                        )
INTER-AMERICAN INVESTMENT               )
CORPORATION,                            )
            Defendant.                  )
                                        )
_____)


## MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS


Introduction.

Defendant's Motion asks the court to dismiss Plaintiff Jorge Vila's complaint under Rule 12(b)(6), for two basic reasons.  The first is that Defendant enjoys "absolute immunity" from suit, thereby depriving this court of subject matter jurisdiction.  Def.'s Memorandum, p. 2.  The second reason Defendant's cite for dismissing the complaint is the each of the claims suffers some defect of factual pleading that renders the complaint one which fails to state a claim upon which relief may be granted.  Def.'s Memorandum, p. 3, citing Fed. R, Civ. P. 12(b)(6).  Plaintiff responds separately to each of the Defendant's arguments in support its Motion with the following:

### I.  Defendant ICC Has Explicitly Waived Its Immunity From Suit for Exactly the Type of Claim Brought Here

Defendant's Memorandum lays out in great detail the history and statutory framework

-1-

supporting its claim of absolute immunity.  Def.'s Memorandum, pp. 6-8.  While instructive, this analysis is beside the point.  Even if Defendant's Immunities are as broad as they claim, the fact is that, despite Defendant's assertion to the contrary, the IIC has waived its immunity to the type of claim Mr. Vila files here.  Just as with its "parent" entity, the International Development Bank (IBD), the IIC's own Charter waives its immunity with language that clearly permits assertion of a claim, and lays venue for the suits permitted.  See, Agreement Establishing Inter-American Investment Corporation ("Charter"), Art. VII, Sec. 3. Judicial Proceedings.

Defendant's admit that such waivers have been found by the courts on page 9 of their Memorandum, quoting this Court's Circuit Court of Appeal's own language in *Mendaro v. World Bank*, 717 F.2d 610 at 615.  Perhaps not surprisingly however, Defendants fail to mention the case most directly on point for this issue.  In *Luchter S.A. Cellulose e Papel v. Inter-American Development Bank*, 382 F.2d 454 (D.C. Cir. 1983), the court identified language in the IDB Charter exactly like that in IIC Charter, Article VII, Section 3.(a), to be an explicit waiver of immunity.  *Luchter*, F.2d 454, at 456.  The *Luchter* court also dealt with the Defendant IDB's assertion in that case that the waiver was a limited one, only authorizing certain types of claims arising from specified bank activities, such as exercising its power to borrow money, to guarantee obligations or to buy, sell or underwrite the sale of certain securities.  *Luchter*, at 459, (comparing Asian Development Bank's Charter language to that of the IDB).  The court found that the language in IBD's Charter contained none of the limitations that the Asin Development Bank's did, and that this had to have been a knowing choice by the drafters of the IDB's Charter. *Id.*, at 459.  The same reasoning must apply to the ICC Charter and it's waiver language which is identical to that of the IDB.

The *Luchter* Court also found support for its conclusion that the Sec. 3, Art. XI language in the IDB charter was in fact a waiver in the title of the section.  The Court noted the section was entitled, "Status, Immunities and Privileges," and the language in the second paragraph of the section expressly prohibiting suits by members as evidence that the drafters, "manifested full awareness of the immunity problem and . . .must have been aware that they were waiving immunity in broad terms, rather than treating narrowly a venue problem.  *Id.*

In the case of the ICC, Article VII, containing the waiver language is entitled, "Judical Personality, Immunities, Exemptions and Privileges."  This title supports the reasoning in *Luchter* finding an explicit waiver even more strongly that the title of the related section in the IDB Charter did.  Further, Section 2 of Article VII, entitled, "Juridical Personality," declares that the ICC shall have full capacity to contract, to acquire property and to, "institute legal and administrative proceedings."   This language clearly evidences that the drafters intended to confer on the ICC a status which would allow it to avail itself of the legal and administrative forums and proceedings like any other corporate entity, at least with respect to outside entities it might contract with, in the member countries.  It is worth noting that the *Luchter* decision was issued in 1967 -- more than 15 years before the ICC charter language was drafted.

In addition, the language in section 3.(b) of Article VII declares the "Property of the Corporation. . . shall be immune from all forms of seizure, attachment, or execution *before the delivery of final judgement against the Corporation.*" (emphasis added).  Without an explicit waiver of immunity, this language is utterly nonsensical.

Finally, There can be no doubt that the drafters of the ICC Charter were aware of *Luchter*, yet they chose identical language, and embedded it in an Article with even more

explicit indications of an intent to waive immunity, when they drafted the ICC charter.  The only explanation for this is that they intended to waive immunity in a similar fashion to the waiver in the IDB charter recognized by the D.C. Circuit Court of Appeals some fifteen years previously.

After glossing over the most factually similar and relevant precedent in this matter, Defendant's attempt to adapt the reasoning developed in *Mendaro* and its progeny limiting the waiver found in the Charter of the World Bank, and several sister organizations, including the IDB.  The refinement brought to the immunity issue in *Mendaro* was that the express waiver language should only be read to apply to suits brought by the organizations, "debtors, creditors, bondholders, and those other potential plaintiffs to whom the Bank would have to subject itself to suit in order to achieve its chartered objectives."  *Mendaro*, at 615.  Each of the cases cited by defendant's, however, differ significantly from the instant case, as explained below.

*Mendaro* was distinguished from *Luchter* primarily because of public policy concerns raised by the potentially disruptive and effect lawsuits based on internal employment grievances would have on the Bank's ability to carry out its mission.  *Mendaro*, at 615-616.  Mendaro was a Bank employee who attempted to impose liability under Title VII of the Civil Rights Act of 1964.  The Court rejected this claim, citing the practice in several other nations of upholding immunity claims in disputes that arise out of the employment relationship.  *Id*., 215.

Similarly, most of the cases defendant cites in its Memorandum (pages 7-12) involve claims arising either directly or indirectly from an employment relationship.  *Broadbent v. Organization of American States*, 628 F.2d 27 (D.C.Cir. 1980), involved wrongful termination claims by the Plaintiff (this case actually preceded *Mendaro*); In *Atkinson v. Inter-American Development Bank*, 156 F.3d 1335 (D.C.Cir. 1998), the Plaintiff was the former wife of an

employee who  attempted to enforce garnishment proceedings against the Bank to collect a state

court award to her of alimony, child support, profits from a rental property and a monetary

award;  *Fazzari v. IDB,* 254 F.3d 315 (Table), 2000 WL 1838237, (D.C. Cir. Nov. 16, 2000),

involved a former employee who attempted (and failed) to distinguish his case from the other

employment based claims because of his status as a retiree;  *Weinstock v. Asian Development*

*Bank*, No. Civ.A 105CV00174RMC, 2005 WL 1902858 (D.D.C. July 13, 2005),  involved a

plaintiff's effort to vindicate his Constitutional rights in the wake of action by his employer, the

ABD; and *Chiriboga v. International Bank for Reconstruction and Development*, 616 F. Supp.

963 (D.D.C. 1985), where the plaintiff's were the heirs of a deceased employee, and the

employees benefits were at issue.  Because the instant matter is fundamentally factually different

from these cases because it involves an external relationship, they are of little use in determining

whether there is a waiver of immunity for the suit Plaintiff has filed here.

It is *Mendaro* itself, however, that provides the most cogent analysis on the immunity

issue when it distinguishes the cases cited by the Defendants from the one before the court.  The

Court rejected Mendaro's assertion that the waiver in the Charter subjected to the Bank to

liability to suits from its employees under U.S. statutes prohibiting discrimination on the basis of

broad public policy concerns and a long standing principle to prevent "unilateral control by a

member nation over the activities of the international organization within its territory." Mendaro,

at 615, citing A. Plantey, The International Civil Service § 1343 (1981), and C.W. Jenks,

International Immunities 17-18 (1961).  An entirely different rationale however applies to suits

brought by the banks creditors, debtors, and for normal commercial transactions with external

entities.   *Mendaro* finds the language in the World Bank Charter, Artilce VII, sec.3 –virtually

identical language to that in the ICC Charter– evidences a waiver of immunity "with respect to the World Bank's commercial transaction with the outside world . . ." *Mendaro*, at 618.   The court reasoned that NOT finding such a waiver would severely hamper the Banks ability to, "perform the ordinary activities of a financial institution operating in the commercial marketplace." *Mendaro*, at 618.

The contract for Mr. Vila's services as an independent banking consultant with expertise in finding, developing and structuring alternative financing for projects and advising the ICC on market conditions in emerging markets is exactly the type of external relations the *Mendaro* Court preserved. *Id*.  Rather than being considered internal interference that would hamper the organization's mission, the courts recognized that waiving immunity in this context actually provides a necessary benefit to the organization, without which its ability achieve its objectives would be hampered.  *Mendaro*, at 217.

Defendant is an international development financial organization with approximately 100 employees in Washington DC, USA, and 3 Regional Offices in Montevideo, Uruguay, Bogota, Colombia, and San Jose, Costa Rica.  It reported USD 675 million in assets and USD 13 million in income as of 31 December 2005.  See 2005 Annual Report,

http://www.iic.int/images/AnnualReport2005ENGL.pdf.   The purpose and functions of Defendant, "shall be to promote the economic development of its regional member countries by encouraging the establishment, expansion and modernization of private enterprises, preferably those that are small and medium-scale, in such a way as to supplement the activities of the Inter-American Development Bank".  See www.iadb.org/leg/Documents/Pdf/Convenio-Eng.Pdf).

In Article I, Section 2. Functions, of the Agreement it states that, *"in order to accomplish its purpose"*, Defendant shall undertake the following functions:

"(a) Assist, alone or *in association with other lenders or investors*, in the financing of ….enterprises, *utilizing such instruments and/or mechanisms* as the Corporation deems appropriate…;

(b) *Facilitate their access to private and public capital, domestic and foreign*,….;

(c) *Stimulate the development of investment opportunities conducive to the flow of private and public capital, domestic and foreign*, into investments in the member countries;

(d) Take….the proper and necessary measures for their financing…";

(e) Provide technical cooperation for the preparation, financing and execution of projects…:  *Id*.,  (emphasis added) .

The Charter further provides in Article IV Organization and Management, Section 7 (c) (emphasis added) that "Whenever *activities must be carried out that require specialized knowledge or cannot be handled by the regular staff* of the Corporation, the Corporation shall obtain technical assistance from the staff of the (IDB), or…..the *services of experts and consultants may be engaged on a temporary basis"*.

There are numerous other references in the Charter, Annual Reports from 2000 to 2005 and Defendant's Regulations confirming that the mobilization of private capital, through co-financing, loan participations or syndications and other means, is an essential component of Defendant's mandate, purpose and functions.  See Generally Agreement and Charter.

The Charter, Annual Reports and Defendant's Regulations also confirm that obtaining information on terms and conditions in international financial markets for Latin American and

Caribbean debt, and monitoring changes and developments in those markets, is essential for Defendant to carry out its activities with respect to mobilization of private capital, specifically to implement co-financing or loan participation or other syndications alternatives.

In its Motion, Defendant has lightly and conveniently characterized the activities carried out by Plaintiff from January to August 2003 as "some dealings" with Defendant, to support its allegation that allowing Plaintiff's suit would constitute a "disruptive interference" with Defendant's activities.   Def.'s Motion.,p. 11

The evidence confirms a very different reality, that of a substantial amount of consulting services provided by Plaintiff, at the repeated request of Defendant, to contribute to a function that is central to Defendant's purposes.  Attached to this Memorandum as Exhibit 1, are copies of 273 mails exchanged between Defendant, Plaintiff, financial counterparts and Defendant' clients. We have also attached, as Exhibit B, a detailed summary description of each mail, which should be considered incorporated herein by reference.

These mails include requests by Defendant, or Defendant's clients, to Plaintiff to perform various consulting services on behalf of Defendant, or participate in conference calls with Defendant's clients or financial counterparts to discuss terms and conditions of Defendant's loans, or specific approvals by Defendant of activities carried out or proposed by Plaintiff on behalf of Defendant, including negotiations of terms and conditions with potential participant banks (Exhibit 1, Email #'s 3, 4, 5, 7, 13, 15, 16, 31, 36, 39, 40, 70, 76, 79, 80, 89, 18, 109, 110, 113, 114, 115, 121, 124, 126, 133, 135, 136, 149, 152, 155, 158, 166, 168, 170, 171, 173, 174, 181, 184, 186, 188, 189, 191, 192, 200, 201, 206, 209, 213, 215, 217, 219, 220, 223, 226, 227, 229, 233, 234, 237, 238, 240, 245, 248, 249, 251, 252, 255, 257 and 258);

Additional Emails show Plaintiff providing Defendant, at its request, market information, comments, reports, advise, confirmation of negotiations of terms and conditions of Defendant's loans with potential participant banks, confirmation of meetings with potential participant banks or Defendant's external documentation drafts, in at least one case for the signature of senior management (Exhibit 1, Email #'s 1, 2, 6, 8, 9, 11, 12, 32, 35, 38, 49, 50, 57, 58, 71, 72, 78, 87, 88, 90, 92, 94, 103, 104, 107, 111, 112, 116, 117, 120, 123, 125, 128, 129, 130, 132, 134, 138, 140, 142, 143, 145, 148, 150, 151, 153, 154, 157, 159, 164, 167, 169, 172, 175, 177, 178, 180, 182, 183, 185, 187, 190, 193, 194, 199, 202, 204, 205, 207, 208, 211, 212, 214, 216, 218, 221, 222, 224, 225, 228, 230, 231, 232, 235, 236, 239, 242, 243, 244, 247, 250, 253, 254, 256 and 259);

Further Emails show Plaintiff's invitations to banks to participate in Defendant's co-financing activities and bank replies (Exhibit 1, Email #'s 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 33, 34, 37, 42, 43, 44, 45, 46, 47, 48, 51, 52, 53, 54, 55, 56, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 73, 74, 75, 77, 83, 84, 85, 86, 91, 93, 95, 96, 97, 98, 99, 100, 101, 102, 105, 106, 118, 119, 122, 127, 131, 137, 139, 141, 144, 146, 147, 156, 160, 161, 162, 163, 165, 176, 179, 198, 203, 210, 241 and 246);

Finally, Emails containing confidential internal information and documentation sent by Defendant, or Defendant's clients at its request, to Plaintiff for his comments or to be presented to Defendant's counterparts or clients on behalf of Defendant, information and documentation that, due to their sensitive nature, are only to be disclosed to members of Defendant, as established in Defendant's Policy on Disclosure of Information (Exhibit 1, Email #'s 5, 10, 36, 80, 82, 136, 152, 166, 173, 174, 200, 213, 215, 219, 224, 249 and 258).

As these mails clearly show, Plaintiff's activities, carried out during almost 7 months and including a total of 47 reports from Plaintiff, involved conversations and personal meetings with senior officers of Defendant, including Steven Reed (Plaintiff's direct report and, at the time, Corporate Finance Division Chief), Raul Herrera (at the time Defendant's General Counsel), Mario Mahler (at the time Chief Credit Officer), and the following other less senior officers, Victor Moscoso, David Levy, Michael Appel, Felipe Varela, Javier Barsantini, Diego Noseda and others.

Most importantly, Defendant's Standard Terms and Conditions for Consulting Services also provided in the contracts previously executed with Plaintiff contains the following section on jurisdiction:

> " 9. Jurisdiction (emphasis added): *Jurisdiction and venue for all legal actions which may arise as a result of any question, matter or dispute concerning this Agreement shall in the first instance be with the United States District Court for the District of Columbia;…"*  Exhibit 1

By incorporating this provision, Defendant clearly accepts the possibility that external consultants, and specifically Plaintiff, may take Defendant to court. This provision could only be part of this contract if Defendant recognizes that it must waive its immunity when it deals with external parties such as consultants contributing services to activities that are central to Defendant's Purposes and Functions, such as mobilization of private capital, with all that this requires. The fact that this provision is included in "Standard Terms and Conditions for Consulting Services" clearly confirms that Defendant recognizes that it must necessarily submit itself to jurisdiction before this group of outside entities to carry out its activities and achieve its chartered objectives.

The benefit to Defendant comes from the services provided by external consultants with

respect to activities that are central to the Purposes and Functions of Defendant (mobilization of private capital), which would not be prepared to contribute their services if they knew that they would face Defendant's immunity.   This clause clearly and unequivocally reflects a waiver of immunity by Defendant.  See Exhibit 1 (emphasis added).

Thus, despite Defendant's assertions, the suit brought in this case fits exactly into the explicit waiver of immunity by international organizations such as the Defendant that the Court recognized in *Luchter* and preserved and affirmed in *Mendaro*.  Because the same language cited by the Court in those cases was used in the ICC Agreement and Charter, the court should reject the Defendant's argument that it is immune from suit in this case.

## II.  Plaintiff Does Allege Sufficient Facts to State a Claim Upon Which Relief Can be Granted

A. Breach of Contract (Implied)

After outlining the four elements necessary to establish an implied contract without challenging the allegations in the Complaint with regard to those elements,  Defendants urge the court to dismiss the first Count in the Complaint, for Breach of Contract (Implied), because they interpret the complaint language as conceding a lack of agreement on a material term to the implied contract.  However, this court has long recognized that, "Dismissal for failure to state a claim upon which relief may be granted is only permissible "where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Richardson v. Easterling*, 878 A.2d 1212 (D.C. 2005) citing  *McBryde v. Amoco Oil Co.,* 404 A.2d 200, 202 (D.C.1979), (quoting *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d

80 (1957)).  Therefore, it is only if the facts alleged, when accepted as true, and construed in the light most favorable to Vila, could not possibly establish a claim for relief, that dismissal is appropriate.

Defendant's make much of two statements in the complaint which they claim indicate that the parties had not agreed to the terms of compensation, in an attempt to meet this standard. The first is in paragraph 7 of the complaint, where the complaint states "Plaintiff and Defendant's senior officers verbally agreed to complete contractual documentation, including compensation, "later". . .  Defendant's ask the court to read this statement as proof that compensation had not been agreed to.  This is, however, nothing more than their self-serving linguistic twist on the statement.  The plaintiff states that the Defendants agreed *to document* the terms of the verbal agreement they had reached to retain Plaintiff under the same terms as he had been retained, for work on a new project.  Complaint, page 3 (emphasis added).

Similarly, later on the same page, the Complaint states, "although no specific compensation structure was discussed for the new projects, the senior officers who made the requests, and the senior management who accepted the work done were fully aware of the history of plaintiff's services and expectation of compensation.  Complaint, ¶ 7.  This statement alleges that the officials involved knew from previous experience exactly what plaintiff was paid for the same work.  By requesting the work and agreeing to "document" the contract later, these officials were agreeing to the same terms of compensation the parties had previously used. Defendants also point to the statement in the complaint at ¶ 6, that his compensation "varied from a monthly retainer and a success fee . . . to a success fee only," as further support for the contention that the terms of compensation had not been established.  This interpretation reads too

much into the statement.  Plaintiff's compensation history involved different types of payment

for different types of work.

Defendant first contracted Plaintiff from  February 7 to  March 7, 2001, to identify

financial institutions to participate in Defendant's loans to two Latin American banks. Plaintiff

received a success fee of $60,000 in compensation (equivalent to 0.50% of the nominal amount

of participations identified and implemented). Plaintiff was also responsible for advising

Defendant on terms and conditions in international financial markets for Latin American and

Caribbean debt, including any changes and developments, with a view to structuring, pricing and

syndicating Defendant's loans.

Defendant then contracted Plaintiff from June 1 to December 31, 2001, to identify

financial institutions to participate in Defendant's loans to several potential Latin American and

Caribbean borrowers.  Plaintiff received a total of $28,000 in monthly retainer fees, and was

entitled to a success fee equivalent to 0.33% of the nominal amount of participations identified

and implemented. Plaintiff was also responsible for contributing to structure the loans to those

potential borrowers and for advising Defendant on terms and conditions in international financial

markets for Latin American and Caribbean debt, including any changes and developments, with

a view to structuring, pricing and syndicating Defendant's loans.

Defendant then contracted Plaintiff from January 1 to March 31, 2002, to identify

financial institutions to participate in Defendant's loans to several potential Latin American and

Caribbean borrowers, including Invertec Pesquera, a Chilean salmon exporter. Plaintiff received

a total of $12,000 in monthly retainer fees, and a success fee of $15,000, equivalent to 0.30% of

the nominal amount of participations identified and implemented for the Invertec Pesquera

project.  Plaintiff was also responsible for contributing to structure Invertec's and other loans to

potential borrowers and for advising Defendant on terms and conditions in international financial

markets for Latin American and Caribbean debt, including any changes and developments, with

a view to structuring, pricing and syndicating Defendant's loans.

Defendant again contracted Plaintiff from May 1 to December 31,  2002, to identify

financial institutions to participate in Defendant's loans to several potential Latin American and

Caribbean borrowers. Plaintiff was entitled to a success fee equivalent to 0.40% of the nominal

amount of participations identified and implemented. Plaintiff was also responsible for

contributing to structure several Defendant's loans to potential borrowers and for advising

Defendant on terms and conditions in international financial markets for Latin American and

Caribbean debt, including any changes and developments, with a view to structuring, pricing and

syndicating Defendant's loans.

It must be further noted that on several occasions in 2001 and 2002, when Plaintiff

carried out its responsibilities under these contracts from Washington DC, Defendant provided

Plaintiff with an office plus secretarial and administrative assistance, and Plaintiff participated in

internal meetings to discuss Defendant's projects.  All these written agreements in 2001 and

2002 included Terms of Reference establishing the scope of services to be performed by Plaintiff

as well as compensation terms.

The Complaint's allegation is that each time a request was made, the parties agreed to

extend the terms of the pervious agreement for the same type of work, to the new project.  The

fact that different compensation structures were used for different types of work does not mean that the parties did not understand the expectation for compensation, *including the compensation terms*, to be the same as it had been for previous, similar assignments.   Attached as Exhibit 2, is a sworn statement by plaintiff, providing more detail about the conversations and understanding of the officials who made the request for work, that at the time of formation, both parties acknowledged that the Plaintiff would be compensated under the same terms he had been in previous instances, and that they would prepare documentation of the agreement "later."

As the court noted in *Bloomgarden v. Coyer*, 479 F2d 201, "An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt."  This is exactly the situation here.  The implied contract claim was eventually denied in *Bloomgarden*, because there was no direct precedent of the type of "finders fee" claimed by the Plaintiff, and because the Plaintiff did not inform the defendant of his compensation expectation until some time after the introduction of the two parties was accomplished. *Bloomgarden*, at 212.   In this case, there was indeed direct precedent between these parties for the same type of work he had done under written agreements.  The individuals who requested the work were also informed that Plaintiff expected compensation because they had agreed to provide documentation, "later." Complaint, ¶ 7.  Therefore, unlike *Bloomgarden*, the milieu in which these parties dealt was well established, and the expectation for compensation was made clear early on in the process.

As support for their request that the court dismiss the implied contract claim because the compensation term was not agreed to, Defendant's cite *Perles v Kagy* 362 F.Supp.2d

195.  Perles dealt primarily with whether there was However that case contains a critical factual distinction from the present case.  In determining that a material term had not ben agreed to, the Court in *Perles* noted the repeated attempts by the Plaintiff, during the time the work was being performed, to establish a specific, written agreement.  *Perles*, at 199.  There was no such communication between the parties during the period the work was being performed, hence no indication from either party that their agreement was not complete.  While it is certainly true that the Defendants claimed, after the work had been done and delivered, that they did not understand the basis for the Plaintiff's compensation claims, that is not probative of whether when the parties had an agreement on terms when the contract was formed, it merely creates a factual dispute on the issue.

      B.  Vila's Breach of Contract Claim and Unjust Enrichment Claim are Not Barred by the Statute of Limitations

Defendant's allege that Plaintiff's claim for Breach of Contract and Unjust Enrichment are barred by the statute of limitations.  Because the relevant facts for both claim on this issue are identical, we will address them together.  Defendant bases their assertion on a factual comparison to the District of Columbia's recent ruling in *News World Communications, Inc. V. Thompsen*, 878 A.2d 1218.  Unfortunately, defendant's reliance on *Thompsen* is mis-placed because the issue in that case was when the Plaintiff knew that the Defendant was enriched.  In this case the issue is when the Plaintiff knew he would not be compensated by the Defendant.  Further, as with the comparison to *Perles,* above, the Defendant's Motion culls only the facts supporting its position and ignores the significant differences between *Thompsen* and the case before the Court.        Unjust Enrichment occurs when three elements are present: 1) The

Plaintiff confers a benefit on the defendant; 2) the defendant retains the benefit; and 3) under the circumstances the defendant's retention of the benefit is unjust. *4934, Inc. V District of Columbia Department of Employment Services*, 605 A.2d 50, at 55. For the purpose of this Motion, the first two elements are not in dispute. Defendant's argument therefore focuses on the circumstances under which the retention became unjust, and when that element accrued. In *Thompsen* the Court dealt with the issue of when the Plaintiff could have known the Defendant's had been enriched, due to a delay in the acceptance of the Plaintiff's services and the apparent benefit. Here the issue is not when the defendant received the benefit, but when the Plaintiff knew with any certainty that he would not be compensated. In order to fully address this point it is necessary to further discuss the relevant facts.

Plaintiff's complaint clearly states that defendant, "refused to pay for them, on November 4, 2003, after Plaintiff presented Defendant with an invoice, supported by extensive documentation, according to terms similar to those the parties had previously agreed to and operated under." Complaint ¶ 5. While it is true the first *indication* that there may be a problem obtaining compensation from defendants came in August 2003, this was hardly definitive (despite the adjectives used in subsequent paragraphs of the complaint), nor was it the last communication between the parties on the issue. On August 4, 2003, in an email communication to Plaintiff, Mr. Victor Moscoso, after having requested the services of Plaintiff replied to an inquiry from Plaintiff with "Unfortunately, I do not think there is room for a fee in this case." See Exhibit 3, Email #260. While this is a preliminary indication that Defendants may be refusing to abide by the contract, or at least reinterpreting its terms, this is hardly a definitive refusal to compensate him on any basis, nor does it relate to all of Plaintiff's claims. Following

-17-

that communication, on August 28, 2003, Mr. Steven Reed, and Mr. Moscoso's senior manager

wrote an email to Mr. Vila challenging (for the first time) that Plaintiff and Defendant had an

agreement on one type of compensation for one of the projects on which Mr. Vila had worked,

explicitly reassures Plaintiff that, "You will be compensated on a success fees basis. Regards,

Steve"  See Exhibit 3, Email # 262.

Furthermore, Plaintiff had not submitted a definitive statement to Defendants of

what he believed to be the compensation he was entitled to until October 9, 2003 when he email

an invoice to Defendant.  The Defendant did not refuse to pay that invoice until November 4,

2003.  Exhibit 3, Email #271 (Translation included separately as Exhibit 4), and Exhibit 2

(Sworn statement), .   Despite the terms used to describe these communications in the Complaint,

the court must look to the record and evidence presented in this case.  In doing so, it becomes

clear that Defendant's could not, and did not refuse to compensate Plaintiff before November 4,

2003, less than three years before Plaintiff filed this compliant.

Even after that, the Defendants continued give the Plaintiff indications that they

were considering his compensation request through at least March 20, 2004.  In an email from

Alvaro Rebello, an anaylst in the General Manager's Office, to Plaintiff, in which he

acknowledges receiving the request for compensation sent to the President of the ICC with the

documentation justifying the request.  Mr. Rebollo states, "In this respect, we are pleased to

inform you that *we are carrying out a detailed analysis of your request in order for the ICC to

propose a decision on the subject."* Exhibit 1, Email # 273 (emphasis added).   A copy of this

message was sent to Mr. Jacques Rogozinsky, ICC General Manager, as well as Mr. Euric Bobb,

in the Office of the President.  Therefore, Defendant's gave the Plaintiff a clear indication that

-18-

while the lower level managers had indicated theat they did not believe he was entitled to compensation on at least some of the work he was claiming, the ultimate decision-makers in the organization were still considering his request.

Subsequent to Mr. Rebollo's email, Mr. Vila learned that Mr. Enrique Iglesias, Mr. Bobb, Mr. Rogozinski and Mr. James Spinner, General Counsel of ICC's "parent" organization (whose participation was requested by Mr. Bobb pursuant to section 8 (b) of Defendant's Charter), met several time from February to July, 2004, to discuss Plaintiff's compensation request. It is Plaintiff's understanding that Mr. Bob and Mr. Spinner expressed their opinion that Mr. Vila was entitled to compensation and that Mr. Iglesias initiatlly agreed with them. Apparently, however, Mr. Rogozinsky ultimately decided to send a letter to Plaintiff a letter dated August 31, 2004, which denied Plaintiff's compensation request.

Finally, even after that communication, the ICC further clouded the issue in response to the request Plaintiff sent to the ICC Board of Directors requesting compensation, Mr. Vila was informed by Eugenio Diaz Bonilla, President of the ICC for Argentina, that in a conversation with the General Manager, he (Mr. Diaz Bonilla) was informed that "an offer would be made" to Plaintiff. Unfortunately this promised offer never materialized and Plaintiff filed the instant cpomplaint on October 26, 2006.

In light of these facts, it is clear that the earliest possible date the Defendants could have known what the Plaintiff's specific claims (as dictated by the terms of their agreements) for compensation were was August 31, 2004. Exhibit 1, Email # 266. And the Plaintiff could not have understood that Defendant's were refusing any and all compensation until Defendant's email of November 4, 2003. Exhibit 1, Email #271 (translation as Exhibit 4).

As noted above therefore, *Thompsen* is of little value in analyzing Plaintiff's claim here. In *Thompsen*, following the initial denial by Mr. Mahr, that she would not be compensated there are no facts indicating that the company was reconsidering this initial denial, and at no time was there a specific itemization from the Plaintiff, such as an invoice, that provided the basis for a definitive refusal. *Thompsen*, 878 A.2d at 1220. Both of these facts are present in this case, and make comparisons to *Thompsen* inappropriate.

The record therefore clearly established that the Plaintiff could not have known that the ICC was refusing to compensate him prior to November 4, 2003, less than three years before he filed this Complaint. The Defendant's request that the claims be dismissed based on the statute of limitations should therefore be denied.

C. Plaintiff's Claims for Defamation Should Not be Dismissed Because the Statements by
   Defendant Were Indeed Defamatory and were Made to Individuals Not Covered by Common Interest Privilege

Defendant's Motion merely chooses to interpret the comments made by the Defendant's as relatively harmless. This is again, nothing more than self-serving interpretation of the facts alleged in the Complaint to recast the statements in a light most favorable *to the Defendants*. The statements could clearly have had a very damaging effect on Plaintiff's reputation and professional standing in the community in which he makes his living. Defendant's clearly held Plaintiff in high regard for his previous work, and used that good reputation when it served them. See Exhibit 5. An equally valid interpretation of these defamatory statements is that they accused Plaintiff of being habitual liar and manipulator who makes a practice of using improper

influence to gain confidential information.  Simply put, the fact that Defendant's interpret these statements differently creates a factual dispute which bare not appropriate for dismissal on in a Motion to Dismiss for Failure to State a Claim.  *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Further, the statement was made to a former IDB manager, not a current employee Def's Mot., p. 24.  This individual was clearly no longer in realm of a Common Interest privilege. Whether others who received these statements might have been covered by such a privilege is also clearly a factual issue that makes dismissal of this claim inappropriate at this stage. *Id*.


D.  Plaintiff's Claims State Sufficient Facts to State a Calim for Tortious Interference
    With Prospective Advantage

Plaintiff's Complaint alleges that Defendant's employees made several statements to other members of the professional community that works in international financial institutions, including the ICC and IDB.  Complaint, ¶ 36.  These statements by their very nature could do nothing but damage plaintiff professional reputation and standing among the very people with whom he contracts as a consultant.  The intent of making such statements to these individuals could be none other than to damage the plaintiff's ability to obtain contracts and business from members of this community.   The Complaint also directly alleges that plaintiff has suffered a loss of business as a result of these statements and the damage to his reputation.  Complaint. ¶36. Defendant's urge dismissal of this claim based on the Plaintiff's inability to specifically divine the intent behind those making the statements.  Once again, the Defendant's ask the Court to dismiss a claim based on a purely factual issue.

E.  Plaintiff's Claims should not Be Dismissed With Prejudice

Unless this Court decides that the Plaintiff's Claims are barred by the ICC' Immunity or the Statute of Limitations, dismissal with prejudice would be inappropriate.  Each of the cases sited by defendant's point to an issue of law, not of fact.  Def's Motion, p. 28-29.  When a complaint suffers from minor factual deficiencies which could be cured by amendment, the Court should freely allow such Amendment.  Fed. Rules Civ. Procedure 15.

## <u>CONCLUSION</u>

For the Reasons stated above the Defendant's Motion to Dismiss for Failure to State Claim on Which Relief Can be Granted should be dismissed in its entirety.

Respectfully Submitted.

_____/s/_____
F. Douglas Hartnett
D.C. Bar No. 466851
ELITOK & HARTNETT, LLC
2428 Wisconsin Ave., N.W.
Washington, D.C. 20007
(202) 965-0529
*Counsel for Plaintiff Jorge Vila*

Dated March 5, 2007

I, Jorge R. Vila Moya, citizen of Spain and a private consultant in emerging markets, domiciled at Beaver Cottage North, Alderbrook Road, Cranleigh, Surrey GU6 8QX, England, do solemnly swear that:

1. In January and February 2003, I started to receive telephone calls and e-mails from Washington DC-based officers of the Inter-American Investment Corporation ("Defendant"), including Victor Moscoso, requesting my consulting services with respect to Defendant's potential financings to Banco Safra, Brazil, and Sunset Beach, Jamaica. I was asked to contribute to obtain a mandate from both clients, identify cofinanciers and advise on market conditions in order to structure, price and distribute both potential financings. V. Moscoso and I verbally agreed that I would be compensated on the same basis for services in 2001 and 2002: a combination of a success fee **and** a monthly retainer, calculated according to the type of services required and the success achieved;

2. When I again discussed compensation for my services with V. Moscoso the week of 2 June 2003, he reiterated that I would be compensated as agreed when my services were requested.

3. My direct report, Steven Reed, offered to "clarify and document" my Banco Safra "assignment" (mail 262 of Appendix A), an offer which I accepted by e-mail of 10 September 2003 (mail 263 of Appendix A). He did not comment on the Invertec and A-B Loan Programme Presentation projects. On 9 October 2003, Mr Reed further informed me (mail 265 of Appendix A), that he wanted to discuss the compensation issue upon his return to Washington, a confirmation that I considered very positive.

4. The communications in August and September between V. Moscoso, S. Reed and myself did not address all my activities or claims for compensation. Obviously, I never considered those communications definitive, as their tone was constructive and S. Reed made a specific offer with respect to B. Safra (28 August 2003), which I accepted, and offered to discuss the compensation issue upon his return to Washington DC (9 October 2003).

5. Pursuant to my agreement with V. Moscoso, my compensation would be a combination of a success fee **and** a retainer according to the type of services required and the success achieved. Defendant could only know the amount claimed when I presented my first invoice on 9 October 2003, reiterated on 22 October 2003 (mails 266 and 267 of Appendix A) detailing **all** my activities and claims of compensation. Even then, Defendant replied **not with a negative**, but with a request that I should present a written contract and an authorization for my trip to Milan in March 2003 (mail 268 of Appendix A), a communication to which I replied on 23 October 2003 (mail 269 of Appendix A). And even Defendant's negative on 4 November 2003 refers to the absence of a written contract in the context of my previous agreement with Defendant (mail 271 of Appendix A), but there was no mention of my activities in 2003. I therefore rightfully expected that Defendant's highest authority would

recognise my legitimate right to compensation when I wrote to Defendant's Presidency on 29 December 2003.

6. Approximately in March 2004, I called James Spinner, General Counsel of the Inter-American Development Bank ("IDB"), in Washington DC, to enquire about my claim to Enrique Iglesias, President of the IDB and Chairman of the Board of Directors of Defendant, by letter of 29 December 2003. Mr Spinner informed me that the IDB Presidency, through Euric Bobb, Chief of the Presidency Office, had requested a meeting of several IDB and Defendant's senior officers, including Mr Bobb and Mr Spinner, to discuss alternatives to settle my claim and that I would be informed of the decision in due course. I was further encouraged by a communication of 10 March 2004 from Defendant's A.Rebollo confirming that the Presidency was carrying out a detailed examination of my claim in order to "propose" a decision (mail 273 of Appendix A).

7. Subsequently, I was informed by IDB sources that, as requested by Mr Bobb, at least two meetings took place between March and July 2005 to discuss alternatives to settle my case, one of them the week of 19 July 2005, with the participation of Mr Iglesias, Mr Bobb, Mr Spinner, Mr J.Scott (IDB Legal Department), Mr Jacques Rogozinski (General Manager of Defendant) and Mrs Sarah Fandell. I understand from the same sources that there were opinions in those meetings in favour of compensating my services, which of course further encouraged my expectations.

8. Defendant's letters of 31 August and 6 October 2004 were the first indications that an agreement to compensate my services would be difficult to reach. All previous communications from Defendant indicated that compensation for my services was possible.

9. Sometime in mid or late November 2005, Eugenio Diaz Bonilla (Defendant's and IDB's Executive Director), told me by telephone, after reviewing my letter to Defendant's Board of Executive Directors of 31 October 2005, and the accompanying documentation supporting my claim, that this evidence indicated that there had been "an activity that benefited the IIC", that he had discussed the matter with Jacques Rogozinski, Defendant's General Manager, and that Mr Rogozinski told him that Defendant was prepared "to make me an offer" to settle my compensation claim for my services. As I could not have expected support from any higher authorities of Defendant, I was confident that a settlement would be reached in early 2006.

Jorge R. Vila

12 March 2007

----- Original Message -----
**From:** Vallejo, Alejandra
**To:** 'j.r.vila@btinternet.com'
**Cc:** Rogozinski, Jacques ; Reed, Steven L. ; Salazar, Susana
**Sent:** Tuesday, November 04, 2003 6:20 PM
**Subject:** Invoice for consulting services

**Señor Vila:**

**La CII no puede procesar ningún pago por servicios de consultoría que no esté amparado por un contrato formalizado con términos y condiciones definidos, y que además tenga la cobertura presupuestaria correspondiente. Este procedimiento es exigido por las políticas que rigen esta institución de derecho público internacional, y que entiendo usted conoce por haber mantenido relaciones formales de contratación con la CII en distintos periodos. En nuestros registros se marca la finalización de su último periodo contractual con fecha 31 de diciembre de 2002.**
**Sin otro particular,**
**Atentamente**
**Alejandra Vallejo**
**Coordinadora de Asuntos Institucionales**
**IIC**


"Mr Vila:

The IIC cannot process any payment for consulting services that is not supported by a formal agreement with defined terms and conditions, and also with the corresponding budget coverage. This procedure is required by the policies that rule this international public law institution, which I understand you know due to having maintained formal contractual relationships with the IIC at different times. Our records indicate that your last contractual term ended on 31 December 2002.
Sincerely,
Alejandra Vallejo
Coordinator Institutional Affairs
IIC"

----- Original Message -----
**From:** Corrigan, Kevin
**To:** JR Vila
**Sent:** Monday, November 21, 2005 1:28 PM
**Subject:** Assignment for IDB/PRI

Dear Jorge:

You have asked me to provide confirmation of your assignment with the Inter-American Development Bank, Private Sector Department, during the year 2000, when I was leading the B loan syndications program at that institution. At that time, the IDB's B-loan program was scarcely four years old, was undergoing rapid growth, and we felt it would be useful to have someone with your profile assist us in expanding our universe of potential B loan lenders. The program, as you recall, was modeled after that of the International Finance Corporation, whose B-loan program was staffed with individuals in their Head office in Washington D.C., as well as satellite offices in London and Singapore. The IDB had only me and one other individual looking after this program from our Head office in Washington D.C., and your location in London, as well as your qualifications, made you an ideal candidate to carry out this assignment.

I was very pleased with the results, and while I cannot remember precisely how many banks and individuals you contacted to introduce the IDB's B-loan program, I do remember that it was a considerable number, but more important than that, you did so with an organization and dedication that ensured a favorable outcome. I recall discussing with you how we should approach each country with banks which operated internationally, deciding on the right strategy and the specific institutions to approach. You then went about your assignment with enthusiasm and professionalism, armed only with a brief description of the IDB and its B-loan program. In the end, you prepared a detailed report, with names of institutions and key contacts, which enabled us to follow-up, and from which several new institutions were added to the IDB's universe of B-lenders, which by the time I left earlier this year was approaching one hundred institutions.

I want to thank you for the excellent work you performed at the time, and wish to reiterate that nothing in the way you conducted your assignment could be construed in a negative light. Your clarity and professionalism were evident throughout the assignment, and the results were clearly within the scope of work we had agreed upon.

With best wishes,

Kevin Corrigan

Senior Vice President

Trust Company of the West

8010 Towers Crescent Drive, Suite 410

Vienna, VA 22182

Tel: 703-506-0726

Fax:703-506-0741



**CORPORACION INTERAMERICANA DE INVERSIONES**
**INTER-AMERICAN INVESTMENT CORPORATION**

**CORPORAÇÃO INTERAMERICANA DE INVESTIMENTOS**
**SOCIÉTÉ INTERAMÉRICAINE D'INVESTISSEMENT**

1300 New York Avenue, NW
Washington, DC 20577
Tel: (202) 623-3957  Fax: (202) 623-3824

AGREEMENT FOR CONSULTING SERVICES
between
INTER-AMERICAN INVESTMENT CORPORATION
and
JORGE R. VILA MOYA

The Inter-American Investment Corporation, a public international organization with headquarters located at 1300 New York Avenue, N.W., Washington, D.C., 20577 (hereinafter the "Corporation") and Jorge R. Vila Moya, citizen of Spain and a private consultant, with offices located at 13 Devoil Close, Guilford, Surrey GU4 7FG, England (hereinafter the "Consultant") hereby agree as follows.

1.    Services:

The scope of the services to be performed by the Consultant under this Agreement and the proposed time schedule for such performance shall be in accordance with the "Terms of Reference" attached hereto as Annex A and the Annex B "Standard Terms and Conditions for Consulting Services" incorporated herein.

2.    Remuneration:

The Corporation will pay the Consultant a maximum not-to-exceed amount representing 40% (forty percent) of the success fee to be received by the Corporation from a borrower/transaction for which the Consultant obtained B loan participations. The Consultant will be entitled to that fee only if the Corporation has asked the Consultant to assist in obtaining B Loan participations. This maximum, not-to-exceed amount includes all Consultant's travel and personnel costs, overhead expenses, subcontracts, and any other costs, fees, or other out-of-pocket expenses directly or indirectly related to this Agreement.

3.    Payment:

Payment of success fee will be made to the Consultant within fifteen (15) calendar days of the IIC's receipt of: a) the completion of the cofinancing transaction evidenced by signed Participation Agreements for an A/B Loan cofinancing transaction; b) receipt from the borrower/transaction, requesting the cofinancing, of the success fee due to the Corporation; (c) duly executed and enforceable Participation Agreement(s) by commercial bank participant(s) in the total principal amount of the B loan participation; and (d) a properly documented invoice(s) from the Consultant addressed to the authority designated by the Corporation in Article 7 hereunder. The Consultant agrees that the Fee Percentage shall only be paid for those potential commercial banks the Consultant identifies to the Corporation as interested in participating as a B loan participant with the Corporation.

4.    Reports:

The Consultant shall submit reports as established in Annex A "Terms of Reference."

5.    Term:

Maximum of seven (7) continuous months, starting on May 1, 2002 through December 31, 2002.

6.    Termination:

The Corporation shall have the right to terminate this Agreement at any time by giving fifteen (15) days written notice to the Consultant, in which case no payment shall be made by the Corporation to the Consultant under the terms of this Agreement.

7.    Supervision:

In carrying out the services to be performed herein, the Consultant shall officially report to the Corporation through the Division Chiefs of both the Financial Services and the Corporate Finance whom will act on behalf of the Corporation pursuant to Article 8 hereunder.

8.    Administrative Control, Designated Representatives, Notices and Requests:

The Consultant and the Corporation shall give written notice of their respective representatives authorized to act pursuant to the various provisions of this Agreement. Such notice shall be given upon execution of this Agreement and from time to time upon each party's designation of other authorized officers.  Any notice or request required to be given or made under this Agreement shall be deemed to have been duly made or given when delivered by hand or by mail to the party to which it is required to be given or made at the party's address as specified below:

Inter-American Investment Corporation
1300 New York Avenue
Washington, DC 20577
Attention:  Financial Services Division Chief

Consultant:
Jorge Vila
13 Devoil Close, Guildford
Surrey GU4 7FG, England

9.    Modifications:

The provisions of this Agreement are final and cannot be modified without the written consent of both parties. The General Manager and the General Counsel are the only officers of the Corporation authorized to approve any modifications, extras and change

**Agreement for Consulting Services – Jorge R. Vila Moya**                                    **Page 3**

orders to any of the requirements or provisions of this Agreement. This authority vests in their successors and in addition may be delegated to other Corporation officers by notification to the Consultant in writing of the scope of said delegation of authority. Changes made without their signature will be deemed to be invalid for lack of proper authority.

10.    Integration:

The terms and conditions of this Agreement and of Annex A "Terms of Reference" and Annex B, "Standard Terms and Conditions for Consulting Services," embody the whole of the agreement between the parties. There are no promises, terms, conditions or obligations other than those contained herein. This Agreement shall supersede all previous communications, representations, understandings or agreements, either oral or written, between the parties hereto.

By: _____                    By: _____
       Susana Salazar                                              Jorge R. Vila Moya
       Inter-American Investment Corporation              Consultant
       Personnel and Administration Officer

Date: _____ 06 -18 -02 _____              Date: 27 June 2002 _____

Attachment:    Annex A        Terms of Reference
                      Annex B        Standard Terms and Conditions for Consulting Services

PER024-02-

ANNEX A

TERMS OF REFERENCE
Mr. Jorge R. Vila Moya

I. General

You are being contracted as a consultant to the Inter-American Investment Corporation (IIC) to assist the Financial Services Group and the Corporate Finance Division. You will report directly to Mr. Jorge Zelada, Division Chief, Financial Services Group and Mr. Steve Reed, Division Chief, Corporate Finance.

II. Background

The IIC has as one of its objectives to attract resources from private sector financial institutions into the Latin American and Caribbean region. To accomplish this, both the Financial Services Group and Corporate Finance Division within the IIC, structure cofinancing transactions with private sector financial or corporate borrowers. In these transactions, a portion of the total financing is provided by the IIC through an A Loan and another is obtained from private sector financial institutions that participate in the financing through a B Loan. These efforts have been concentrated in transactions involving financial intermediaries and corporate clients. However, it is envisaged that new transactions involving asset-backed securities, in particular, mortgage-backed securities could also require B loan participations.

III. Objective

The objective of your contract is to participate as the team member of both the Financial Services Group and Corporate Finance Division assisting with cofinancing transactions. As such, you will be expected to be able to share your knowledge on this subject with the other team members, with respect to market intelligence concerning the current position of potential participant banks with respect to cofinancing transactions and any developments concerning cofinancing activities. In addition, you will be expected to provide assistance in the process of evaluation of the structure of new cofinancing transactions and to comment on their viability to be placed with potential participant banks. The assessment should determine if proposed structures are adequate, and should identify the risks and issues related to their successful placement and recommend ways to mitigate or eliminate such risks. Finally, you will be expected to share with the other team members, potential transactions and business opportunities that you encounter in the market that could be of interest to the IIC.

IV. Scope of Work

Specific tasks expected of you include, but are not limited to, the following:

1.    Assist the IIC in obtaining B Loan Participations from financial institutions that the Consultant deals with, for cofinancing transactions presented by either the Financial Services Group or the Corporate Finance Division of the IIC;
2.    Provide weekly reports on the position of potential participant banks with respect to cofinancing transactions, and of any developments in cofinancing activities that the IIC would need to take into consideration when structuring future cofinancing transactions;

- Evaluate the structure of new cofinancing transactions and to comment on their viability to be placed with potential participant banks as team members present them to you. The assessment should determine if proposed structures are adequate, and should identify the risks and issues related to their successful placement and recommend ways to mitigate or eliminate such risks;
- Provide the team members with possible cofinancing transactions that meet IIC's eligibility criteria and are being offered in the market. If the IIC indicates interest, assist in introducing the pertinent team members within the IIC to the parties presenting the potential transaction;

**ANNEX B**

## Standard Terms and Conditions for Consulting Services

### Standards

The Consultant undertakes to carry out the work hereunder in accordance with the highest standards of professional competence and integrity, having due regard for the nature and purposes of the Corporation as a public international organization and to ensure that any employee or agent assigned by him to perform any work hereunder will conduct himself in a manner consistent therewith.

Nevertheless, upon request by the designed representative of the Corporation, the Consultant shall replace any of his employees or agents stationed or working in the Corporation. In case the Consultant takes reasonable exception to the request to replace any of his employees or agents, he may, upon 30 days notice to the Corporation, terminate this Agreement.

### Relationship of Parties

Nothing contained in this Agreement shall be construed as the establishment or creation of a relationship of master and servant or principal and agent between the Consultant and the Corporation, it being agreed that the position of the Consultant and of anyone else performing any services under this Agreement is that of an independent contractor.

### Taxes

The Consultant shall be responsible for the payment of any taxes on income derived from the Corporation.

The Corporation is exempt from payment of all sales and excise taxes and shall provide the Consultant with tax exemption certificates upon written request. The Consultant shall consult the Corporation before payment of any sales and excise taxes demanded by any authority and incurred in the performance of services incident to this Agreement. The Consultant shall inform the Corporation if any taxing authority refuses to recognize the Corporation's proof of its immunity from taxation and the Corporation shall take such steps as are necessary for payment of the taxes under protest.

### Confidential Information

The Consultant and its employees or agents are aware that, in discharging their obligations pursuant to this Agreement, they may have access to privileged and confidential information of the Corporation. Under no circumstances shall the Consultant or its employees or agents disclose to any third party, in any manner or form, now or after the expiration of this Agreement, such information or any part thereof.

## Indemnification and Insurance

A. The Consultant agrees to indemnify, save harmless and defend the Corporation, its officers, agents, employees, servants and/or invitees and each and every one of them, against and from all claims, suits and costs of every kind and description, including Attorneys' fees, and from all damages which the Corporation, its officers, agents, employees, servants and/or invitees may sustain by reason of damage or injury proximately caused but not limited to any improper or defective work, machinery, material, supplies, implements or appliances (or through any instruction or directions for use thereof) which are under the control of or used by the Consultant, its employees or agents in connection with the performance of the services hereby covenanted and agreed to be done.

B. The Consultant shall be responsible for maintaining all life, health, accident, Workmen's Compensation, including employer's liability, and any other insurance for himself and for all those employed by the Consultant.

C. Upon request, the Consultant shall provide the Corporation with satisfactory Certificates of Insurance with respect to any of the matters specified in this Article.

## Advertisement

The Consultant agrees not to refer to this Agreement, or any aspects thereof, in commercial advertising in such a manner as to state or imply that the services provided by the Consultant are endorsed or preferred by the Corporation, or are considered by the Corporation to be superior to other services. Furthermore, the Consultant shall obtain the prior and express written consent of the Corporation, which consent shall not be unreasonably withheld, before using the name of the Corporation for any purposes.

## Arbitration

If any dispute shall arise between the Consultant and the Corporation as to the performance of this Agreement, or any matter or thing arising therefrom or in connection therewith, which cannot be settled by amicable agreement; then upon either party's giving notice of the difference or dispute to the other, the same shall be referred to arbitration and final determination by a single arbitrator in accordance with the rules of the American Arbitration Association.

The place of arbitration shall be Washington, D.C.

The language to be used in the arbitration proceedings shall be English with simultaneous interpretation to any of the official languages of the Corporation, if so requested by the Corporation.

The Arbitrator shall have legal counsel if he shall desire it or if one of the parties so requests.

The expenses of any arbitration proceeding shall be born equally by the Consultant and the Corporation.

8.    **Governing Law**

All questions, matters or disputes arising from this Agreement, or any part thereof, including but not limited to questions of interpretation, construction, validity and performance, shall be governed by the laws of the District of Columbia, except that nothing in this Agreement shall operate to restrict, limit, or defeat any rights, privileges or immunities granted to the Corporation or its personnel by the Agreement Establishing the Corporation or any law of the United States of America.

9.    **Jurisdiction**

Jurisdiction and venue for all legal actions which may arise as a result of any question, matter or dispute concerning this Agreement shall in the first instance be with the United States District Court for the District of Columbia; provided that the parties have complied with the provisions of the Arbitration clause of this Agreement.

10.    **Successors and Assigns**

The Corporation and the Consultant each binds itself, its successors, assigns and legal representatives to the other party hereto, and to the successors, assigns and legal representatives of such other party in respect to all covenants, agreements and obligations contained in this entire Agreement. Neither party shall assign this Agreement in whole or in part, without the written consent of the other party.

11.    **Severability**

If any provision of this Agreement is declared invalid by any tribunal, the remaining provisions shall not be affected thereby and shall remain in full force and effect.

**JRVila**

| | |
|---|---|
| **From:** | "Levy, David" <DAVIDL@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Cc:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **Sent:** | 06 February 2003 23:03 |
| **Subject:** | RE: Jamaica Resort A-B Loan |

# Mail # 4

Vila,

We'll meet with financial advisor of the company that we mentioned in Jamaica tomorrow. He has to confirm the time. He would like to have you on a conference call. As soon as he tells me in the morning what time we'll meet I'll let you know.

Thanks,

David

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Wednesday, February 05, 2003 1:57 PM
**To:** Victorm@iadb.org; davidl@iadb.org
**Subject:** Jamaica Resort A-B Loan

# Mail # 1

Please find below Jamaican sovereign bond market mid-prices as of last Monday:

Republic June 2005, 2.3 yrs average life, about T+495.
Republic September 2007, 4.6 yrs average life, about T+425.
Republic May 2011, 8.3 yrs average life, about T+525.
Republic June 2017, 14.4 yrs average life, about T+625.
Republic January 2022, 18.9 yrs average life, about T+535.

The results of my 3-day search are not conclusive, but they are relatively optimistic, subject to quite a few "ifs". Look forward to discussing them with you this afternoon. Please let me know a convenient time to call you or receive your call.
Saludos, Jorge

**JRVila**

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 06 February 2003 20:30 |
| **Subject:** | RE: Of B Loans & tulips - Jamaica |

**Mail # 3**

Jorge:

Thanks for the information.  With respect to the conversations today about Jamaica, those had to be postponed for tomorrow. We most definitely need to have you participate in them.  We will advise the time and will initiate the conference call.

Saludos,

Victor Hugo

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Thursday, February 06, 2003 9:45 AM
**To:** victorhm@iadb.org
**Subject:** Of B Loans & tulips - Jamaica

**Mail # 2**

Victor: two lines to let you know that my market walk-about so far suggests that Safra's TR B Loan should fly at L+2.25 to 2.375%, plus fees (1%), one year renewable. I would advice to "proceed with all dispatch", there is another Brazilian bank, tulip-foreign owned, pressing the IFC for a similar deal.
On a different tone, would you want me on stand-by during your conversations today about Jamaica? Ready, willing and able, but please let me know.
Saludos, J.

**JRVila**

| From: | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
|---|---|
| To: | "Jorge Vila (E-mail)" <j.r.vila@btinternet.com> |
| Sent: | 28 February 2003 23:48 |
| Attach: | SUMMARY TERMS AND CONDITIONS.doc |
| Subject: | Indicative Terms and Conditions |

# Mail # 5

Jorge:

Attached is a draft Indicative Terms and Conditions for Banco Safra.  Please let me know your comments before you start using it with potential participant banks.

Thanks,

Victor Hugo

Mail # 5
Attachment
Page 1

## INDICATIVE TERMS ONLY
(Subject to IIC=s Board approval)

### PARTICIPATIONS  IN  A  US$75,000,000  LOAN
FROM
### THE  INTER-AMERICAN  INVESTMENT  CORPORATION
TO
### BANCO SAFRA  S.A.

| | |
|---|---|
| **Borrower:** | Banco Safra S.A. (ASafra≅), a private Brazilian commercial bank. |
| **Lender of Record:** | Inter-American Investment Corporation (AIIC≅). |
| **Participants:** | Non-Brazilian financial institutions engaged in international lending (AParticipants≅). |
| **Amount of A Loan, B Loan:** | US$75,000,000 (Athe IIC Loan≅).  The IIC Loan will consist of an A A Loan≅ of US$15,000,000 (Athe A Loan≅) to be funded by the IIC, and a  AB Loan≅ of US$60,000,000 (Athe B Loan≅) to be funded by Participants. |
| **Amount of Individual Participation Commitments:** | Minimum US$4,000,000, maximum US$10,000,000, in increments of US$1,000,000. |
| **Rate of Interest of the B Loan:** | Six-month LIBOR plus 2.375% per annum, payable semi-annually. |
| **Use of Proceeds by Safra:** | Safra will on-lend funds from the IIC Loan for the financing of any import or export activity by an Eligible Project Company  (EPC) on the ordinary course of business (including the provision of pre-export, post-export and import financing) provided that is not engaged in activities related to speculative real estate, gaming tobacco or manufacturers  of arms or alcohols and that are U.S. dollar-denominated loans (ASub-loans≅) to eligible Brazilian borrowers (ASub-borrowers≅).  Sub-loans funded by the IIC Loan shall not be less than US$200,000. All Sub-loans will have commercial terms. |
| **Term of Loan:** | The A  Loan will have a term of 2 (two) years with one bullet payment. The B Loan will have a term of 1 (one) year, renewable for one more year, at the option of the Participant. |

**Mail # 5
Attachment
Page 2**

**Commitment Fee to
B Loan Participants:**    0.5% (one-half of one percent) per annum, on the undisbursed portion of a Participant=s commitment, payable semi-annually, for its portion of the B Loan financed.

**Participation Fee to
B Loan Participants:**    .50 - .625% (one half of one percent to five eighths of one percent) of the amount of a Participant=s commitment, payable 30 (thirty) calendar days after the Effective Date, for its portion of the B Loan financed.

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <victorhm@iadb.org> |
| **Sent:** | 03 March 2003 13:44 |
| **Attach:** | Safra Draft Summary Terms & Conditions 2.doc |
| **Subject:** | Banco Safra B Loan - Draft Terms & Conditions |

# Mail # 6

Victor: here is the draft that I would propose (although I would like to discuss a few clauses). In terms of pricing, this would be the break-down (perhaps we could use 0.50% and 0.625% as up-fronts, but........ you now want US$ 60M!k I do not know, at 0.625 and 0.75% we may be overpaying a bit, but again........I would hate to come short of US$60M for only 1/8%).

| | |
|---|---|
| 1. B Loan spread: | 2.3750% |
| 2. Estimated average up-front fee (0.625% & 0.75%): | 0.6875% |
| | |
| Sub total: | 3.0625% |
| Cost ceiling: | (4.0000%) |
| | |
| 3. Net available: | 0.9375% |
| 4. IIC distribution fee: | (0.8500%) |
| 5. Estimated commitment fee: | (0.0875%) |
| | |
| Total: | 0.00000% |

Let's discuss today, if you are available.
Saludos, J.

**Mail # 6
Attachment
Page 1**

---

## CONFIDENTIAL SUMMARY OF TERMS AND CONDITIONS

**March 2003**

### PARTICIPATION IN A US$75,000,000 LOAN

### FROM

### INTER-AMERICAN INVESTMENT CORPORATION

### TO

### BANCO SAFRA S.A.
*incorporated in The Republic of Brazil*

This Summary of Terms and Conditions has been prepared by the Inter-American Investment Corporation ("IIC") on behalf of Banco Safra S.A. ("Bank") regarding the indicative loan described herein. Delivery of this Summary shall not, under any circumstances, create any implication that the terms and conditions described herein are final or correct as of any time subsequent to the date of this Summary.

This Summary is not intended to provide the sole basis for a decision to participate in the tentative financing described herein; it is the responsibility of each prospective participant to conduct its own evaluation of the risks and merits of any such decision to participate.

This Summary is furnished with the understanding that without prior authorization from the IIC or the Bank, no person accepting this Summary will either release it (or a reproduction of it) to third parties, or use it for any purpose other than information to evaluate a participation in the indicative loan described herein.

**Mail # 6
Attachment
Page 2**

PARTICIPATION IN A US$ 75,000,000 LOAN
FROM
THE INTER-AMERICAN INVESTMENT CORPORATION
TO
BANCO SAFRA S.A.

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Borrower:** | Banco Safra S.A., a private commercial bank incorporated in the Republic of Brazil ("Bank"). |
| **Lender of Record:** | Inter-American Investment Corporation ("IIC") |
| **Participants:** | Financial institutions that are not incorporated in the Republic of Brazil and that are engaged in international lending ("Participant/s"). |
| **Amount of the Loan:** | US$ 75,000,000 (the "IIC Loan"), including an "A Loan" of US$ 15,000,000 to be funded by IIC, and a "B Loan" of US$ 60,000,000 to be funded by Participants. |
| **Amount of Individual Participation Commitments:** | Minimum US$ 2,000,000, maximum US$ 10,000,000, in increments of US$ 1,000,000 ("Participation Amount/s"). |
| **Use of Proceeds:** | the Bank will use any funds from the IIC Loan to finance, through U.S. dollar-denominated loans under market terms and conditions, qualified trade related transactions (generally defined as qualified cross-border exchanges of goods and services) by eligible Brazilian borrowers in the ordinary course of their business, including pre-export, post-export and import financing, provided that these transactions do not relate to speculative real estate, gaming, tobacco or manufacturing arms or alcohol ("Sub-Loans"). |
| **Loan Terms:** | The A Loan will have a term of 2 (two) years, paying interest semi-annually, with 1 (one) full principal repayment at the end of the 2 years. The B Loan will have a term of 1 (one) year, renewable for 1 (one) more year at the option of the Participant, with 1 (one) full principal repayment at the end of the 1 year. |
| **B Loan Interest Rate:** | Six-month Libor plus 2.375% per annum, payable semi-annually. |
| **B Loan Front-end Fee:** | 0.625% (five eighths of one percent) on Participations up to US$ 5,000,000, and 0.75% (three quarters of one percent) on Participation Amounts over US$ 5,000,000. |
| **Commitment Fee:** | 0.50% (one-half of one percent) per annum, on the undisbursed portion of the IIC Loan, payable to Participants semi-annually on the basis of their Participation Amount. |

# Mail # 6
# Attachment
# Page 3

**Effective Date of
the B Loan:**    The effective date of the B Loan will be the date when Participation Agreements have been executed by all Participants ("Effective Date").

**Optional Prepayment:**    Permitted with 90 day-notice only with prepayment fee equal to 1.5% (one and a half percent) of the prepaid amount ("Prepayment Fee") prorated by the months remaining to maturity. The minimum prepayment will be US$ 2,500,000.

**Mandatory Prepayment:**    (a) All amounts disbursed by IIC but not used by the Bank to finance Sub-Loans within 90 days of disbursement and (b) all repayments and prepayments of Sub-Loans not reinvested in other eligible Sub-Loans within 90 days of receipt, in an aggregate amount of not less than US$100,000.

**Covenants:**    Customary in loan agreements of this nature.

**Disbursement Availability:**    Initial disbursement of the B Loan will be no later than 1 (one) month after the Effective Date, and final disbursement will be no later than 3 (three) months after the Effective Date. Neither IIC nor any Participant will be obligated to fund any portion of the B Loan which another Participant may have failed to fund.

**Allocation of Payments
Among IIC and Participants:**    As lender of record, IIC will collect all debt service and other charges from the Bank and, with the sole exception of fees arising from IIC's role as administrator of the B Loan and for IIC's supervision activities, will distribute them if, when and as received, *pro rata* among itself and the Participants according to the percentage share of each in the principal amount of the IIC Loan outstanding, on a *pari passu* basis.

**Events of Default:**    Payment and performance defaults as are customary in loan agreements of this nature.

**Late Payment Charge:**    Six percent (6%) per annum, payable on the amount of principal, interest, fees and charges in arrears to the extent permitted by law, and for each day that an amount is due but remains unpaid.

**Increased Costs or
Material Changes in
Circumstances:**    Customary in loan agreements of this nature, providing protection for Participants in the event of increased costs or funding losses.

**Limited Liability
of IIC:**    IIC shall have no obligation or liability to Participants for payments due on the B Loan. Participants shall have no recourse against IIC for any payment of principal of, or interest on, the B Loan, or for any fees or other amounts payable thereon by the Bank, or for any act or omission by IIC in administering the IIC Loan other than acts of gross negligence or of willful misconduct.

# Mail # 6
# Attachment
# Page 4

**Responsibility of Participants:**

Participants will be responsible for conducting their own due diligence and for making independent credit evaluations regarding the Bank, and for making Participation commitments based upon the results of such due diligence.

**Participant's Right of Assignment:**

Each Participation is for the account of the Participant, and may not be re-offered, assigned, sold or otherwise transferred without the prior written approval of IIC.

**Governing Law:**

The laws of the State of New York, United States of America.

**No IIC Representations or Warranties:**

IIC makes no representations or warranties, express or implied, as to the merits of the Participation described herein, or to the financial condition or creditworthiness of the Bank.

**JRVila**

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "Jorge Vila (E-mail)" <j.r.vila@btinternet.com> |
| **Sent:** | 04 March 2003 17:19 |
| **Attach:** | Summary of Terms and Conditions (Participations).doc |
| **Subject:** | Revised Summary Terms and Conditions |

**Mail # 7**

Jorge:

Attached are the revised summary terms and conditions for Banco Safra that include Alejandro's comments. Let's talk before sending them out.

Victor Hugo

**Mail # 7**
**Attachment**
**Page 1**

## CONFIDENTIAL SUMMARY OF TERMS AND CONDITIONS

**March 2003**

## PARTICIPATION IN A US$75,000,000 UNSECURED LOAN

### FROM

### INTER-AMERICAN INVESTMENT CORPORATION

### TO

### BANCO SAFRA S.A.

*incorporated in The Republic of Brazil*

This Summary of Terms and Conditions has been prepared by Banco Safra S.A. ("Bank") with the authorization of the Inter-American Investment Corporation ("IIC") on behalf of Banco Safra S.A. ("Bank") regarding the indicative loan described herein. Delivery of this Summary shall not, under any circumstances, create any implication that the terms and conditions described herein are final or correct as of any time subsequent to the date of this Summary, and no representation or warranty, express or implied, is made by the IIC as to the accuracy or completeness of such information, and nothing contained in this Summary of Terms and Conditions is, or shall be relied upon as, a promise or representation of the IIC.

This Summary is not intended to provide the sole basis for a decision to participate in the tentative financing described herein; it is the responsibility of each prospective participant to conduct its own evaluation of the risks and merits of any such decision to participate.

This Summary is furnished with the understanding that without prior authorization from the IIC or the Bank, no person accepting this Summary will either release it (or a reproduction of it) to third parties, or use it for any purpose other than information to evaluate a participation in the indicative loan described herein.

**Mail # 7
Attachment
Page 2**

PARTICIPATION IN A US$ 75,000,000 UNSECURED LOAN
FROM
THE INTER-AMERICAN INVESTMENT CORPORATION
TO
BANCO SAFRA S.A.

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Borrower:** | Banco Safra S.A., a private commercial bank incorporated in the Republic of Brazil ("Bank"). |
| **Lender of Record:** | Inter-American Investment Corporation ("IIC") |
| **Participants:** | Financial institutions that are not incorporated in the Republic of Brazil and that are engaged in international lending ("Participant/s"). |
| **Amount of the Loan:** | US$ 75,000,000 (the "IIC Loan"), including an "A Loan" of US$ 15,000,000 to be funded by IIC, and a "B Loan" of US$ 60,000,000 to be funded by Participants. |
| **Amount of Individual Participation Commitments:** | Minimum US$ 2,000,000, maximum US$ 10,000,000, in increments of US$ 1,000,000 ("Participation Amount/s"). |
| **Use of Proceeds:** | the Bank will use any funds from the IIC Loan to finance, through U.S. dollar-denominated loans under market terms and conditions, qualified trade related transactions (generally defined as qualified cross-border exchanges of goods and services) by eligible Brazilian borrowers in the ordinary course of their business, including pre-export, post-export and import financing, provided that these transactions do not relate to speculative real estate, gaming, tobacco or manufacturing arms or alcohol ("Sub-Loans"). |
| **Loan Terms:** | The A Loan will have a term of 2 (two) years, paying interest semi-annually, with 1 (one) full principal repayment at the end of the 2 years. The B Loan will have a term of 1 (one) year, renewable for 1 (one) more year at the option of the Participant, with 1 (one) full principal repayment at the end of the first year 1 year. |
| **B Loan Interest Rate:** | Six-month Libor plus 2.375% per annum, payable semi-annually. |
| **B Loan Front-end Fee:** | 0.50625% (five eighths of one percent) on Participations up to US$ 5,000,000, and 0.62575% (three quarters of one percent) on Participation Amounts over US$ 5,000,000. |

**Mail # 7
Attachment
Page 3**

| | |
|---|---|
| **Commitment Fee:** | 0.50% (one-half of one percent) per annum, on the undisbursed portion of the IIC Loan, payable to Participants semi-annually on the basis of their Participation Amount. |
| **Effective Date of the B Loan:** | The effective date of the B Loan will be the date when Participation Agreements have been executed by all Participants ("Effective Date"). |
| **Optional Prepayment:** | Permitted with 90 day-notice only with prepayment fee equal to 1.05% (one ~~and a half~~ percent) of the prepaid amount ("Prepayment Fee") prorated by the months remaining to maturity. The minimum prepayment will be US$ 2,500,000. |
| **Mandatory Prepayment:** | (a) All amounts disbursed by IIC but not used by the Bank to finance Sub-Loans within 90 days of disbursement and (b) all repayments and prepayments of Sub-Loans not reinvested in other eligible Sub-Loans within 90 days of receip~~t, in an aggregate amount of not less than US$100,000~~. |
| **Covenants:** | Customary in loan agreements of this nature. |
| **Disbursement Availability:** | Initial disbursement of the B Loan will be no later than 1 (one) month after the Effective Date, and final disbursement will be no later than 3 (three) months after the Effective Date. Neither IIC nor any Participant will be obligated to fund any portion of the B Loan which another Participant may have failed to fund. |
| **Allocation of Payments Among IIC and Participants:** | As lender of record, IIC will collect all debt service and other charges from the Bank and, with the sole exception of fees arising from IIC's role as administrator of the B Loan and for IIC's supervision activities, will distribute them if, when and as received, *pro rata* among itself and the Participants according to the percentage share of each in the principal amount of the IIC Loan outstanding, on a *pari passu* basis. |
| **Events of Default:** | Payment and performance defaults as are customary in loan agreements of this nature. |
| **Late Payment Charge:** | Six percent (6%) per annum, payable on the amount of principal, interest, fees and charges in arrears to the extent permitted by law, and for each day that an amount is due but remains unpaid. |
| **Increased Costs or Material Changes in Circumstances:** | Customary in loan agreements of this nature, providing protection for Participants in the event of increased costs or funding losses. |
| **Limited Liability of IIC:** | IIC shall have no obligation or liability to Participants for payments due on the B Loan. Participants shall have no recourse against IIC for any payment of principal of, or |

**Mail # 7
Attachment
Page 4**

interest on, the B  Loan, or for any fees or other amounts payable thereon by the Bank, or for any act or omission by IIC in administering the IIC Loan other than acts of gross negligence or of willful misconduct.

**Responsibility of
Participants:**

Participants will be responsible for conducting their own due diligence and for making independent credit evaluations regarding the Bank, and for making Participation commitments based upon the results of such due diligence.

**Participant's Right
of Assignment:**

Each Participation is for the account of the Participant, and may not be re-offered, assigned, sold or otherwise transferred without the prior written approval of IIC.

**Governing Law:**

The laws of the State of New York, United States of America.

**No IIC Representations
or Warranties:**

IIC makes no representations or warranties, express or implied, as to the merits of the Participation described herein, or to the financial condition or creditworthiness of the Bank.

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | <victorhm@iadb.org> | **Mail # 8** |
| **Sent:** | 05 March 2003 11:53 | |
| **Attach:** | Safra Summary Terms & Conditions .doc | |
| **Subject:** | Safra B Loan | |

Victor: attached is Summary including Alejandro's comments, and very few minor changes that I would further suggest (nothing material in my view). I will call you at your opening.
Saludos, J.

Mail # 8
Attachment
Page 1

CONFIDENTIAL SUMMARY OF TERMS AND CONDITIONS

March 2003

PARTICIPATION IN A US$75,000,000 UNSECURED LOAN

FROM

INTER-AMERICAN INVESTMENT CORPORATION

TO

**BANCO SAFRA S.A.**
*incorporated in The Republic of Brazil*

This Summary of Terms and Conditions has been prepared by Banco Safra S.A. ("Bank") with the authorization of the Inter-American Investment Corporation ("IIC"), regarding the indicative loan described herein. Delivery of this Summary shall not, under any circumstances, create any implication that the terms and conditions described herein are final or correct as of any time subsequent to the date of this Summary, and no representation or warranty, express or implied, is made by the IIC as to the accuracy or completeness of such Summary, and nothing contained in this Summary is, or shall be relied upon as, a promise or representation of the IIC.

This Summary is not intended to provide the sole basis for a decision to participate in the tentative financing described herein; it is the responsibility of each prospective participant to conduct its own evaluation of the risks and merits of any such decision to participate.

This Summary is furnished with the understanding that without prior authorization from the IIC or the Bank, no person accepting this Summary will either release it (or a reproduction of it) to third parties, or use it for any purpose other than information to evaluate a participation in the indicative loan described herein.

**Mail # 8
Attachment
Page 1**

## CONFIDENTIAL SUMMARY OF TERMS AND CONDITIONS

**March 2003**

### PARTICIPATION IN A US$75,000,000 UNSECURED LOAN

### FROM

### INTER-AMERICAN INVESTMENT CORPORATION

### TO

### BANCO SAFRA S.A.
*incorporated in The Republic of Brazil*

This Summary of Terms and Conditions has been prepared by Banco Safra S.A. ("Bank") with the authorization of the Inter-American Investment Corporation ("IIC"), regarding the indicative loan described herein. Delivery of this Summary shall not, under any circumstances, create any implication that the terms and conditions described herein are final or correct as of any time subsequent to the date of this Summary, and no representation or warranty, express or implied, is made by the IIC as to the accuracy or completeness of such Summary, and nothing contained in this Summary is, or shall be relied upon as, a promise or representation of the IIC.

This Summary is not intended to provide the sole basis for a decision to participate in the tentative financing described herein; it is the responsibility of each prospective participant to conduct its own evaluation of the risks and merits of any such decision to participate.

This Summary is furnished with the understanding that without prior authorization from the IIC or the Bank, no person accepting this Summary will either release it (or a reproduction of it) to third parties, or use it for any purpose other than information to evaluate a participation in the indicative loan described herein.

# Mail # 8
# Attachment
# Page 2

PARTICIPATION IN A US$ 75,000,000 UNSECURED LOAN
FROM
THE INTER-AMERICAN INVESTMENT CORPORATION
TO
BANCO SAFRA S.A.

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Borrower:** | Banco Safra S.A., a private commercial bank incorporated in the Republic of Brazil ("Bank"). |
| **Lender of Record:** | Inter-American Investment Corporation ("IIC") |
| **Participants:** | Financial institutions that are not incorporated in the Republic of Brazil and that are engaged in international lending ("Participants"). |
| **Amount of the Loan:** | US$ 75,000,000 (the "IIC Loan"), including an A Loan of US$ 15,000,000 to be funded by IIC, and a B Loan of US$ 60,000,000 to be funded by Participants. |
| **Amount of B Loan Individual Participation Commitments:** | Minimum US$ 2,000,000, maximum US$ 10,000,000, in increments of US$ 1,000,000 ("Participations"). |
| **Use of Proceeds:** | the Bank will use any funds from the IIC Loan to finance, through U.S. dollar-denominated loans under market terms and conditions, qualified trade related transactions (generally defined as qualified cross-border exchanges of goods and services) by eligible Brazilian borrowers in the ordinary course of their business, including pre-export, post-export and import financing, provided that these transactions do not relate to speculative real estate, gaming, tobacco or manufacturing arms or alcohol ("Sub-Loans"). |
| **Loan Terms:** | The A Loan will have a term of 2 (two) years, paying interest semi-annually, with 1 (one) full principal repayment at the end of the second year. The B Loan will have a term of 1 (one) year, renewable for 1 (one) more year at the option of the Participant, with 1 (one) full principal repayment at the end of the first year. |
| **B Loan Interest Rate:** | Six-month Libor plus 2.375% per annum, payable semi-annually. |
| **B Loan Front-end Fee:** | 0.50% (one-half of one percent) on Participations up to US$ 5,000,000, and 0.625% (five eighths of one percent) on Participations over US$ 5,000,000. |
| **Commitment Fee:** | 0.50% (one-half of one percent) per annum, on the undisbursed portion of the IIC Loan, payable to Participants semi-annually on the basis of their Participations. |

# Mail # 8
# Attachment
# Page 3

**Effective Date of
the B Loan:**

The effective date of the B Loan will be the date when Participation Agreements have been executed by all Participants ("Effective Date").

**Optional Prepayment:**

Permitted with 90 day-notice only with a prepayment fee equal to 1.0% (one percent) of the prepaid amount ("Prepayment Fee") prorated by the months remaining to maturity. The minimum prepayment will be US$ 2,500,000.

**Mandatory Prepayment:**

(a) All amounts disbursed by IIC but not used by the Bank to finance Sub-Loans within 90 days of disbursement and (b) all repayments and prepayments of Sub-Loans not reinvested in other eligible Sub-Loans within 90 days of receipt.

**Covenants:**

Customary in loan agreements of this nature.

**Disbursement Availability:**

Initial disbursement of the B Loan will be no later than 1 (one) month after the Effective Date, and final disbursement will be no later than 3 (three) months after the Effective Date. Neither IIC nor any Participant will be obligated to fund any portion of the B Loan which another Participant may have failed to fund.

**Allocation of Payments
Among IIC and Participants:**

As lender of record, IIC will collect all debt service and other charges from the Bank and, with the sole exception of fees arising from IIC's role as administrator of the B Loan and for IIC's supervision activities, will distribute them if, when and as received, *pro rata* among itself and the Participants according to the percentage share of each in the principal amount of the IIC Loan outstanding, on a *pari passu* basis.

**Events of Default:**

Payment and performance defaults as are customary in loan agreements of this nature.

**Late Payment Charge:**

Six percent (6%) per annum, payable on the amount of principal, interest, fees and charges in arrears to the extent permitted by law, and for each day that an amount is due but remains unpaid.

**Increased Costs or
Material Changes in
Circumstances:**

Customary in loan agreements of this nature, providing protection for Participants in the event of increased costs or funding losses.

**Limited Liability
of IIC:**

IIC shall have no obligation or liability to Participants for payments due on the B Loan. Participants shall have no recourse against IIC for any payment of principal of, or interest on, the B Loan, or for any fees or other amounts payable thereon by the Bank, or for any act or omission by IIC in administering the IIC Loan other than acts of gross negligence or willful misconduct.

**Mail # 8
Attachment
Page 4**

**Responsibility of
Participants:**

Participants will be responsible for conducting their own due diligence and for making independent credit evaluations regarding the Bank, and for making Participation commitments based upon the results of such due diligence.

**Participant's Right
of Assignment:**

Each Participation is for the account of the Participant, and may not be re-offered, assigned, sold or otherwise transferred without the prior written approval of IIC.

**Governing Law:**

The laws of the State of New York, United States of America.

**No IIC Representations
or Warranties:**

IIC makes no representations or warranties, express or implied, as to the merits of the Participation described herein, or to the financial condition or creditworthiness of the Bank.

Page 1 of 1

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <victorhm@iadb.org> |
| **Sent:** | 06 March 2003 12:58 |
| **Subject:** | Banco Safra B Loan |

# Mail # 9

Victor: I learned this morning that the IDB-IFC are already in the market distributing USD150M in a TR B Loan to Bradesco at L+2.50% plus fees ranging from 3/8 to 5/8. Furthermore, I understand that another TR B Loan, this for Votorantim, no details known, is number 1 on the IFC distribution runway.

I have not gone formally into the market yet, just had a few exploratory talks this morning until I learned Bradesco's pricing. Their sense of timing, partners and pricing is unfortunate for us, but our timing is still good and we are not far in price.

I advice to start formally offering our Safra, immediately, at L+2.625% (instead of 2.375%, in the market perception Safra must pay at least 1/8 over Bradesco for 1 yr), plus the already discussed fee structure (0.50% and 0.625%). Breakdown cost would be:

| | |
|---|---|
| Spread: | 2.625% |
| Maximum participation fee: | 0.625% |
| Estimated commitment fee: | 0.050% |
| | |
| Total: | 3.300% |
| IIC fee: | 0.700% |
| | |
| Total cost: | 4.000% |

If you agree, I will ammend the Summary of Terms and Conditions and I will go full speed. Please confirm asap.

Saludos,
Jorge

**JRVila**

| | | |
|---|---|---|
| **From:** | <paolo.r.curiel@us.pwcglobal.com> | **Mail # 10** |
| **To:** | <j.r.vila@btinternet.com> | |
| **Sent:** | 05 March 2003 23:56 | |
| **Attach:** | Sunset Beach Information.eml | |
| **Subject:** | Sunset Beach Information | |

This message has been processed by BTopenworld Email Protection Service powered by Brightmail(TM) Anti-Virus using
Symantec's Norton AntiVirus Technology.

SUNSET FEB 2002.pdf was not scanned for viruses by BTopenworld Email Protection Service powered by Symantec because it is too large.


For more information on anti-virus tips and technology, visit
http://www.brightmail.com/antivirus .

**JRVila**

| | |
|---|---|
| **From:** | "Maurici LLado" <maurici.llado@batlantico.com> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 18 March 2003 19:54 |
| **Subject:** | RE: IIC Trade Related B Loan Banco Safra SA |

**Mail # 73**

Jorge,
Ya estamos empezando a movernos con respecto a la operacion que nos ofreces.
Estoy viajando esta noche a Europa. Te confirmo que estare alojado en Milan en el Hotel Westin Palace. Mi # Celular es (786) 303.42.73.
Espero que pueda saludarte en Milan,
Un abrazo.
Maurici Llado.

-----Mensaje original-----
**De:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Enviado el:** Thursday, March 13, 2003 5:15 PM
**Para:** Maurici.llado@batlantico.com
**Asunto:** IIC Trade Related B Loan Banco Safra SA

**Mail # 42**

Dear Maurici: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.
I look forward to seeing you at the IDB in Milan, let me know your mobile number.
We look forward to having Banco Atlantico on board for this very attractive project.
Best regards,
Jorge R. Vila

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender via returned e-mail. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Although Banco Atlantico operates anti-virus programs, it does not accept responsibility for any damage whatsoever that is caused by viruses being passed.

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <Jean.Delbecque@bbi.be> |
| **Cc:** | <Victorhm@iadb.org> |
| **Sent:** | 13 March 2003 13:00 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 43

Dear Mr Delbecque: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very attractive project.
Best regards,
Jorge R. Vila

16/03/2005

**JR Vila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | <Heinz-Werner.Firmenich@lrp.de> | **Mail # 44** |
| **Sent:** | 13 March 2003 09:53 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA, Brazil | |

Dear Mr Firmenich: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. I look forward to meeting you in Milan by the end of this month. Kindly see www.iadb.org for information on the IIC.

We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with Rheinland-Pfalz LB.

Best regards,

Jorge R. Vila

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <Victoria_petterson@bancone.com> |
| **Sent:** | 13 March 2003 23:18 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 45

Dear Victoria: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.

As discussed, I will contact you in a few weeks to discuss any developments. I look forward to seeing Madeleine Champion at the IDB in Milan.

Best regards,

Jorge R. Vila

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <zoltan.toth@rzb.at> |
| **Cc:** | <victorhm@iadb.org> |
| **Sent:** | 13 March 2003 11:11 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 46

Dear Zoltan: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. I will mail Safra's 2002 financial statements as soon as I receive them. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.

I look forward to meeting representatives of your bank in Milan by the end of this month. Kindly see www.iadb.org for information on the IIC. We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with RZB-Austria.

Best regards,

Jorge R. Vila

**JR Vila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 56** |
| **To:** | <Debbie.Harsono@INGBank.com> | |
| **Cc:** | <Annemarie.den.Bezemer@INGBank.com>; <michaela.di_francesco@bhf.ing.com> | |
| **Sent:** | 14 March 2003 13:11 | |
| **Subject:** | Re: IADB Meeting, Milan | |

Dear Ms Harsono: thank you for your kind invitation. I will be at the Marriot Hotel, on Monday 24 March, at 13.00. Just in case please note my mobile number 44-7775-587-964. Unfortunately, Steven Reed, IIC Operations Manager, is already engaged at that time, but I will be happy to describe the IIC current distribution pipeline and explore opportunities of mutual interest.
Best regards,
Jorge R. Vila

----- Original Message -----

**Mail # 47**

From: <Debbie.Harsono@INGBank.com>
To: <j.r.vila@btopenworld.com>
Cc: <Annemarie.den.Bezemer@INGBank.com>; <michaela.di_francesco@bhf.ing.com>
Sent: Thursday, March 13, 2003 1:25 PM
Subject: IADB Meeting, Milan

> Dear Mr. Vila,
>
> We suggest a meeting on:
>
> Date: Monday 24 March 2003
> Time: 13.00 hrs
> Place: The Marriott Hotel
>
> Participants from ING Bank:
> Mr. Jean-Louis Goedmakers, Head of Relationship Management
> Ms. Annemarie den Bezemer, Regional Manager
> Mr. Gerding, Senior Regional Manager
> Mr. Tuchnitz, Regional Manager
>
> Please let me know whether this convenient is for you and indicate also the
> names of the persons who will attend this meeting.
>
> Thanks in advance.
>
> Best regards,
>
> Debbie Harsono
> Secretary Financial Institutions
> Location HA 01.05
> Bijlmerplein 888
> 1102 MG Amsterdam
> The Netherlands
> Tel: 31.20.5634913
> Fax: 31.20.5768763
> Email: Debbie.Harsono@ingbank.com

**JRVila**

| | |
|---|---|
| **From:** | <zoltan.toth@rzb.at> |
| **To:** | <j.r.vila@btopenworld.com> |
| **Sent:** | 13 March 2003 17:33 |
| **Subject:** | Antwort: IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 48

Dear Jorge,

Thanx for the termsheet. Pls. find enclosed our people coming to IDB meeting:

Dr. Martin Czurda, Vice President RZB AG Vienna and
Warren Baker and Griselda Alvizo from RZB New York.

Lets keep in touch, kind regards,


Zoltan Toth
Manager Financial Institutions & Sovereigns
for CE and Latin America
RAIFFEISEN ZENTRALBANK OESTERREICH AG
Am Stadtpark 9
A-1030 Vienna

Tel.: +43-1-71707/1494
Fax: +43-1-71707/3935
e-mail: zoltan.toth@rzb.at
www.rzb.at

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <Victorhm@iadb.org> |
| **Sent:** | 13 March 2003 15:24 |
| **Subject:** | Safra B Loan |

# Mail # 49

Victor: podemos pedirle a Safra 2002 financial statements por mail para Hypovereinsbank NY, y para otros que los pidan? Sobre el tema de los corresponsales, me quede pensando tu comentario de anoche y tal vez no sea conveniente pedirle esa ayuda a Safra. De todas maneras yo puedo llegar eventualmente a esos relationship managers, aunque tomaria mas tiempo. Estoy planeando enviarte manana un resumen con las conversaciones de la semana y outlook.
Please let me know. Saludos, J.

**JRVila**

| | | |
|---|---|---|
| From: | "J R Vila" <j.r.vila@btopenworld.com> | |
| To: | <victorhm@iadb.org> | **Mail # 50** |
| Sent: | 13 March 2003 19:47 | |
| Subject: | Milan meetings | |

Victor: I have arranged the following Milan meetings so far:

1. Landesbank Baden-Wurttemberg (Stuttgart, USD 255bn in assets by Dec 99), Sunday 23 March, 12.00 West Inn Palace, Piazza de la Republica;
2. ING, Monday 24 March, 13.00, Marriot Hotel.

Still working on RZB-Austria, Bayerische LB (VERY IMPORTANT FOR SAFRA PURPOSES, I NEED TO TALK TO YOU ABOUT THIS), and other meetings. I strongly recommend that Steve joins me for 1. and 2. at least, they will include senior people from LB BW and ING. Can you find out & let me know?
Saludos, J.

**JRVila**

| | |
|---|---|
| **From:** | "Brenner, Thomas" <Thomas.Brenner@blb.de> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 14 March 2003 13:48 |
| **Subject:** | AW: IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 52

Dear Jorge,

I remember quite well your visit here in Munich some years ago, when you were still working for BoA. I'll transfer your message to our secretary as she is coordinanting our shedule for Milan. She will contact you next week in order to arrange a meeting.
Have a nice weekend and best regards,
Thomas Brenner

# Mail # 51

-----Ursprüngliche Nachricht-----
**Von:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Gesendet am:** Freitag, 14. März 2003 14:18
**An:** Martina.Lemmer@bayernlb.de
**Cc:** Thomas.Brenner@bayernlb.de
**Betreff:** IIC Trade Related B Loan Banco Safra SA Brazil
**Dear Martina:** per our conversation yesterday, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.
I look forward to meeting with Thomas in Milan to discuss opportunities of mutual interest. He may remember that I visited him in Munich some years ago. I will call him at the Golden Tulip Hotel to arrange a meeting. Please let me know if he will be reachable at a mobile. Just in case, I can also be reached at my mobile number above.
Kindly see www.iadb.org for information on the IIC.
We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with Bayerische LB.
Best regards,
Jorge R. Vila

**JR Vila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | <alberto.lourenco@commerzbank.com> | **Mail # 53** |
| **Sent:** | 14 March 2003 11:46 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | Fw: IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Mr Lourenco: attached please find Summary of terms and conditions for the B Loan discussed. I look forward to seeing you in Milan next week! I will try to reach you at the Sheraton Diana.
Best regards,
Jorge R. Vila

———— Original Message ————
**From:** J R Vila
**To:** dweissfeld@cbkn.com
**Sent:** Tuesday, March 11, 2003 10:03 PM
**Subject:** IIC Trade Related B Loan Banco Safra SA Brazil

Dear Daniel: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very attractive project.
Best regards,
Jorge R. Vila

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <zrubinstein@hapoalimusa.com> |
| **Sent:** | 14 March 2003 15:05 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 54

Dear Ziporah: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information on this B Loan. For information on the IIC, please look at www.iadb.org
We look forward to having you on board for this trade project, as we believe it would be a good opportunity to develop a closer relationship with Bank Hapoalim.
Best regards,
Jorge R. Vila

Page 1 of 1

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <tim.reid@us.hsbc.com> |
| **Cc:** | <david.kimball@us.hsbc.com> |
| **Sent:** | 14 March 2003 14:35 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 55

Dear Tim: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information on this B Loan. For additional information on the IIC, kindly look at www.iadb.org

I look forward to meeting your colleague David Kimball at the IDB in Milan by the end of this month. We also look forward to having you on board for this project, as we believe it would be a good opportunity to start developing a closer relationship with HSBC.

Best regards,
Jorge R. Vila

**JR Vila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 57** |
| **To:** | <Victorhm@iadb.org> | |
| **Sent:** | 16 March 2003 20:26 | |
| **Attach:** | Safra Syndication Report 1.xls | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Victor: attached please find a distribution report for the Safra B Loan. Two issues emerge clearly after my discussions with about 40 banks so far.

1. There is significant and widespread scepticism in the market about the "de facto preferred creditor status" under the B Loan "umbrella". This was confirmed by a number of participants in recently restructured B Loans, particularly IIC and IFC Banco Galicia's, when invited to participate in Safra's. Most expressed their disappointment at what they perceive as being treated "the same" as more junior creditors in restructuring negotiations. We are beginning to see some specific consequences of this scepticism: German banks must now include B Loans in their country risk, although they are still exempt from provisions.

2. As discussed in the past, the market distinguishes between a) "real trade", usually represented by letters of credit, bills of lading and similar instruments, including promissory notes **if** these provide **on the note** detailed information on the trade transaction, including a description of the underlying commercial contract, evidence of registration with the Central Bank, shipment means, dates and amounts, etc.; and b) "bundled" trade, perceived by the market as uncomfortably close to working capital. The market will not accept as "real trade" instruments, typically promissory notes, that merely state that the funds will be used to finance "trade transactions". The different price expected from real and bundled trade instruments / facilities simply reflect the different market perception of risk.

Some of the banks reached so far expressed their concern that this B Loan might be a "bundled" trade facility. I have explained that the IIC will only make disbursements if presented with real trade, eligible transactions, although I have not discussed specific qualification requirements.

Current market conditions leave little room for flexibility: "bundled" trade facilities will not go far. This B Loan will be more difficult to sell if it is perceived as "bundled" trade. And since there is, as you know, a USD 150M B Loan facility also out in the street, we must try to differentiate our product by emphasizing its "real trade" nature. At some point down the distribution road, this will have to be supported by proposed documentation providing for requirements to qualify as an Eligible Transaction that leave no doubt that the IIC will authorize a disbursement only when presented with a "real trade" transaction.

Perhaps it would be advisable to review now the relevant wording in the current draft documentation and make sure that it has fair chances of passing the "real trade" test of potential participants. Otherwise, we should probably start now drafting alternative, stricter wording. It would certainly increase our chances of a successful distribution.

Finally, the BCP issue has come up occasionally, but so far it is not a major problem.

Please let me know if you need further information or clarifications. I will keep you informed of developments. Saludos, J.

# Mail # 57
# Report

| BANCO SAFRA | | | |
|---|---|---|---|
| BANK | LOCATION | DATE | COMMENTS |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| 1  ING_BHF | Frankfurt | 11-Mar | Mailed Summary. Milan meeting |
| 2  Vereins und Westbank | Frankfurt | 11-Mar | Mailed Summary. Milan meeting |
| 3  Deutsche Bank | Frankfurt | 11-Mar | Mailed Summary. Milan meeting |
| 4  Commerzbank | Frankfurt | 11-Mar | Mailed Summary. Milan meeting |
| 5  Sabadell | Miami | 11-Mar | Mailed Summary |
| 6  CSFB | New York | 11-Mar | Mailed Summary |
| 7  Dresdner Bank | Frankfurt | 12-Mar | Mailed Summary |
| | | 13-Mar | Declined by mail, she'll try again. |
| 8  Saar LB | Saarbrucken | 12-Mar | Mailed Summary |
| 9  LB Baden-Wurttemberg | Stuttgart | 12-Mar | Mailed Summary. Milan meeting |
| 10  Hypovereinsbank | New York | 12-Mar | Mailed Summary |
| 11  ING | Amsterdam | 12-Mar | Mailed Summary |
| 12  ABN | New York | 12-Mar | Mailed Summary |
| 13  Bayerische LB | Munich | 12-Mar | Mailed Summary. Milan meeting |
| 14  Rheinland-Pfalz | Mainz | 13-Mar | Mailed Summary |
| 15  RZB-Austria | Vienna | 13-Mar | Mailed Summary. Milan meeting |
| 16  BBL | Brussels | 13-Mar | Mailed Summary. Milan meeting |
| 17  KBC | NY | 13-Mar | KBC NY unlikely |
| 18  Banco Atlantico | Miami | 13-Mar | Mailed Summary. Milan meeting |
| 19  Banc One | Chicago | 13-Mar | Mailed Summary |
| 20  HSBC | NY | 14-Mar | Mailed Summary. Milan meeting |
| 21  Hapoalim | NY | 14-Mar | Mailed Summary |
| | | | |
| | | | |
| 1  Bankgesellschaft | Berlin | 11-Mar | Eastern Europe only focus |
| 2  Bremen Landesbank | Bremen | 11-Mar | No Bra lines |
| 3  Bank Kreiss | Frankfurt | 11-Mar | Merged with Yapi Bank |
| 4  Westfalenbank | Bochum | 12-Mar | Decline |
| 5  DGZ Dekabank DKB | Frankfurt | 12-Mar | No Bra lines |
| 6  GZ Bank | Frankfurt | 12-Mar | No passive investors |
| 7  Bankhaus Herman Lampe | Dusseldorf | 12-Mar | No Bra lines |
| 8  Dresdner Latinamerika | Frankfurt | 13-Mar | Prefer direct lines |
| 9  ERSTE | Vienna | 13-Mar | Customer driven. |
| 10  BACOB | Brussels | 13-Mar | Bought by Dexia, conservative |
| 11  Societe Generale | New York | 13-Mar | No interest |
| 12  Wachovia | Atlanta | 13-Mar | Leaving Bra |
| 13  Bank of New York | New York | 13-Mar | Policy no B Loans |
| 14  Bank of America | Sao Paulo | 13-Mar | No interest in Safra (BCP deal) |
| 15  San Paolo | New York | 14-Mar | Difficult to define as trade |
| 16  Citizens Bank | Boston | 14-Mar | Out of LA |

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | <jim.liddell@scotiabank.com>; <moises.gutfrajnd@scotiabank.com> | **Mail # 58** |
| **Cc:** | "Levy, David" <DAVIDL@iadb.org> | |
| **Sent:** | 17 March 2003 21:50 | |
| **Attach:** | SBR Scotiabank.doc | |
| **Subject:** | Jamaica Sunset Beach Project | |

Dear Jim and Moises: per conversation today, attached is information letter on the Sunset Beach project in Jamaica. Please note that my details are included at the end of the letter. I look forward to receiving your initial comments.
Best regards,
Jorge Vila

# Mail # 58
# Letter Page 1

London, 17 March 2003

Scotiabank
44 King Street West
Toronto
Ontario M5H 1H1
Canada

Attn:  Jim Liddell
        Head of International Project Finance

Re: Jamaica project

Dear Jim:

As discussed today, Sunset Beach Resorts and Spa Limited ("SBR"), is seeking to expand its existing facilities in Montego Bay and simultaneously expand its operations into Negril, the premier resort area of Jamaica. Please note the following information on this project as provided by SBR.

With 431 rooms and 380 staff, SBR, the only revenue earning company of the Grand Bay Group ("GBG"), is the fifth largest hotel in Jamaica and the largest independently owned, accounting for 3.0% of the total available rooms in Jamaica and 8.5% in Montego Bay. SBR is managed by Ian Kerr, Cathy Hendrickson-Kerr, and a 12-member senior management team with a 14-year average experience in the travel/leisure industry. GBG is owned by Karl Hendrickson (71.5%), a well-known Jamaican businessman, Ian and Cathy Kerr (11.4%), and National Continental Corporation (17.1%).

The Montego Bay facilities include the Seawind Towers, with 307 rooms and suites in 6.52 acres (the building and land are owned by SBR's affiliate Flexnon Ltd), and the adjacent Beach Inn, with 124 rooms and suites in 14.10 acres, leased from a third party. When the project is completed, SBR will be able to offer 605 rooms and suites at Montego Bay and 250 at Negril.

For the financial year ending May 31, 2002, with total assets of USD 26.4M, GBG generated gross revenues of USD 17.7M and a USD 2.7M profit. Total equity for the same year was USD 20.4M and long term debt USD 6.0M. The average daily room rate was USD 153.50, with a net revenue per room for the last couple of years over 85% of that average daily room rate. SBR has managed to maintain a 0.8 to 1 staff to guest ratio, whereas the Jamaican market average is about 1.2 to 1.

In view of its historically high occupancy levels, its success at managing the business by providing a wide range of products and services while maintaining low cost ratios, and further considering the excellent growth prospects in its market segment, as confirmed by the high occupancy rate projected for the first quarter of 2003, SBR is keen on expanding in Montego Bay and Negril.

**Mail # 58
Letter Page 2**

This would allow SBR to strengthen its market position as the largest independently owned hotel, reach the most sought after tourist destination in Jamaica, increase profitability by gaining significant economies of scale and leveraging existing management and marketing infrastructure, and diversify the risk in case of nature related localized adverse situations.

At Montego Bay the project involves a) purchasing, refurbishing and upgrading the existing 124-room Beach Inn and 14.10 beachfront acres currently leased; b) acquiring the adjoining 8.55 beachfront acres and constructing an additional 174 rooms; and c) constructing additional facilities and infrastructure such as conference and banqueting facilities, a swimming pool, new gift shops, covered walkways, driveway, parking area and others.

At Negril the project involves a) purchasing and refurbishing the 86-room Negril Cabins presently owned by a third party, together with 8.57 acres, and constructing 14 suites; b) acquiring 4.96 beachfront acres, constructing 150 rooms and an underpass to qualify as a "beachfront" resort; and c) constructing additional infrastructure.

The total cost of the project, to be completed by December 2004, is USD 57.4M, with Montego Bay taking USD 25.5M, Negril USD 23.4M and USD 8.5M allocated to debt refinancing, up-front financing costs, and professional and commitment fees. SBR has already contributed USD 5.48M.

As a result of the project, BGB revenues should increase from USD 17.6M in 2003 (projected), to USD 34.5M in 2006 (projected), as well as BGB's cash flow, which is expected to increase from USD 7.0M in 2003 to USD 13.1M in 2006.

In order to finance 69.7% of this total cost, SBR and the Inter-American Investment Corporation are discussing a possible USD 40M A-B Loan, including a 5-6 year USD 30M B Loan and a USD 10M A Loan. SBR would contribute the remaining USD 17.4M in the form of new equity or internally generated cash.

SBR is a 3-star resort focusing on the widest cross-section of the mass market, including singles, couples and families, thus selling a large range of products to a broad client base. The geographic market target is North America, the United Kingdom and Europe, as well as local Caribbean.

The very high occupancy rates achieved since 1999 (85% in 99-00, 93% in 00-01 and 80% in 01-02, as opposed to current industry averages of about 68% for hotels larger than 100 rooms) would confirm the attractiveness of its products and the soundness of its marketing strategy and managing policies. SBR has achieved a strong reputation for a solid mid-market all-inclusive resort with a strong "value for money" concept, including good product and service delivery.

SBR relies heavily on tour operators to sell package deals including air travel and ground transportation, with no operator accounting for more than 30% of package revenue. SBR is firmly positioned with all major wholesale tour operators and retail

**Mail # 58**
**Letter Page 3**

travel agents in North America and the UK/Europe, including Air Jamaica Vacations, Apple Vacations, Air Canada Vacations, Virgin Holidays and others.

These partnerships generate over 85% of all SBR bookings. The objective of SBR's marketing efforts is to achieve a minimum of 95% average yearly occupancy with tour operators representing 85% of the business mix and direct and local business contributing 10% and 5% respectively.

Subject to terms under an appropriate B Loan structure, SBR would be prepared to pledge these receivables in order to mitigate project risk and reduce financial costs.

As discussed today, Scotiabank in Jamaica has already expressed a strong interest in financing part of this project. I believe that an appropriately structured and successfully distributed IIC A-B Loan could provide not only the necessary funds to complete the entire project under a risk mitigating structure, but also the long sought opportunity for Scotiabank and the IIC to cooperate in an area of such a strong mutual interest as the Caribbean.

Please let me know if you would like additional information. I look forward to hearing your initial views on the above.

Best regards,

Jorge R. Vila

Crossways
Wanborough Lane
Cranleigh, Surrey GU6 7DT
England

Phone: 44-1483-548-460 (and fax)
        44-7775-587-964 (mobile)
E-mail: j.r.vila@btinternet.com

cc:    David Levy
       IIC Loan Officer – Washington D.C.

Page 1 of 2

**JRVila**

| | |
|---|---|
| From: | <jbecerra@notes.banesto.es> |
| To: | "J R Vila" <j.r.vila@btopenworld.com> |
| Sent: | 26 March 2003 09:15 |
| Subject: | Re: IIC Trade Related B Loan Banco Safra SA Brazil |

**Mail # 100**

Dear Jorge,

My risk department tells me that unfortunately we cannot participate in this transaction due to the fact that our risk exposure on the short term with Brazil is already too high.

Sorry for taking so long in answering back, and I hope that future transactions will fit within our Investment strategy.

Thank you for your assistance and kind cooperation.

Best Regards,

José Ramón Becerra
International Finance
Banco Español de Crédito, S.A.


"J R Vila"
<j.r.vila@btopen     Para:  <jbecerra@notes.banesto.es>
world.com>           cc:
                     Asunto:  IIC Trade Related B Loan Banco Safra SA Brazil
17/03/03 17.18

**Mail # 59**

Dear Jose Ramon: per our conversation today,  attached please find a Summary of Terms and Conditions for the discussed IIC USD  40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not  hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at  202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if  you need further information. Kindly look  at www.iadb.org for information on  the IIC.
We look forward to having you on board for  this very attractive project, as we believe it would be a good opportunity  to strengthen our relationship with Banesto.
Best regards,
Jorge R. Vila


El documento contenía los siguientes anexos:

**JR Vila**

| | | **Mail # 60** |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | <marco.achon@bbvany.com> | |
| **Sent:** | 17 March 2003 15:36 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Marco: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly look at www.iadb.org for information on the IIC. We look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with BBVA.
Best regards,
Jorge R. Vila

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <calonso@cajamadrid.es> |
| **Sent:** | 17 March 2003 11:16 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 61

Dear Carlos: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.

I hope to see you in Milan next week, I will call you at your mobile on Saturday evening.

We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to continue to strengthen our close relationship.

Best regards,

Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "Claus Aaby Knudsen" <claus.aaby@danskebank.dk> |
| **To:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **Sent:** | 24 March 2003 08:59 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | Vedr.: IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 97

Dear Jorge,

We have received the Confidential Summary of Terms and Conditions concerning the Banoc Safra transaction:

| | |
|---|---|
| Borrower: | Banco Safra S.A. |
| Lender of Record: | Inter-American Investment Corporation |
| Amounts: | USD 40,000,000 IIC B-loan |
| Tenor: | 1 year |
| Interest: | Libor + 2.625 % p.a. |

We will be pleased to participate in the above IIC B-loan facility with USD 2,000,000 subject to satisfactory loan documentation.

I look forward to hearing from you.


Best regards
Claus Aaby

Danske Bank
Export/Import Finance
Phone: +45 3344 2844
Fax: +45 3344 2829
E-mail: claus.aaby@danskebank.dk
Homepage: http://www.danskebank.com/exportfinance


| "J R Vila" <j.r.vila@btopenworld.com> | | |
|---|---|---|
| | Til: | Claus Aaby Knudsen/CLKN/Intranet/DDB@DKDDB04 |
| 17-03-2003 11:13 | cc: | |
| | Vedr.: | IIC Trade Related B Loan Banco Safra SA  Brazil |


Dear Claus: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. I should note that, confirming a Nordic connection, Den Danske has been a correspondent bank for Safra. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly look at www.iadb.org for information on the IIC.
I hope to see your colleague Torben Helbo in Milan next week. We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with Danske Bank.
Best regards,
Jorge R. Vila

# Mail # 62

Vi goer opmaerksom paa, at denne e-mail kan indeholde fortrolig information. Hvis De ved en fejltagelse modtager e-mailen, beder vi Dem venligst informere

**JR Vila**

From:     "J R Vila" <j.r.vila@btopenworld.com>
To:       <luisa.antas@finantia.com>
Sent:     17 March 2003 12:25
Subject:  IIC Trade Related B Loan Banco Safra SA Brazil

# Mail # 63

Dear Maria Luisa: a pleasure talking to you after so long! Here are my details:

Crossways
Wanborough Lane
Cranleigh
Surrey GU6 7DT

Phone: 44-1483-548-460 (office), 44-1483-548-482 (home), 44-7775-587-964 (mobile).

Thank you for your help with Renato Schulman, I will call him today. This is a good trade related B Loan and both Safra and the IIC would be very happy to have your support.

I hope to see you soon in London or Lisbon!
Best regards,
Jorge

**JRVila**

| | |
|---|---|
| **From:** | <Brigitte.Jahnke@helaba.de> |
| **To:** | <j.r.vila@btopenworld.com> |
| **Sent:** | 19 March 2003 15:01 |
| **Subject:** | AW: IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 86

Dear Jorge,

Thank you for the invitation. However, due to completely utilized country limits we are presently not in a position to participate. Nevertheless we appreciated your offer and certainly would welcome receiving further invitations to participate.

With kind regards

**Brigitte Jahnke**
**Abteilungsdirektorin/Vice President**
**Structured Trade & Commodity Finance**

Landesbank Hessen-Thüringen (Helaba)
MT-211000 Corporate Finance/Trade Finance
Neue Mainzer Str. 52-58, D-60311 Frankfurt
Tel.: +49 (0) 69/9132-2321
Fax.:+49 (0) 69/9132-82321
E-Mail: Brigitte.Jahnke@helaba.de

-----Ursprüngliche Nachricht-----
**Von:** Hartmann, Jörg
**Gesendet:** Mittwoch, 19. März 2003 15:56
**An:** Jahnke, Brigitte
**Betreff:** WG: IIC Trade Related B Loan Banco Safra SA Brazil

bitte absagen, danke !

Gruß hn
-----Ursprüngliche Nachricht-----
**Von:** Peter, Holger
**Gesendet:** Mittwoch, 19. März 2003 15:34
**An:** Hartmann, Jörg
**Betreff:** WG: IIC Trade Related B Loan Banco Safra SA Brazil

-----Ursprüngliche Nachricht-----
**Von:** J R Vila [mailto:]
**Gesendet:** Montag, 17. März 2003 11:02
**An:** holger.peter@helaba.de
**Betreff:** IIC Trade Related B Loan Banco Safra SA Brazil

# Mail # 64

Dear Mr Peter: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.
Kindly look at www.iadb.org for information on the IIC. We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with Helaba.
Best regards,
Jorge R. Vila

**JR Vila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | <jens.haberkost@hamburglb.de> | **Mail # 65** |
| **Sent:** | 17 March 2003 10:54 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Jens: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.

Kindly look at www.iadb.org for information on the IIC.

I hope to see your colleagues in Milan next week. We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to continue to develop our close relationship with Hamburgische LB.

Best regards,

Jorge R. Vila

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <marc.colasdelanoue@nxbp.fr> |
| **Sent:** | 17 March 2003 12:05 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 66

Dear Marc: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly look at www.iadb.org for information on the IIC. I hope to see you in Milan next week, I will call you at your hotel to try to arrange a convenient time to meet. We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to strengthen our close relationship.

Best regards,

Jorge R. Vila

**JR Vila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 67** |
| **To:** | <alexandra.kettis@nordea.com> | |
| **Sent:** | 17 March 2003 09:48 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related BLoan Banco Safra SA Brazil | |

Dear Alexandra: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. I should note that, confirming a Nordic connection, Merita has been a correspondent bank for Safra. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly look at www.iadb.org for information on the IIC.

I hope to see you in Milan next week. We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with Nordea.

Best regards,

Jorge R. Vila

## JR Vila

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <jcarralero@gruposantander.com> |
| **Sent:** | 17 March 2003 11:30 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 68

Dear Juan: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly look at www.iadb.org for information on the IIC.
I hope to see you in Milan next week, I will call you at your mobile on Sunday. We also look forward to having you on board for this very attractive project, as we believe it would be a good opportunity to start developing a closer relationship with SCH.
Best regards,
Jorge R. Vila

S'to Cogi·

## JR Vila

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <timothy.plumptre@scotiabank.com> |
| **Sent:** | 17 March 2003 20:48 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 69

Dear Tim: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.

Kindly look at www.iadb.org for information on the Inter-American Investment Corporation.

I look forward to seeing you in Milan next Monday 24 March at the Principe de Saboya at 11.15 hrs (just in case I will be carrying my mobile). And we also look forward to having Scotiabank on board for this very attractive project, as we believe it would be a good opportunity to start building a close relationship.

Have a nice flight to Milan.

Jorge R. Vila

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 71** |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> | |
| **Sent:** | 17 March 2003 20:55 | |
| **Subject:** | Re: Banco safra completes US$250 million Eurobond | |

No. But I do not think it hurts, it is a very different market. As long as they are not talking to banks while we are out there.... I assume that we are acting under a clear "bank market" for at least 30 days.
About this, we need to talk. Safra will meet with Bayerische in Milan next Tuesday at 17.30 (Bayerische told me), and I am sure they are not the only one. We need Safra to support our-their B Loan! Bradesco IDB-IFC's is drawing some liquidity away from us! We must play the relationship card. Safra: show your card! We need to coordinate a little bit these conversations, perhaps tell Safra where we need support (certain banks are likely to be key) and maximize the available Milan time.
Can we talk at the end of your day?
Please let me know.
Saludos, J.

—— Original Message ——
**From:** Moscoso, Victor Hugo
**To:** Jorge Vila (E-mail)
**Sent:** Monday, March 17, 2003 8:12 PM
**Subject:** Banco safra completes US$250 million Eurobond

**Mail # 70**

**Banco Safra completes $250 million bond emission - Brazil**
*Friday, March 14, 2003 18:10 (GMT-0400)*

(Agência Estado) Brazilian bank Safra on Friday priced $250 million in nine-month Eurobonds, paying an annual yield of 6.75%.

The operation originally comprised $50 million, but the bank decided to boost the offering amid higher-than-expected demand.

Safra finance director Joao Tourinho attributed the strong demand to an improvement in conditions on international markets. He also said the "excellent handling" of Brazil's economic policies benefited the operation, as it has contributed to reduce Brazil's risk premium.

This was the second emission by Safra in 2003. In a previous operation, the bank priced $200 million in six-month bonds, paying an annual yield of 7%.

by William Provasi

Agência Estado

Jorge:

Tu sabias sobre esto?

VHM

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **Sent:** | 18 March 2003 13:53 |
| **Attach:** | Safra Syndication Report 2.xls |
| **Subject:** | B Loan Banco Safra |

# Mail # 72

Victor: per conversation yesterday, attached is latest list of banks reached. I need 2002 financial statements for Banco Safra (I'm working on opening new lines with a couple of banks, this is urgent!). Standing by for the conference call discussed!
Saludos, J.

| | BANCO SAFRA | | | |
|---|---|---|---|---|
| | **BANK** | **LOCATION** | **DATE** | **COMMENTS** |
| | | | | |
| | | | | **Mail # 72** |
| | | | | **Report Page 1** |
| | | | | |
| | | | | |
| 1 | ING_BHF | Frankfurt | 11-Mar | Mailed Summary. Milan meeting |
| 2 | Vereins und Westbank | Frankfurt | 11-Mar | Mailed Summary. Milan meeting |
| 3 | Deutsche Bank | Frankfurt | 11-Mar | Mailed Summary. Milan meeting |
| 4 | Commerzbank | Frankfurt | 13-Mar | Mailed Summary. Milan meeting |
| 5 | Sabadell | Miami | 11-Mar | Mailed Summary |
| 6 | CSFB | New York | 11-Mar | Mailed Summary |
| 7 | Dresdner Bank | Frankfurt | 12-Mar | Mailed Summary |
| | | | 13-Mar | Declined by mail, but she'll try again. |
| 8 | Saar LB | Saarbrucken | 12-Mar | Mailed Summary |
| 9 | LB Baden-Wurttemberg | Stuttgart | 12-Mar | Mailed Summary. Milan meeting |
| 10 | Hypovereinsbank | New York | 12-Mar | Mailed Summary |
| | | | | Milan meeting? |
| 11 | ING | Amsterdam | 12-Mar | Mailed Summary |
| 12 | ABN | New York | 12-Mar | Mailed Summary |
| 13 | Bayerische LB | Munich | 13-Mar | Mailed Summary. Milan meeting |
| 14 | Rheinland-Pfalz | Mainz | 13-Mar | Mailed Summary |
| 15 | RZB-Austria | Vienna | 13-Mar | Mailed Summary. Milan meeting |
| 16 | BBL | Brussels | 13-Mar | Mailed Summary. Milan meeting |
| 17 | KBC | NY | 13-Mar | KBC NY unlikely |
| | | Brussels | | |
| 18 | Banco Atlantico | Miami | 13-Mar | Mailed Summary. Milan meeting |
| 19 | Banc One | Chicago | 13-Mar | Mailed Summary. FU after Milan |
| 20 | HSBC | NY | 14-Mar | Mailed Summary. Milan meeting |
| 21 | Hapoalim | NY | 14-Mar | Mailed Summary |
| 22 | Hessen-Thuryngen LB (Helaba) | Frankfurt | 17-Mar | Mailed Summary |
| 23 | Hamburgische LB | Hamburg | 17-Mar | Mailed Summary. FU mid-April. Milan meeting |
| 24 | Nordea | Stockholm | 17-Mar | Mailed Summary. Milan meeting |
| 25 | Den Danske | Copenhagen | 17-Mar | Mailed Summary. Milan meeting |
| 26 | Caja Madrid | Madrid | 17-Mar | Mailed Summary. Milan meeting |
| 27 | SCH | Madrid | 17-Mar | Mailed Summary. Milan meeting |
| 28 | BBVA | NY | 17-Mar | Mailed Summary. Milan meeting? |
| 29 | Banesto | Madrid | 17-Mar | Mailed Summary |
| 30 | Natexis | Paris | 17-Mar | Mailed Summary. Milan meeting |
| 31 | Scotiabank | Toronto | 17-Mar | Mailed Summary. Milan meeting |
| 32 | Credit Agricole | Paris | 18-Mar | Mailed Summary. Milan meeting |
| 33 | Credit Lyonnais | Paris | 18-Mar | Mailed Summary |
| 34 | BCP | Lisbon | 18-Mar | Mailed Summary, FU mid-April |
| 35 | Caixa Geral | Lisbon | 18-Mar | Mailed Summary. Milan meeting |
| | | | | |
| | | | | |
| 1 | Bankgesellschaft | Berlin | 11-Mar | |
| 2 | Bremen Landesbank | Bremen | 11-Mar | |
| 3 | Bank Kreiss | Frankfurt | 11-Mar | |
| 4 | Westfalenbank | Bochum | 11-Mar | |
| 5 | DGZ Dekabank DKB | Frankfurt | 12-Mar | |
| 6 | GZ Bank | Frankfurt | 12-Mar | |
| 7 | Bankhaus Herman Lampe | Dusseldorf | 12-Mar | |

**Mail # 72
Report Page 2**

|    |                              |               | 13-Mar |  |
|----|------------------------------|---------------|--------|--|
| 9  | ERSTE                        | Vienna        | 13-Mar |  |
| 10 | BACOB                        | Brussels      | 13-Mar |  |
| 11 | Societe Generale             | New York      | 13-Mar |  |
| 12 | Wachovia                     | Atlanta       | 13-Mar |  |
| 13 | Bank of New York             | New York      | 13-Mar |  |
| 14 | Bank of America              | Sao Paulo     | 13-Mar |  |
| 15 | San Paolo                    | New York      | 14-Mar |  |
| 16 | Citizens Bank                | Boston        | 14-Mar |  |
| 17 | Finantia                     | Lisbon-London | 17-Mar |  |
| 18 | Sudameris                    | Paris         | 17-Mar |  |
| 19 | Skandinaviska                | Stockholm     | 17-Mar |  |
| 20 | Comerica                     | Chicago       | 17-Mar |  |
| 21 | Banco Portugues do Investimento | Lisbon     | 18-Mar |  |

**JRVila**

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 18 March 2003 19:49 |
| **Subject:** | RE: IIC Trade Related B Loan Banco Safra SA |

**Mail # 76**

Ya le mande la carta del Banco de España a José Miguel Arigita

VHM

-----Original Message-----
From: J R Vila [mailto:j.r.vila@btopenworld.com]
Sent: Tuesday, March 18, 2003 1:32 PM
To: Jose Miguel Arigita
Cc: Moscoso, Victor Hugo
Subject: Re: IIC Trade Related B Loan Banco Safra SA

**Mail # 75**

Dear Jose Miguel: thank you for your mail. Please note that under an
agreement between Banco de Espana and the IIC, Spanish banks participating
in IIC B Loans are exempt from Country Risk provisions. I will obtain a copy
of the relevant letter from Banco de Espana and mail or fax it to you as
soon as possible. Kindly further note that you can find additional
information about the IIC at www.iadb.org
Best regards,
Jorge Vila

----- Original Message -----
From: "Jose Miguel Arigita" <jose.arigita@batlantico.com>
To: <j.r.vila@btopenworld.com>
Sent: Tuesday, March 18, 2003 6:11 PM
Subject: IIC Trade Related B Loan Banco Safra SA

**Mail # 74**

> Dear Jorge,
>
> As per conversation with Maurici,
>
> I am writting you, to ask about if the syndicated loans organized by you
> Institution "Interamerican Investment Corporation" are consider by the
> Spanish Central Bank, exempt of Country Risk provissions?
>
> Do you know this information?
>
> Thank you very much, best regards,
>
> Jose Miguel Arigita
> Banco Atlantico Miami
> T.F.Area Manager South America
> Ph:        305-374-7515
> Direct Ph: 305-503-1907
> Fax:        305-374-7521
>
>
>

## JRVila

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **Sent:** | 18 March 2003 23:31 |
| **Subject:** | Fw: IIC's Privileges and Immunities |

**Mail # 78**

FYI. Saludos, J.

----- Original Message -----
**From:** Raymond_Spring@america.hypovereinsbank.com
**To:** j.r.vila@btopenworld.com
**Cc:** Carla_Campos@america.hypovereinsbank.com
**Sent:** Tuesday, March 18, 2003 10:29 PM
**Subject:** IIC's Privileges and Immunities

**Mail # 77**

Dear Jorge,

Thank you for calling me with the latest update on Safra. Herebelow is my earlier email to Victor Moscoso. After our telephone discussion, I checked the 'Invertec' file but could *not* find the information covering the points raised on IIC's preferred creditor status. Any information you may have on this will be appreciated. Should there be anything new after your teleconference on Wednesday with Safra, kindly give me a ring.

I will mention to Leonhard Fehr and Jorge Willmer that you will be attending the IDB Conference in Milan. Perhaps there is a chance for you to meet.

Best regards,
Raymond M. Spring
Director
Structured Finance/Risk Mitigation - Latin America
Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Tel. (212) 672-6203
Fax (212) 672-5597
E-mail: Raymond_Spring@hvbamericas.com

*******************************************************************
This e-mail contains information which may be confidential or proprietary and is solely for the use of the intended recipient. Unauthorized disclosure, use, dissemination or copying of this email and its attachments (if any) are prohibited. E-mails are susceptible to alteration and their integrity can be compromised. The sender is not responsible for any such alteration. If you are not the intended recipient or are not a named recipient, please delete this e-mail immediately from your system and notify the sender immediately by reply e-mail of the mailing error and your deletion.
*******************************************************************

----- Forwarded by Raymond Spring/LAT/NY/NA/Vereinsbank on 03/18/03 05:22 PM -----

**Raymond Spring**

| | | |
|---|---|---|
| | To: | victorhm@iadb.org |
| 03/18/03 03:12 PM | cc: | Carla Campos/LAT/NY/NA/Vereinsbank@BV-NA |
| | Subject: | IIC's Privileges and Immunities |

Dear Victor,

Thank you for your fax with referral to Article VII of IIC's Charter and the German "Bundesaufsichtsamt"'s letter of 2/23/96 re: risk-weighting of IIC claims.

__JRVila__

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "Jorge Vila (E-mail)" <j.r.vila@btopenworld.com> |
| **Sent:** | 18 March 2003 21:33 |
| **Subject:** | FW: FW: IIC's Privileges and Immunities |

# Mail # 79
# Page 1

FYI

-----Original Message-----
**From:** Carla_Campos@america.hypovereinsbank.com [mailto:Carla_Campos@america.hypovereinsbank.com]
**Sent:** Tuesday, March 18, 2003 4:23 PM
**To:** Moscoso, Victor Hugo
**Subject:** Re: FW: IIC's Privileges and Immunities

Dear Victor,

Good to hear from you. In fact, Ray and I are working together on these type of transactions, I have shared my thoughts with him on IIC and I think we are getting there. Our institution, however, is a strickler for confirming this Lender of Record type issues because we are such a big user of MLA B loan programs, particularly of the IFC and the IDB and we have little or almost no experience here in NY with IIC. Right now, we are awaiting Munich's response for setting limits for the IIC.

Another important issue is IIC's track record in Argentina and I was looking into what happened with our Galicia B loan with the IIC but Bank of America exited Argentina at the beginning of the year and they shut down the office so I was wondering if you know what happened to the loan did you end up restructuring the obligation?

Also we are looking into why there are differences in the rating of IIC vs. IDB which is a double A vs. a triple A whereas IFC which is structured just like IIC, i.e. IFC being an arm of the World Bank gets the same triple A rating. If you can shed some light on this issue it would be helpful. In any case, I will try to get the information from Moody's and S&P.

I hope that with all this information we can convince them internally that the Lender of Status is as tight as that of the IFC and we will be on the right track, then we just have to convince Brazil that this is a good way to utilize its line with Banco Safra.

Let's continue to keep each other posted.

best regards,
Carla

---

Carla Campos │ HVB Americas, Inc │ Director, Debt Capital Markets - Latin America

Phone: (212) 672-5937 │ Cell: │ Fax: (212) 672-5597

Carla_Campos@hvbamericas.com │ [ Mailing: 150 East 42nd Street  New York, NY 10017 USA ]

This e-mail contains information which may be confidential or proprietary and is solely for the use of the intended recipient. Unauthorized disclosure, use, dissemination or copying of this email and its attachments (if any) are prohibited. E-mails are susceptible to alteration and their integrity can be compromised. The sender is not responsible for any such alteration. If you are not the intended recipient or are not a named recipient, please delete this e-mail immediately from your system and notify the sender immediately by reply e-mail of the mailing error and your deletion.

---

"Moscoso, Victor Hugo"
<VICTORHM@iadb.org>

03/18/03 03:22 PM

To:    "carla_Campos@america.hypovereinsbank.com"
<carla_Campos@america.hypovereinsbank.com>

cc:
Subject:    FW: IIC's Privileges and Immunities

# Mail # 79    Page 2 of 2
# Page 2

Dear Carla:

We have not communicated in a while but I hope you are doing fine. As you can see from the e-mail sent by Raymond Spring below, your institution is looking into participating in a proposed B-Loan with Banco Safra in Brazil. Since you have already worked with us in the past, do you think you could speak to Raymond about your experience with the IIC B Loan program? I will attempt to answer his questions but I thought your input might be helpful for him to become more familiar with the IIC B loan program.

Best Regards,

Victor Hugo Moscoso
Senior Investment Officer
Inter-American Investment Corporation


-----Original Message-----
**From:** Raymond_Spring@america.hypovereinsbank.com [mailto:Raymond_Spring@america.hypovereinsbank.com]
**Sent:** Tuesday, March 18, 2003 3:12 PM
**To:** victorhm@iadb.org
**Cc:** Carla_Campos@america.hypovereinsbank.com
**Subject:** IIC's Privileges and Immunities


Dear Victor,

Thank you for your fax with referral to Article VII of IIC's Charter and the German "Bundesaufsichtsamt"'s letter of 2/23/96 re: risk-weighting of IIC claims.

While this information helps, I wonder whether you could let me know the following:

a) do you have other letters similar to that of the German Bundesaufsichtsamt?
b) could you give us examples where IIC's preferred creditor status proved its worth?
c) what is IIC's loss and/or provisioning experience for Argentina over the past 12 months?

I look forward to receiving your feedback to the above as well as any additional comments you may deem of importance for us to consider when evaluating the benefits of working with the IIC on B-loans.

Best regards,
Raymond M. Spring
Director
Structured Finance/Risk Mitigation - Latin America
Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Tel. (212) 672-6203
Fax (212) 672-5597
E-mail: Raymond_Spring@hvbamericas.com

*******************************************************************
This e-mail contains information which may be confidential or proprietary and is solely for the use of the intended recipient. Unauthorized disclosure, use, dissemination or copying of this email and its attachments (if any) are prohibited. E-mails are susceptible to alteration and their integrity can be compromised. The sender is not responsible for any such alteration. If you are not the intended recipient or are not a named recipient, please delete this e-mail immediately from your system and notify the sender immediately by reply e-mail of the mailing error and your deletion.
*******************************************************************

**JRVila**
_____

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "Reed, Steven L." <STEVENR@iadb.org>; "Jorge Vila (E-mail)" <j.r.vila@btopenworld.com> |
| **Sent:** | 18 March 2003 21:45 |
| **Subject:** | FW: IIC's Privileges and Immunities |

# Mail # 80

Steve:

This is an e-mail from a potential B loan bank for Banco Safra. They are concerned about the validity of the B loan program. There is a question with respect to IIC's loss and/or provisioning experience for Argentina over the past 12 months. I don't think we should provide that information. What do you think?

Thanks,

Victor Hugo
-----Original Message-----
**From:** Raymond_Spring@america.hypovereinsbank.com [mailto:Raymond_Spring@america.hypovereinsbank.com]
**Sent:** Tuesday, March 18, 2003 3:12 PM
**To:** victorhm@iadb.org
**Cc:** Carla_Campos@america.hypovereinsbank.com
**Subject:** IIC's Privileges and Immunities


Dear Victor,

Thank you for your fax with referral to Article VII of IIC's Charter and the German "Bundesaufsichtsamt"'s letter of 2/23/96 re: risk-weighting of IIC claims.

While this information helps, I wonder whether you could let me know the following:

a) do you have other letters similar to that of the German Bundesaufsichtsamt?
b) could you give us examples where IIC's preferred creditor status proved its worth?
c) what is IIC's loss and/or provisioning experience for Argentina over the past 12 months?

I look forward to receiving your feedback to the above as well as any additional comments you may deem of importance for us to consider when evaluating the benefits of working with the IIC on B-loans.

Best regards,
Raymond M. Spring
Director
Structured  Finance/Risk Mitigation - Latin America
Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Tel. (212) 672-6203
Fax (212) 672-5597
E-mail: Raymond_Spring@hvbamericas.com

*********************************************************************
This e-mail contains information which may be confidential or proprietary and is solely for the use of the intended recipient. Unauthorized disclosure, use, dissemination or copying of this email and its attachments (if any) are prohibited. E-mails are susceptible to alteration and their integrity can be compromised. The sender is not responsible for any such alteration. If you are not the intended recipient or are not a named recipient, please delete this e-mail immediately from your system and notify the sender immediately by reply e-mail of the mailing error and your deletion.
*********************************************************************

**JRVila**

| From: | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
|---|---|
| To: | <Raymond_Spring@america.hypovereinsbank.com> |
| Cc: | <Carla_Campos@america.hypovereinsbank.com>; "Jorge Vila (E-mail)" <j.r.vila@btopenworld.com>; "Apel, Michael" <MICHAELA@iadb.org> |
| Sent: | 19 March 2003 15:39 |
| Subject: | RE: IIC's Privileges and Immunities |

# Mail # 82

Dear Raymond:

In response to your questions:

(a) We have similar letters to that of the German Bundesaufsichtsamt from the Bank of England , Banco de Espana, Commission Bancaire in France, De Nederlandsche Bank, Swiss Banking Association, The Office of the Superintendent of Financial Institutions Canada among others.

(b)  First, the IIC, as other multilaterals, was exempt from the Decree Law in Argentina which called for the pesofication of the U.S. Dollar denominated debt.   Second, all of the IIC's clients in Argentina that have the ability and willingness to pay have been able to process FX transfers to the IIC since early in the first quarter of last year.  A very high percentage of the IIC's portfolio is fully current . Third, Venezuela in the past year and Jamaica in years past have honored the privileges and immunities of the IIC.

(c) Due to the delicate nature of the question, I can only comment that the IIC took provisions for Argentine exposure for credit reasons not because of inability to transfer funds. IIC transactions are not immune from credit problems.

I trust that I have been able to answer your questions.

Regards,

Victor Hugo Moscoso
Senior Investment Officer
Inter-American Investment Corporation

-----Original Message-----
From: Raymond_Spring@america.hypovereinsbank.com [mailto:Raymond_Spring@america.hypovereinsbank.com]
Sent: Tuesday, March 18, 2003 3:12 PM
To: victorhm@iadb.org
Cc: Carla_Campos@america.hypovereinsbank.com
Subject: IIC's Privileges and Immunities

Dear Victor,

Thank you for your fax with referral to Article VII of IIC's Charter and the German "Bundesaufsichtsamt"'s letter of 2/23/96 re: risk-weighting of IIC claims.

While this information helps, I wonder whether you could let me know the following:

a) do you have other letters similar to that of the German Bundesaufsichtsamt?
b) could you give us examples where IIC's preferred creditor status proved its worth?
c) what is IIC's loss and/or provisioning experience for Argentina over the past 12 months?

I look forward to receiving your feedback to the above as well as any additional comments you may deem of importance for us to consider when evaluating the benefits of working with the IIC on

**JRVila**

| | |
|---|---|
| **From:** | <florence.gaymard@ca-indosuez.com> |
| **To:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **Cc:** | <mathieu.vidal@ca-indosuez.com>; <thierry.becker@br.ca-indosuez.com>; <roger.barends@br.ca-indosuez.com> |
| **Sent:** | 20 March 2003 16:08 |
| **Attach:** | C.htm; Safra Summary Terms & Conditions.doc |
| **Subject:** | Réf. : IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 93

Dear Jorge,
Thank you very much for your invitation to participate in the B Loan in favour of Banco Safra.
Unfortunately CAI won't be able to participate in this transaction for client-interest reasons.

Best regards and see you in Milano.

Florence Gaymard

# Mail # 83

"J R Vila" <j.r.vila@btopenworld.com> le 18/03/2003 10:46:49

Pour : Florence GAYMARD/DPAI/DFA/BANQUE_INDOSUEZ/FR@BANQUE INDOSUEZ
cc :    (ccc : Florence GAYMARD/DPAI/DFA/BANQUE_INDOSUEZ/FR)
Objet :    IIC Trade Related B Loan Banco Safra SA Brazil

Dear Florence: per our conversation today, attached please find a Summary of Terms and Conditions
for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not
hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in
London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.
Kindly look at www.iadb.org for information on the Inter-American Investment Corporation.
I look forward to seeing you in Milan next week. And we also look forward to having Credit Agricole
on board for this very attractive project, as we believe it would be a good opportunity to start
building a close relationship.
Have a nice flight to Milan.
Jorge R. Vila

(See attached file: C.htm)
(See attached file: Safra Summary Terms & Conditions.doc)

Page 1 of 2

**JRVila**

From:       "Karine Legeret" <karine.legeret@creditlyonnais.fr>
To:         "J R Vila" <j.r.vila@btopenworld.com>
Sent:       26 March 2003 17:57
Attach:     Safra Summary Terms & Conditions.doc
Subject:    Réf. : IIC Trade Related B Loan Banco Safra SABrazil

**Mail # 101**

Dear Jorge,

Thank you for approaching us on this very interesting deal. Banco Safra is already a good customer of Credit Lyonnais in Brazil. Unfortunately, due to current limited country risk capacity, my colleagues in charge of Brazil indicated that they prefer to keep our available lines for our bilateral business with this bank.
Best regards,

Karine Legeret


"J R Vila"
<j.r.vila@btopen          Pour :  Karine Legeret/FI/DCI/DRI/BFI/CLY@CLY
world.com>              cc :
                      Objet :  IIC Trade Related B Loan Banco Safra SA Brazil
18/03/03 11:03

**Mail # 84**

Dear Karine: per our conversation today, attached  please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate  to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918  or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need  further information.
Kindly look at www.iadb.org for information on the  Inter-American Investment Corporation.
We look forward to having Credit  Lyonnais on board for this very attractive project, as we believe it would  be a good opportunity to start building a close relationship.
Hope to see you soon in Paris.
Jorge R. Vila

(See attached file: Safra Summary Terms & Conditions.doc)

**JR Vila**

| | |
|---|---|
| **From:** | <Raymond_Spring@america.hypovereinsbank.com> |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **Cc:** | <Carla_Campos@america.hypovereinsbank.com>; "Jorge Vila (E-mail)" <j.r.vila@btopenworld.com>; "Apel, Michael" <MICHAELA@iadb.org> |
| **Sent:** | 19 March 2003 16:16 |
| **Subject:** | RE: IIC's Privileges and Immunities |

# Mail # 85

Dear Victor,

Your information is very helpful, thank you so much.

Regards,
Raymond M. Spring
Director
Structured  Finance/Risk Mitigation - Latin America
Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Tel. (212) 672-6203
Fax (212) 672-5597
E-mail: Raymond_Spring@hvbamericas.com

****************************************************************
This e-mail contains information which may be confidential or proprietary and is solely for the use of the intended recipient. Unauthorized disclosure, use, dissemination or copying of this email and its attachments (if any) are prohibited.  E-mails are susceptible to alteration and their integrity can be compromised. The sender is not responsible for any such alteration.  If you are not the intended recipient or are not a named recipient, please delete this e-mail immediately from your system and notify the sender immediately by reply e-mail of the mailing error and your deletion.
****************************************************************

| | | |
|---|---|---|
| "Moscoso, Victor Hugo" <VICTORHM@iadb.org> | **To:** | "Raymond_Spring@america.hypovereinsbank.com" <Raymond_Spring@america.hypovereinsbank.com> |
| | **cc:** | "Carla_Campos@america.hypovereinsbank.com" <Carla_Campos@america.hypovereinsbank.com>, |
| 03/19/03 10:39 AM | | "Jorge Vila (E-mail)" <j.r.vila@btopenworld.com>, "Apel, Michael" <MICHAELA@iadb.org> |
| | **Subject:** | RE: IIC's Privileges and Immunities |

Dear Raymond:

In response to your questions:

(a) We have similar letters to that of the German Bundesaufsichtsamt from the Bank of England , Banco de Espana, Commission Bancaire in France, De Nederlandsche Bank, Swiss Banking Association, The Office of the Superintendent of Financial Institutions Canada among others.

(b)  First, the IIC, as other multilaterals, was exempt from the Decree Law in Argentina which called for the pesofication of the U.S. Dollar denominated debt.   Second, all of the IIC's clients in Argentina that have the ability and willingness to pay have been able to process FX transfers to the IIC since early in the first quarter of last year.  A very high percentage of the IIC's portfolio is fully current . Third, Venezuela in the past year and Jamaica in years past have honored the privileges and immunities of the IIC.

26/03/2005

**JRVila**

| | |
|---|---|
| **From:** | "Varela, Felipe Alberto" <FELIPEV@iadb.org> |
| **To:** | "Jorge Vila (E-mail)" <j.r.vila@btinternet.com> |
| **Sent:** | 19 March 2003 12:05 |
| **Subject:** | Invertec Pesquera |

# Mail # 87

Estimado Jorge:

Cómo has estado? Hace tiempo que no nos comunicamos. Estuve intentando llamarte pero no he logrado comunicarme. Quisiera saber si no has cambiado de números.

Invertec Pesquera quiere hacer los desembolsos de los B Loans (Sudameris y Caixa). Yo me quiero poner en contacto con los bancos ya que hay algunos temas previos que me gustaría conversar con ellos, pero quisiera saber con quién hablar en cada caso ya que las personas a cargo pudieran haber cambiado en este tiempo. Te agradezco si me sugieres a quién llamar o me dices a qué número te puedo llamar a ti.

Un abrazo,

Felipe

12/12/04

**JRVila**

| | |
|---|---|
| **From:** | "Varela, Felipe Alberto" <FELIPEV@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 19 March 2003 18:29 |
| **Subject:** | RE: B Loan Invertec Pesquera |

**Mail # 89**

Gracias Jorge. Luego te cuento cómo fueron las conversaciones.

Un abrazo,

Felipe

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Wednesday, March 19, 2003 1:33 PM
**To:** Varela, Felipe Alberto
**Subject:** B Loan Invertec Pesquera

**Mail # 88**

Estimado Felipe: los contactos son los siguientes:

1. Caixa Geral, Dale Prusinowski, New York, 212-557-0025. Dale probablemente te remita a Max Zelmanowicz, Caixa Grand Cayman, 345-946-4344. He estado hablando estos dias con Daniel Shambel, Caixa en Lisboa, por Safra. Daniel me pregunto por Invertec y le comente, tratando de comprar tiempo, que me parecia que iban a comenzar a hablar del desembolso "en estos dias". Daniel le puede haber pasado ese comentario a Dale.

2. Sudameris, Paris, Francois Lyon 331-4801-7975. Tambien hable con el la semana pasada por Safra. Estan en una situacion dificil. Banca Intesa, el dueno, anuncio claramente que se retiran de Latin America. Como recordaras, anunciaron la venta de Sudameris en Brazil a Itau. Entiendo que Bco Patagonia esta comprando Sudameris Argentina. Y el resto de las oficinas de Sudameris en LA esta a la venta abiertamente. Francois esta preocupado porque puede significar el cierre del banco en Francia. Me pregunto por Invertec y le hice el mismo comentario que a Daniel Shambel. No note que viera el desembolso como un potencial problema, es decir, que los nuevos duenos aprovecharan el tiempo pasado, o un pedido de waiver que cambiara significativamente las condiciones del credito, para salirse del compromiso. Pensaria que en este punto las posibilidades de que traten de salirse no debieran ser altas. Pero sugiero apurar el desembolso caminando con cuidado, Sudameris esta muy sensibilizado. Y por los cambios que han habido en Banca Intesa recientemente, seguramente van a haber noticias sobre alguna de las oficinas de Sudameris en LA en los proximos 2 o 3 meses.

Dejame saber si necesitas mas informacion o si puedo ayudar.
Un abrazo,
Jorge

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Levy, David" <DAVIDL@iadb.org>; <samer.jumean@us.pwcglobal.com> |
| **Cc:** | <john.lee@jm.pwcglobal.com> |
| **Sent:** | 20 March 2003 20:32 |
| **Subject:** | Re: Sunset Beach - Scotiabank Toronto |

**Mail 92**

Too early to tell. Let's wait until we hear from them. In the meantime I would advice to focus on the full half of the bottle: they were initially interested.
Jorge

----- Original Message -----
**From:** samer.jumean@us.pwcglobal.com
**To:** j.r.vila@btopenworld.com ; Levy, David
**Cc:** john.lee@jm.pwcglobal.com
**Sent:** Thursday, March 20, 2003 8:01 PM
**Subject:** Re: Sunset Beach - Scotiabank Toronto

**Mail 91**

Not encouraging

| | | |
|---|---|---|
| **"J R Vila" <j.r.vila@btopenworld.com>**<br>03/20/2003 02:41 PM | **To:** | Samer Jumean/US/FAS/PwC@Americas-US, "Levy, David" <DAVIDL@iadb.org> |
| | **cc:** | |
| | **Subject:** | Sunset Beach - Scotiabank Toronto |

**Mail 90**

Dear Gentlemen: I discussed Sunset Beach with Scotiabank Toronto a couple of nights ago. Initially, a good reaction, particularly after they learned that Scotiabank Jamaica are keen on financing the project. However, they also suggested, subject to learning more about the project, that the price is not likely to be below L+5.0%. They also mentioned, subject to the same, that the equity of the company might be a little small for the project amount. I felt I had to mention these comments, although at this point I would not make much of any of them, this is only beginning....
They are reading my letter and most likely talking to Jamaica these days. I will probably not hear from them until next week. I will be at the IDB in Milan until next Thursday. On Monday, I will meet with the head of Scotiabank's international division, on a different subject. He is not directly involved in project finance, but Jim Liddell reports to him, and we discussed Sunset Beach briefly when I called to arrange the Milan meeting, so I may hear something on Monday. Otherwise I will try to call Toronto from Milan Tuesday or Wednesday.
Please call me until tomorrow night if you want further comments or clarifications. Next week I will be reachable at my mobile 44-7775-587-964. I will keep you informed of any developments.
Best regards,
Jorge Vila

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <Michaela@iadb.org> |
| **Sent:** | 21 March 2003 17:56 |
| **Subject:** | B Loan Banco Safra - Meeting Milan |

# Mail 94

Hi Michael: Cesar Purgato called me yesterday saying that, due to a family problem, there was a slight chance that he might have to delay his trip one day, and so was exploring whether we could meet Monday morning instead of Sunday. I said no problem. We agreed that he would call me today **only** if he could not be in Milan Sunday morning. He has not called, so I will show at the agreed place and time on Sunday, hoping that he will be there.

Would you let me know where we are with Safra? Do we have a mandate? If not, how close are we? Please do not hesitate to call me Sunday or Monday evening if you want to know how it went. I am staying at the Hotel Sant' Ambroeus 39-02-4800-8989, or I can be reached at my mobile 44-7775-587-964.

I'll try to reach later today. It is important for me to go into the meeting Sunday morning knowing where we are with Safra.
Saludos, Jorge

**JRVila**

| | |
|---|---|
| **From:** | "Gerardo Danilo (UCI)" <danilo.gerardo@unicredit.it> |
| **To:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **Sent:** | 21 March 2003 11:58 |
| **Subject:** | R: IDB Milan Meeting |

**Mail 96**

Dear Mr Vila,
here you are.
Le espero el próximo jueves a las 12:00 horas a la dirección abajo indicada.
Cordiales saludos,
Danilo Gerardo


.........................................
**Danilo Gerardo**
UniCredito Italiano
Senior Manager – Correspondent Banking
International
Via San Protaso, 3 - 20121 Milano
int. +39 02 8862 2656 - fax +39 02 8862 3524

danilo.gerardo@unicredit.it


.........................................

-----Messaggio originale-----
**Da:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Inviato:** venerdì 21 marzo 2003 13.01
**A:** Gerardo Danilo (UCI)
**Cc:** Moscoso, Victor Hugo
**Oggetto:** IDB Milan Meeting

**Mail 95**

Dear Mr Gerardo: as discussed today, I syndicate B Loans for the Inter-American Investment Corporation from London. I would appreciate the opportunity to visit you next week in Milan, discuss projects in the IIC pipeline and potential cooperation alternatives. Thursday 27 March at 12.00 as you suggested is convenient. Please let me know your address.
I look forward to meeting with you.
Sincerely,
Jorge R. Vila

**JRVila**

| | |
|---|---|
| From: | "Jose Miguel Arigita" <jose.arigita@batlantico.com> |
| To: | <j.r.vila@btopenworld.com> |
| Sent: | 24 March 2003 21:34 |
| Subject: | FW: Sindicación de USD 6 millones. Banco Safra |

# Mail 98

Estimado Jorge,

He estado intentando localizarte en los telefonos que dispongo, sin exito

| | |
|---|---|
| Tlf: | 44-1483-548-460 |
| Cell: | 44-7775-587-964 |

Necesitaria si eres tan amable contactar contigo,

Para agilizar todo, te adjunto email, donde puedes comprobar que necesito cierta informacion,

Te agradezco de antemano tus gestiones para facilitarme dicha informacion,

Muchas gracias, saludos cordiales,

Jose Miguel Arigita
Banco Atlantico Miami
T.F.Area Manager South America
Ph:        305-374-7515
Direct Ph: 305-503-1907
Fax:       305-374-7521

-----Original Message-----
**From:** ma.pierre@batlantico.es
**Sent:** Monday, March 24, 2003 11:26 AM
**To:** giovanna zeka; roberto Mayo
**Subject:** Sindicación de USD 6 millones. Banco Safra

Hola chic@s,

para estudiar esta operación necesitamos tener la documentación completa del préstamo sindicado, todo el estudio de la operación, la carta de invitación, condiciones del sindicado.......

Quedamos a la espera de recibir esta información.

Gracias por vuestra ayuda.

Un abrazo
Angeles

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender via returned e-mail. Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent those of the company. Although Banco Atlantico operates anti-virus programs, it does not accept responsibility for any damage whatsoever that is caused by viruses being passed.

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail 103** |
| **To:** | <samer.jumean@us.pwcglobal.com> | |
| **Cc:** | "Levy, David" <DAVIDL@iadb.org> | |
| **Sent:** | 28 March 2003 14:28 | |
| **Subject:** | Re: Sunset Beach - Scotiabank Toronto | |

Samer: I returned from Milan last night. No substantial comments from Scotiabank when we met there last Tuesday. I will contact them in Toronto today and inform you of any feedback as soon as this is received.
Best regards,
Jorge

—— Original Message ——
**From:** samer.jumean@us.pwcglobal.com
**To:** samer.jumean@us.pwcglobal.com
**Cc:** Levy, David ; J R Vila
**Sent:** Thursday, March 27, 2003 4:31 PM
**Subject:** Re: Sunset Beach - Scotiabank Toronto

**Mail 102**

David and Jorge

I need to hear back from you guys. Please advise.

| | | |
|---|---|---|
| **Samer Jumean** | | |
| 03/25/2003 05:22 PM | **To:** | "J R Vila" <j.r.vila@btopenworld.com>@INTL |
| | **cc:** | "Levy, David" <DAVIDL@iadb.org>, John Lee/JM/ABAS/PwC@Americas-Carib |
| | **Subject:** | Re: Sunset Beach - Scotiabank Toronto Link |

**Mail 99**

David

I understand you are out and I am assuming you are in Milan attending the IADB annual meetings.

Based on Jorge's attached message, we look forward to hearing back from him on the additional feed back that he may receive from Scotiabank. We expect this to happen by tomorrow.

In the meantime, I wanted to assess your appetite for participating in a potential cofinancing arrangement with another multialteral where you would be asked to lend $10 million.

Can we discuss tomorrow.

Look forward to you reply.

Regards,

Samer

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org>; "Levy, David" <DAVIDL@iadb.org> |
| **Sent:** | 28 March 2003 21:17 |
| **Subject:** | Sunset Beach - Jamaica |

**Mail 104**

Gentlemen: Scotiabank Toronto just confirmed their initial interest in the project, but they fear that Credit may turn them down given international situation and outlook for tourism. Hesitating, no decision yet. We agreed that they will hold another internal discussion on Monday and call me by the end of their day with a decision on whether to proceed with our conversations.
I will keep you informed.
Saludos, Jorge

## JR Vila

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail 105** |
| **To:** | <graciella.majeroni@bam.it> | |
| **Sent:** | 28 March 2003 21:00 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Graciella: I enjoyed meeting you in Milan this week and I hope that the business possibility discussed will materialize. Per our conversation, attached please find a Summary of Terms and Conditions for the IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly look at www.iadb.org for information on the Inter-American Investment Corporation.

We look forward to having Banca Agricola Mantovana on board for this very attractive project, as we believe it would be a good opportunity to start building a close and mutually rewarding relationship.

Sincerely,

Jorge R. Vila

**JR Vila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <jacques.deraeymaeker@kbc.be>; <katrien.smet@kbc.be> |
| **Sent:** | 28 March 2003 18:43 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

**Mail 106**

Dear Jacques and Katrien: I enjoyed meeting you in Milan this week, and I hope that the business possibility we discussed will materialize. Per our conversation, attached please find a Summary of Terms and Conditions for the IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly look at www.iadb.org for information on the Inter-American Investment Corporation.

We look forward to having KBC on board for this very attractive project, as we believe it would be a good opportunity to start building a close, mutually rewarding relationship.

Sincerely,

Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com>; "Apel, Michael" <MICHAELA@iadb.org>; "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **Sent:** | 31 March 2003 14:41 |
| **Subject:** | RE: IIC Trade Related B Loan Banco Safra SA Brazil |

**Mail 108**

Jorge:

I agree with your strategy and, unless Michael has any objection, you should proceed with it. Congrats on the US$2 million from Danske Bank!

Saludos,

Victor Hugo

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Monday, March 31, 2003 9:15 AM
**To:** Michaela@iadb.org; Moscoso, Victor Hugo
**Subject:** IIC Trade Related B Loan Banco Safra SA Brazil

**Mail 107**

Dear Michael and Victor: FYI. 2 down, 38 to go.......

I had 2 "formal" meetings with Cesar Turgato in Milan, plus a few "in passing" conversations. They all went very well. He was initially cautious, but we quickly developed a good sense of complicity. We agreed that coordination of conversations with banks will be essential to close this B Loan successfully. He was very happy to hear about Den Danske, particularly as he is keen on attracting new banks and lines. He also agreed that speed was of the essence with respect to implementing an IIC mandate, and said that he would make sure, upon his return to Sao Paulo this week, that everything is signed as soon as possible (from Milan he was going to visit a couple of banks in Switzerland, but he may be back in SP today).

Per our conversations in Milan, and subject to your views, I will send Cesar a list of the about 60 banks reached so far including contact and feedback received (plus a list of about 60 more banks that I plan to contact in the next 10 days). In coordination with us, he will then talk to the relevant relationship manager of officer of those banks, in Brazil or wherever they are, to apply maximum pressure to participate.

He will also provide us with a list of banks that have participated in an ordinary, about USD100M, loan syndication maturing next mid-May. I will then focus on those banks, underlining that our B Loan would offer them an opportunity to extend, but also limit and upgrade (trade related and B Loan umbrella) their exposure. To the extent that we have the necessary commitments, it would be particularly important to close our B Loan at about the same time that this facility matures in mid-May. Perhaps we should start telling banks that there is a certain time schedule to keep.....commitments by the beginning of May, draft documentation distributed by 10 May, closing by 15-20 May.....

Unless you would like to pursue a different strategy, I plan to send my report to Safra latest tonight. It will be a good opportunity to put pressure on him to finalize our documentation.

Please let me know if you need further information. I will keep you informed of developments.
Saludos, Jorge

—— Original Message ——
**From:** Claus Aaby Knudsen
**To:** J R Vila
**Sent:** Monday, March 24, 2003 9:59 AM
**Subject:** Vedr.: IIC Trade Related B Loan Banco Safra SA Brazil

Dear Jorge,

### JRVila

**From:**    "J R Vila" <j.r.vila@btopenworld.com>
**To:**    "Moscoso, Victor Hugo" <VICTORHM@iadb.org>; "Apel, Michael" <MICHAELA@iadb.org>
**Sent:**    31 March 2003 17:18
**Subject:**    Re: IIC Trade Related B Loan Banco Safra SA Brazil

# Mail 111

OK. Saludos, J.

---

—— Original Message ——
**From:** Moscoso, Victor Hugo
**To:** Apel, Michael ; 'J R Vila'
**Sent:** Monday, March 31, 2003 5:41 PM
**Subject:** RE: IIC Trade Related B Loan Banco Safra SA Brazil

Very good point. We should be very careful in providing a timetable because there could always be delays that are beyond our control (e.g. the board meeting could be postponed, the term sheet takes longer to negotiate etc.) Although it appears that it would be important that the loan syndication maturity date and the B Loan signing occur at almost the same time, we should not commit to that.

Best regards,

Victor Hugo

-----Original Message-----
**From:** Apel, Michael
**Sent:** Monday, March 31, 2003 11:34 AM
**To:** Moscoso, Victor Hugo; 'J R Vila'
**Subject:** RE: IIC Trade Related B Loan Banco Safra SA Brazil

# Mail 110

It sounds fine, but the timing is up to Safra at this point (I am still waiting for their comments to the first draft of the Term Sheet). Once we have agreement on conditions, I send the Appraisal Report to our Credit Committee, which then approves it and from there it goes to our Board. Our Board takes 3/4 weeks, so the bottom line is that mid-May is about the earliest. Still, it shouldn´t be much beyond that, assuming we can wrap up the Term Sheet this week or latest next week. Anyway, bottom line is that we have to be careful about promising stuff with respect to timing, since that is out of our control.

Best regards.

Michael

-----Original Message-----
**From:** Moscoso, Victor Hugo
**Sent:** Monday, March 31, 2003 11:41 AM
**To:** 'J R Vila'; Apel, Michael; Moscoso, Victor Hugo
**Subject:** RE: IIC Trade Related B Loan Banco Safra SA Brazil

# Mail 109

Jorge:

I agree with your strategy and, unless Michael has any objection, you should proceed with it. Congrats on the US$2 million from Danske Bank!

Saludos,

Victor Hugo

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Monday, March 31, 2003 9:15 AM
**To:** Michaela@iadb.org; Moscoso, Victor Hugo

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> | **Mail 112** |
| **Sent:** | 31 March 2003 14:59 | |
| **Attach:** | Bco Safra invitation letter.doc; Safra Summary Terms & Conditions.doc | |
| **Subject:** | Trade Related B Loan Banco Safra SA - Brazil | |

Victor: Caixa Geral needs to receive invitation directly from Washington. Attached are Invitation Letter and Summary of Terms and Conditions. Please review the Letter, add your title at the end, and anything else that you think appropriate, and mail Letter and Summary to Daniel Chambel, Caixa Geral in Lisbon, at daniel.chambel@cgd.pt I will be grateful if you copy me. I thought it advisable to mention in the Letter that this B Loan is subject to IIC Board approval, not just that it is "indicative".
Best regards,
Jorge.

**JRVila**

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | <daniel.chambel@cgd.pt> |
| **Cc:** | <j.r.vila@btopenworld.com> |
| **Sent:** | 31 March 2003 16:05 |
| **Attach:** | Caixa Geral Letter.doc; Safra Summary Terms & Conditions.doc |
| **Subject:** | Trade Related B Loan Banco Safra SA - Brazil |

# Mail 113

Dear Mr. Chambel:

Please find attached two WORD documents containing an Invitation Letter and the Summary Terms and Conditions for a Trade Related B Loan to Banco Safra SA in Brazil.  We look forward to working with your fine institution which we know very well since both our institutions are shareholders in  CIFI (Corporacion Interamericana para el Financiamiento de Infraestructura S.A.).

Regards,

Victor Hugo Moscoso
Senior Investment Officer
Inter-American Investment Corporation
Tel: (202) 623-3918
Fax: (202) 623-3802
e-mail: victorhm@iadb.org



**Victor Hugo Moscoso**
**Senior Investment Officer**

**INTER-AMERICAN INVESTMENT CORPORATION**
1300 New York Avenue, NW – Stop W0206
Washington, DC 20577
Tel: (202) 623-3918    Fax: (202) 623-3802
E-mail: victorhm@iadb.org

# Mail 113
# Invitation letter

November 14, 2004

Caixa Geral de Depositos SA
Av. Joao XXI 63
Lisbon, Portugal

Attention: Daniel Chambel

Re: USD 40M B Loan Banco Safra SA - Brazil

Dear Mr. Chambel:

Further to your conversations with Jorge Vila in London, we are pleased to invite you to participate in the transaction of the reference. Attached is a Summary of Terms and Conditions. Please note that this transaction is subject to approval by our Board of Directors. Should you have any questions in reference to this invitation or to the terms and conditions in the attached Summary, please do not hesitate to contact either Mr. Vila in London or myself in Washington DC. I can be reached at 202-623-3918 or by e-mail at victorhm@iadb.org, whereas Mr. Vila can be reached at 44-1483-548-460 (phone & fax), 44-7775-587-964 (mobile) or at j.r.vila@btinternet.com.

We appreciate your interest in this transaction and we look forward to working with you as a participant.

Sincerely,


Victor Hugo Moscoso

**Mail 113**
**Summary terms**
**Page 1**

## CONFIDENTIAL SUMMARY OF TERMS AND CONDITIONS

### March 2003

### PARTICIPATION IN A US$50,000,000 UNSECURED LOAN

### FROM

### INTER-AMERICAN INVESTMENT CORPORATION

### TO

### BANCO SAFRA S.A.

*incorporated in The Republic of Brazil*

This Summary of Terms and Conditions has been prepared by Banco Safra S.A. ("Bank") with the authorization of the Inter-American Investment Corporation ("IIC"), regarding the indicative loan described herein. Delivery of this Summary shall not, under any circumstances, create any implication that the terms and conditions described herein are final or correct as of any time subsequent to the date of this Summary, and no representation or warranty, express or implied, is made by the IIC as to the accuracy or completeness of such Summary, and nothing contained in this Summary is, or shall be relied upon as, a promise or representation of the IIC.

This Summary is not intended to provide the sole basis for a decision to participate in the tentative financing described herein; it is the responsibility of each prospective participant to conduct its own evaluation of the risks and merits of any such decision to participate.

This Summary is furnished with the understanding that without prior authorization from the IIC or the Bank, no person accepting this Summary will either release it (or a reproduction of it) to third parties, or use it for any purpose other than information to evaluate a participation in the indicative loan described herein.

# Mail 113
# Summary terms Page 2

PARTICIPATION IN A US$ 50,000,000 UNSECURED LOAN
FROM
THE INTER-AMERICAN INVESTMENT CORPORATION
TO
BANCO SAFRA S.A.

SUMMARY OF TERMS AND CONDITIONS

| | |
|---|---|
| **Borrower:** | Banco Safra S.A., a private commercial bank incorporated in the Republic of Brazil ("Bank"). |
| **Lender of Record:** | Inter-American Investment Corporation ("IIC") |
| **Participants:** | Financial institutions that are not incorporated in the Republic of Brazil and that are engaged in international lending ("Participants"). |
| **Amount of the Loan:** | US$ 50,000,000 (the "IIC Loan"), including an A Loan of US$ 10,000,000 to be funded by IIC, and a B Loan of US$ 40,000,000 to be funded by Participants. |
| **Amount of B Loan Individual Participation Commitments:** | Minimum US$ 2,000,000, maximum US$ 10,000,000, in increments of US$ 1,000,000 ("Participations"). |
| **Use of Proceeds:** | the Bank will use any funds from the IIC Loan to finance, through U.S. dollar-denominated loans under market terms and conditions, qualified trade related transactions (generally defined as qualified cross-border exchanges of goods and services) by eligible Brazilian borrowers in the ordinary course of their business, including pre-export, post-export and import financing, provided that these transactions do not relate to speculative real estate, gaming, tobacco or manufacturing arms or alcohol ("Sub-Loans"). |
| **Loan Terms:** | The A Loan will have a term of 2 (two) years, paying interest semi-annually, with 1 (one) full principal repayment at the end of the second year. The B Loan will have a term of 1 (one) year, renewable for 1 (one) more year at the option of the Participant, with 1 (one) full principal repayment at the end of the first year. |
| **B Loan Interest Rate:** | Six-month Libor plus 2.625% per annum, payable semi-annually. |
| **B Loan Front-end Fee:** | 0.50% (one-half of one percent) on Participations up to US$ 5,000,000, and 0.625% (five eighths of one percent) on Participations over US$ 5,000,000. |
| **Commitment Fee:** | 0.50% (one-half of one percent) per annum, on the undisbursed portion of the IIC Loan, payable to Participants semi-annually on the basis of their Participations. |

# Mail 113
# Summary terms Page 3

**Effective Date of the B Loan:**

The effective date of the B Loan will be the date when Participation Agreements have been executed by all Participants ("Effective Date").

**Optional Prepayment:**

Permitted with 90 day-notice only with a prepayment fee equal to 1.0% (one percent) of the prepaid amount ("Prepayment Fee") prorated by the months remaining to maturity. The minimum prepayment will be US$ 2,500,000.

**Mandatory Prepayment:**

(a) All amounts disbursed by IIC but not used by the Bank to finance Sub-Loans within 90 days of disbursement and (b) all repayments and prepayments of Sub-Loans not reinvested in other eligible Sub-Loans within 90 days of receipt.

**Covenants:**

Customary in loan agreements of this nature.

**Disbursement Availability:**

Initial disbursement of the B Loan will be no later than 1 (one) month after the Effective Date, and final disbursement will be no later than 3 (three) months after the Effective Date. Neither IIC nor any Participant will be obligated to fund any portion of the B Loan which another Participant may have failed to fund.

**Allocation of Payments Among IIC and Participants:**

As lender of record, IIC will collect all debt service and other charges from the Bank and, with the sole exception of fees arising from IIC's role as administrator of the B Loan and for IIC's supervision activities, will distribute them if, when and as received, *pro rata* among itself and the Participants according to the percentage share of each in the principal amount of the IIC Loan outstanding, on a *pari passu* basis.

**Events of Default:**

Payment and performance defaults as are customary in loan agreements of this nature.

**Late Payment Charge:**

Six percent (6%) per annum, payable on the amount of principal, interest, fees and charges in arrears to the extent permitted by law, and for each day that an amount is due but remains unpaid.

**Increased Costs or Material Changes in Circumstances:**

Customary in loan agreements of this nature, providing protection for Participants in the event of increased costs or funding losses.

**Limited Liability of IIC:**

IIC shall have no obligation or liability to Participants for payments due on the B Loan. Participants shall have no recourse against IIC for any payment of principal of, or interest on, the B Loan, or for any fees or other amounts payable thereon by the Bank, or for any act or omission by IIC in administering the IIC Loan other than acts of gross negligence or willful misconduct.

# Mail 113
# Summary terms Page 4

**Responsibility of
Participants:**

Participants will be responsible for conducting their own due
diligence and for making independent credit evaluations
regarding the Bank, and for making Participation
commitments based upon the results of such due diligence.

**Participant's Right
of Assignment:**

Each Participation is for the account of the Participant, and
may not be re-offered, assigned, sold or otherwise transferred
without the prior written approval of IIC.

**Governing Law:**

The laws of the State of New York, United States of
America.

**No IIC Representations
or Warranties:**

IIC makes no representations or warranties, express or
implied, as to the merits of the Participation described herein,
or to the financial condition or creditworthiness of the Bank.

**JRVila**

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "Apel, Michael" <MICHAELA@iadb.org>; <j.r.vila@btopenworld.com> |
| **Sent:** | 01 April 2003 15:19 |
| **Subject:** | RE: Safra |

**Mail 115**

Jorge:

Could you please try to confirm if the B loan for Bradesco was at Libor + 2.125%?  Thanks.

Michael:

I can understand Cesar's concern but we were quoting what at the time was market.  If we receive confirmation that the Bradesco B Loan was done a 2.125% over Libor, than we will have to adjust our pricing to market, that is, the new rate for the B Loan would be Libor + 2.25%.  We have reiterated to the banks that the pricing was "indicative" only.  Any thoughts Jorge?

Regards,

Victor Hugo

| | |
|---|---|
| -----Original Message----- | |
| **From:** | Apel, Michael |
| **Sent:** | Tuesday, April 01, 2003 8:07 AM |
| **To:** | 'j.r.vila@btopenworld.com'; Moscoso, Victor Hugo |
| **Subject:** | Safra |

**Mail 114**

Dear Jorge and Victor Hugo,

I spoke with Cesar this morning. He promises to speed up the process and hopefully we'll get his lawyer's version of the Term Sheet today.

He raised a concern that we have to address: he is concerned that we have put in writing what the deal with Safra will be, and mentioned the figure of Libor + 2.635%. According to him, he spoke with Bradesco and the Bradesco deal was priced at Libor + 2.125%, and not 2.5%. He is concerned that we have used the figure of Libor + 2.625% too much, and that when we decide we can go with something lower (Libor + 2.375 - 2.5) we will have trouble, since the participant banks will have seen the earlier higher figure.

Any comments? I told him I would share that with you. Whether he is justified or not in being concerned, his concern has to be taken seriously.

Regards,

Michael

Page 1 of 2

# Mail 116

**JRVila**

**From:**      "J R Vila" <j.r.vila@btopenworld.com>
**To:**        "Moscoso, Victor Hugo" <VICTORHM@iadb.org>; "Apel, Michael" <MICHAELA@iadb.org>
**Sent:**      01 April 2003 17:53
**Subject:**   Trade Related B Loan Banco Safra SA

Already trying to obtain a Summary of Terms and Conditions for Bradesco. Hopefully, Cesar may be referring to Bradesco's B Loan last year, which was at L+2.125%.

As we have always discussed, the word "indicative" in the Summary is, in my view, enough protection for us. But that does not mean that commercially we will not pay a very high price if we make any changes.

From a commercial angle, we should only modify the price if there is a material change in market conditions, like a new syndication from a similar risk at a substantially lower price, which would clearly, unequivocally indicate that at 2.625% Safra would be overpaying. So far I do not see this happening, but who knows....

If we decide to change the price at the last minute as Cesar seems to suggest, the commercial consequences for us would be very adverse. We would risk losing the syndicate, because all the commitments would have to go back to their credit committees, and some may not come back, we would lose credibility, and probably some / many banks may not answer our phone calls for a long while.......

The price has been set, subject to terms, and we are in the market at that price subject to those terms. We decided a few weeks ago that that was the right price, it was discussed and agreed with Safra, and we went in the market as every syndication should go, within the framework provided by the terms and conditions, including indicatively, but at full speed. It would be a huge mistake, in my view, and we would pay a credibility price, if we proposed to change the price at the last minute because Safra thinks that they can get away with an extra 1/8. A material change in market conditions would, of course, be another matter.

I fear that Cesar does not see this distinction so clear. His concern that "we put in writing what the deal with Safra will be..." seems to reflect a different commercial perception of what we are doing. How could we have done it differently than providing a price? How would he expect a bank to give us any commitment without knowing the most essential element of the proposal?
Going "indicative", what we are doing as far as I understand it, is not "pre-marketing", "testing the water", "feeling out the market", etc, which as you know Victor, I have always adviced against. Come to the market with a price, if you don't have a price don't come to the market, nobody will take you seriously.

In my view, we (Cesar and us) must assume that we will close this at 2.625% unless there is a material change in market conditions or the IIC Board decides otherwise.

I also understand Cesar's concern: he does not want to be seen as paying much higher than competitors perceived as "similar". But the answer is sticking to our price and putting this in the bag as soon as possible.

Cesar never raised this point in Milan, I do not quite understand, unless he heard Bradesco at 2.125% and he is hedging...... Should we perceive a different sense of urgency? He knows the importance of matching the closing of our B Loan with the May maturity of the USD 100M ordinary loan syndication. There isn't that much time left.....

I will contact you asap today with a confirmation of the Bradesco price and hopefully a copy of the Summary that was distributed.
Saludos, Jorge

----- Original Message -----
From: Moscoso, Victor Hugo
To: Apel, Michael ; j.r.vila@btopenworld.com'
Sent: Tuesday, April 01, 2003 4:19 PM
Subject: RE: Safra

Jorge:

Could you please try to confirm if the B loan for Bradesco was at Libor + 2.125%?  Thanks.

03/12/04

# Mail 117

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org>; "Apel, Michael" <MICHAELA@iadb.org> |
| **Sent:** | 01 April 2003 18:35 |
| **Subject:** | Trade Related B Loan Banco Safra SA |

Michael and Victor: as reported in the IFR, Bradesco paid 2.125% for their IDB-IFC B Loan, not 2.5%. I should be able to re-confirm this info, hopefully with a copy of the actual Summary distributed, within the next couple of hours.
For further reference, I understand that Petrobras is paying L+2.50% for 1-yr trade related financing.
If the IFR is right, difficult call......
I will contact you later today with more info.
Saludos, Jorge


[* BRAZIL] (03/03-2:05pm) Hear the Banco Bradesco US120mm-$150mm IFC B-loan
is
in general syndication and slated to close within days. The loan is a
one-year
trade facility similar to recent IFC transactions for Banco BBA
Creditanstalt,
Itau and Unibanco.
    The Bradesco deal has an IFC A-loan and B-loan structure similar to
the
other programs. The A-loan for Bradesco totals US$30mm with IFC and IDB
providing the financing. The B-loan is expected to pay LIBOR + 212.5bp.
    B-loan syndication fees: Co-arrangers above $15mm get 62.5bp, managers
from $10mm-$15mm get 50bp and participants below $10mm get 37.5bp.
    Banco BBA Creditanstalt last month closed a US$60mm B-loan paying
L+237.5bp with the IFC and Hypovereinsbank as co-lead arrangers.
    The Banco Itau IFC loan package closed last October and the Unibanco
IFC
loan package closed in September.

## JR Vila

| | | # Mail 118 |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | "Claus Aaby Knudsen" <claus.aaby@danskebank.dk> | |
| **Cc:** | "Apel, Michael" <MICHAELA@iadb.org>; "Moscoso, Victor Hugo" <VICTORHM@iadb.org>; "Segura-Millan, Alejandro" <ALEJANDROS@iadb.org> | |
| **Sent:** | 01 April 2003 11:48 | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Claus: thank you very much for deciding to participate in our B Loan to Banco Safra. Your colleague Torben Helbo informed me last week in Milan of your decision, adding that a formal communication from Danske Bank would be forthcoming. We will send draft documentation for your review in due course. Please do not hesitate to contact us with any questions or requests for additional information. We are very pleased and we hope that this will become a first step towards a closer cooperation between Danske Bank and the Inter-American Investment Corporation.
Best regards,
Jorge R. Vila

----- Original Message -----
**From:** Claus Aaby Knudsen
**To:** J R Vila
**Sent:** Monday, March 24, 2003 9:59 AM
**Subject:** Vedr.: IIC Trade Related B Loan Banco Safra SA Brazil

Dear Jorge,

We have received the Confidential Summary of Terms and Conditions concerning the Banoc Safra transaction:

| | |
|---|---|
| Borrower: | Banco Safra S.A. |
| Lender of Record: | Inter-American Investment Corporation |
| Amounts: | USD 40,000,000 IIC B-loan |
| Tenor: | 1 year |
| Interest: | Libor + 2.625 % p.a. |

We will be pleased to participate in the above IIC B-loan facility with USD 2,000,000 subject to satisfactory loan documentation.

I look forward to hearing from you.

Best regards
Claus Aaby

Danske Bank
Export/Import Finance
Phone: +45 3344 2844
Fax: +45 3344 2829
E-mail: claus.aaby@danskebank.dk
Homepage: http://www.danskebank.com/exportfinance

| | | |
|---|---|---|
| "J R Vila" <j.r.vila@btopenworld.com> | **Til:** | Claus Aaby Knudsen/CLKN/Intranet/DDB@DKDDB04 |
| | **cc:** | |
| 17-03-2003 11:13 | **Vedr.:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail 120

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org>; "Apel, Michael" <MICHAELA@iadb.org> |
| **Sent:** | 01 April 2003 16:42 |
| **Subject:** | Fw: BANCO ATLANTICO - IIC Trade Related B Loan Banco Safra SA |

# GENTLEMEN! DO I HAVE NEWS FOR YOU!!!!!!!!! PLEASE CHECK BELOW!

By the way, I was worried by the price issue raised by Cesar. But that was before the news below. Now I'm in complete, uncontrollable panic! (I know Victor, my usual condition....). If this deal does not go through at 2.625% as we have informed more than 60 banks already (per agreement with Safra themselves!), with commitments already received, Baghdad is the only place left to hide, at least for me.....
Let's talk. I'll be out from 19.00 returning at 20.30 London time.
How do you like the news?
Saludos, J.

----- Original Message -----

# Mail 119

**From:** Maurici LLado
**To:** 'J R Vila'
**Sent:** Tuesday, April 01, 2003 3:50 PM
**Subject:** BANCO ATLANTICO - IIC Trade Related B Loan Banco Safra SA

Estimado Jorge,
    Fue un placer conocerte personalmente en Milan. Espero que sea el inicio de una buena amistad y colaboracion en el terreno profesional.
    Y para que veas que es cierto lo que digo, te confirmo que BANCO ATLANTICO ha aprobado nuestra participacion en el B Loan de BANCO SAFRA con un importe de USD 6,000,000.
    Dime como quieres que procedamos a partir de este momento.
    Un abrazo,
    Maurici Llado.

-----Mensaje original-----
**De:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Enviado el:** Thursday, March 13, 2003 5:15 PM
**Para:** Maurici.llado@batlantico.com
**Asunto:** IIC Trade Related B Loan Banco Safra SA

Dear Maurici: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.
I look forward to seeing you at the IDB in Milan, let me know your mobile number.
We look forward to having Banco Atlantico on board for this very attractive project.
Best regards,
Jorge R. Vila

# Mail 216

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Varela, Felipe Alberto" <FELIPEV@iadb.org>; "Magdalena Glenz" <mglenz@invertec.cl>; "'Ricardo Merino'" <rmerino@invertec.cl> |
| **Sent:** | 23 June 2003 20:00 |
| **Attach:** | Sample Consent Request.doc |
| **Subject:** | Waiver letter |

Just received from friendly source. No thoughts yet.
Saludos, Jorge

**Mail 216
Form
Page 1**

**[Sample request for consent]**

Participant Name and Address:

RE:   [Borrower Name]
      Investment Agreement dated _____ (the "IA")
      Participation Agreement dated _____ (the "PA")

Dear _____:

Reference is made to the above IA. Capitalized terms used herein and not otherwise defined shall have the same meanings given to them in the IA.

IFC has received a request from [Borrower Name] attached hereto with the latest annual report) to amend the amortization schedule of the B Loan in Section 2.01 of the

Although neither the A nor B Loans have been disbursed, the Borrower's request is to defer repayment of principal of the B Loan by one year, beginning on October 15, 1999 instead of October 15, 1998, but ending on the same date, October 15, 2003, as agreed earlier, and reducing the number of semi-annual consecutive payment installments from 11 (eleven) to 9 (nine). The interest and principal payment dates (October/April 15) remain unchanged. The new date for beginning repayment of the B Loan would coincide with the current date for beginning repayment of the A Loan.

While the Borrower had agreed to repayment of the B Loan approximately a year from the anticipated first disbursement, actual disbursement has been slower than expected due to, inter alia, marketing of the line to their clients and fulfilling the conditions of disbursement. In addition, The Borrower states that as a result of the "Asian Crisis", many clients postponed their investment projects, particularly those financed by foreign currency, due to uncertainties in the international markets and changes in the government's foreign exchange policy. Among the measures adopted by the government to protect the balance of payments was the increase in the Central Bank Base Rate from 20% p.a. to 45% p.a. Since this strategy was successful, the Rate has been allowed to decrease to its current level of 23.25% p.a. and The Borrower expects it to return to pre-"Asian Crisis" levels.

The Borrower believes that as the situation has normalized, demand for its credit line has increased. However, given the delays in the disbursement, the Borrower states that its clients are concerned about the current date for the first repayment of the B Loan, October 15, 1998. It believes that deferring this date by a year, and thus effectively restoring the original grace period, could make the credit line more attractive to its clients.

**Mail 216
Form
Page 2**

IFC supports this request as it agrees with the Borrower that this change could encourage greater use of the established credit line. We also believe it prudent at this time to extend the [disbursement date] to October 31, 1998.

Please indicate your below whether you consent to this request and return an signed copy of this letter to us by facsimile not later than Friday, May 22, 1998. Feel free to contact us with any questions or comments.

[Signature Block]

The Participant signing below consents to the above amendments to the Participation Agreement and the Investment Agreement as per Section 4.01 of the Participation Agreement.

[Participant Name]

By:_____

Printed Name:_____

Date:_____

L:\BLM\MASTER FILE 2\Sample Amendment & Waiver Letters\Sample Consent Request.doc
July 28, 1998 11:11 AM

# Mail 218

**From:**     "J R Vila" <j.r.vila@btopenworld.com>
**To:**        <mglenz@invertec.cl>; <felipev@iadb.org>; '"Ricardo Merino"' <rmerino@invertec.cl>
**Sent:**      26 June 2003 17:32
**Subject:**   Re: carta resultados invertec

Gracias por el borrador de carta. Tratare de enviarles mis comentarios hoy.
Les adelanto que anoche hable con Dale Prusinowski (Caixa New York). Me
confirmo que las posibilidades de una aprobacion dependen sobre todo de que
Caixa perciba un fuerte apoyo de la Corporacion a la compania y al proyecto.
No tienen oficina en Chile, como me repitio Dale, y por tanto es importante
para ellos saber que la Corporacion no solo presta todo su apoyo sino que
sigue el proyecto y la compania tan de cerca como es posible. Tambien
sugirio enfocar el aspecto tecnico, es decir, analizar que tan importante es
la desviacion de los parametros fijados por el contrato. Por una rapida
lectura del borrador, me parece que en este sentido vamos por muy buen
camino.
Le volvi a poner el acento en juzgar el pedido sobre la base de los
resultados de Invertec a traves de los anos, asi como los logros recientes
en materia de ventas (Wal-Mart) y otros como el riesgo Chile en relacion a
otros de la region. Si logramos mostrarle un fuerte apoyo de la Corporacion
asi como "debilitar" el grado de incumplimiento, es posible que Caixa New
York flexibilice un poco su posicion y pase a apoyar el pedido de waiver
frente a Lisboa. Seria muy importante.
Felipe: tratare de enviarte manana a mas tardar el proposed wording para el
cover letter que me pediste el lunes pasado sobre la base de lo conversado
con Invertec. Te parece bien?
Saludos, Jorge


----- Original Message -----
From: "Magdalena Glenz" <mglenz@invertec.cl>
To: <felipev@iadb.org>
Cc: "Jorge Vila (E-mail)" <j.r.vila@btinternet.com>
Sent: Thursday, June 26, 2003 4:03 PM
Subject: carta resultados invertec

# Mail 217


> Estimado Felipe y Jorge:
>
> De acuerdo a lo conversado en nuestra reunion con Jorge y Ricardo esta
> semana, les adjunto un primer borrador de carta con los resultados de
> Invertec a Abril 2003. Les adjunto tambien los estados financieros a esa
> misma fecha, con el calculo de ratios, y el informe ya enviado a NY con
los
> contratos.
> Agradecere me hagan llegar sus comentarios.
> Les saluda
> Magdalena
>
>
>

# Mail 219

**JRVila**

**From:**    "Varela, Felipe Alberto" <FELIPEV@iadb.org>
**To:**    "'J R Vila'" <j.r.vila@btopenworld.com>
**Sent:**    26 June 2003 17:29
**Subject:**    RE: carta resultados invertec

De acuerdo. Mandame un texto tentativo que nosotros lo revisamos. Ya hablé con Diego. El no tiene inconveniente en le medida que la gerencia de la CII esté de acuerdo. El lunes vuelve Steven a quién le vamos a pedir que tome la decisión. En cuanto reciba tu propuesta la reviso con Diego.


Felipe

-----Original Message-----
From: J R Vila [mailto:j.r.vila@btopenworld.com]
Sent: Thursday, June 26, 2003 2:32 PM
To: mglenz@invertec.cl; felipev@iadb.org; 'Ricardo Merino'
Subject: Re: carta resultados invertec


Gracias por el borrador de carta. Tratare de enviarles mis comentarios hoy. Les adelanto que anoche hable con Dale Prusinowski (Caixa New York). Me confirmo que las posibilidades de una aprobacion dependen sobre todo de que Caixa perciba un fuerte apoyo de la Corporacion a la compania y al proyecto. No tienen oficina en Chile, como me repitio Dale, y por tanto es importante para ellos saber que la Corporacion no solo presta todo su apoyo sino que sigue el proyecto y la compania tan de cerca como es posible. Tambien sugirio enfocar el aspecto tecnico, es decir, analizar que tan importante es la desviacion de los parametros fijados por el contrato. Por una rapida lectura del borrador, me parece que en este sentido vamos por muy buen camino.
Le volvi a poner el acento en juzgar el pedido sobre la base de los resultados de Invertec a traves de los anos, asi como los logros recientes en materia de ventas (Wal-Mart) y otros como el riesgo Chile en relacion a otros de la region. Si logramos mostrarle un fuerte apoyo de la Corporacion asi como "debilitar" el grado de incumplimiento, es posible que Caixa New York flexibilice un poco su posicion y pase a apoyar el pedido de waiver frente a Lisboa. Seria muy importante.
Felipe: tratare de enviarte manana a mas tardar el proposed wording para el cover letter que me pediste el lunes pasado sobre la base de lo conversado con Invertec. Te parece bien?
Saludos, Jorge



----- Original Message -----
From: "Magdalena Glenz" <mglenz@invertec.cl>
To: <felipev@iadb.org>
Cc: "Jorge Vila (E-mail)" <j.r.vila@btinternet.com>
Sent: Thursday, June 26, 2003 4:03 PM
Subject: carta resultados invertec


> Estimado Felipe y Jorge:
>
> De acuerdo a lo conversado en nuestra reunion con Jorge y Ricardo esta

# Mail 220

**JRVila**

**From:** "Magdalena Glenz" <mglenz@invertec.cl>
**To:** "Jorge Vila (E-mail)" <j.r.vila@btinternet.com>
**Sent:** 26 June 2003 16:52
**Subject:** iic

Jorge:
hable recien con felipe. Me indica que steve anda fuera de washington hasta
el lunes y que en el intentando estaria preparando la propuesta de carta en
conjunto con noseda y contigo para presentarsela para su aprobacion a su
regreso. Seria bueno que enviaras tus comentarios de manera que los
incorpore en el primer borrador. Por otro lado, me recordo que el tenor de
la carta va ir por el lado del apoyo de la cii a la empresa, pero que el
desembolso es decision del banco. Ellos no nos pueden dar la recomendacion.
saludos
Magdalena

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | "Varela, Felipe Alberto" <FELIPEV@iadb.org> | **Mail 221** |
| **Sent:** | 27 June 2003 13:36 | |
| **Attach:** | IIC Draft Cover Letter.doc | |
| **Subject:** | Invertec B Loan - Caixa Geral waiver | |

Felipe: te envio la carta que sugiero para Caixa. Pensaria que la frase "under the circumstances" protege a la ICC, pero Diego dira..... No hice mencion a una presentacion personal en Lisboa, pero definitivamente sugiero que tu la hagas en el texto del mail que envies directamente a Daniel Chambel (Daniel.Chambel@cgd.pt) copia a Max Zelmanowicz y Dale Prusinowski (te envie sus mails la semana pasada), para dejar establecida una alternativa de apelacion si decidieran insistir con su negativa. Si lo que les interesa es el aspecto tecnico, creo que les va a resultar dificil negarse. Pero si su verdadero interes es limitar su exposure a LA, se van a agarrar de cualquier cosa, y por eso pienso que es importante dejar la puerta abierta a otra instancia que nos permita estirar la conversacion.
Saludos, Jorge

**Mail 221**
**Draft letter**
July __, 2003 **Page 1**

Mr Max Zelmanowicz
Deputy General Manager
Caixa Geral de Depositos, S.A.
Grand Cayman Branco

Dear Mr Zelmanowicz:

Further to our letter of 8 May 2003, reference is made to the Participation Agreement
signed between Caixa Geral de Depositos, S.A. (the "Participant"), and the Inter-
American Investment Corporation ("IIC") (the "Participation Agreement"), and the
Loan Agreement signed between Invertec Pesquera Mar de Chiloe S.A. (the
"Borrower"), and the IIC (the "Loan Agreement"), both dated 17 May 2002.

The Borrower is requesting a disbursement of USD 4 million under the B Loan. Such
disbursement would require a disbursement of USD 2.4 million from the Participant,
determined pro-rata to its Relevant Participation in the B Loan.

The funds will be used to finance the expansion plan. Annex 4, already sent to you,
includes a list of the assets to be incorporated to the project, together with the adjusted
financial projections presented by the Borrower.

Under the provisions of the Loan Agreement, in order to receive disbursement, the
Borrower must comply with various financial ratios, including a debt to equity, a
current and a debt service coverage ratio, as well as present evidence of approval of 4
new concessions for grow-out centers at sea.

With respect to the debt to equity ratio, the Loan Agreement specifies that after
December 2002, the Borrower must achieve a 1.5 ratio. The latest information
provided by the Borrower confirms that as of last April this ratio amounts to 1.7, with
the Borrower estimating that it should reach 1.5 by the end of 2003. While not a
significant deviation, and notwithstanding that this ratio has been steadily declining
from 1.9 in last December to the present 1.7, we must, pursuant to the provisions of
the Loan Agreement, request your waiver before making any disbursement.

With respect to the current and debt service coverage ratios, the information presented
by the Borrower confirms that both comply with the provisions of the Loan
Agreement.

With respect to the 4 new concessions for grow-out centers at sea, the Borrower has
provided evidence confirming that 2 have already been approved and the remaining 2
are in the final stages of approval. While these 2 concessions are not essential to the
implementation of the project in the short term, as in the previous case, under the
provisions of the Loan Agreement we must request your waiver before making any
disbursement.

# Mail 221
# Draft letter Page 2

The latest information provided by the Borrower confirm that the departure from the debt to equity ratio and the pending approval of the last 2 concessions for the project, are now much less significant issues.

Moreover, the positive results achieved by the Borrower as of April 2003, the steady salmon price recovery evident since the middle of last year, and certain recent commercial developments related to a new sales contract with a very large US client and free trade agreements with US and Europe which open very substantial opportunities to increase exports, indicate that the Borrower continues their strong export-oriented, growth trend.

The IIC supports this request because we believe that waiving both requirements is prudent under the circumstances. We do not view them as significant departures and should not affect the project or the performance by the Borrower of their obligations under the Loan Agreement.

Please let us know if you need further information or clarifications.

Sincerely,


Felipe Varela

**JRVila**

| | |
|---|---|
| **From:** | "Varela, Felipe Alberto" <FELIPEV@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 03 July 2003 11:37 |
| **Subject:** | RE: Invertec Pesquera |

**Mail 223**

No. Steve le va a mandar la carta y yo voy a hacer un follow up con la información.

Felipe

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Wednesday, July 02, 2003 7:33 PM
**To:** Varela, Felipe Alberto
**Subject:** Invertec Pesquera

**Mail 222**

Felipe: supongo que Steve enviara la carta junto con la presentacion que preparo la empresa y los balances a Abril....? O sea el paquete completo. Seria importante para que luego esa informacion no le llegue por separado a Chambel. Disculpa si ya esta incluido, pero como no lo comentamos queria asegurarme.
Saludos, Jorge

**Mail 224**    Page 1 of 1

**JRVila**

| | |
|---|---|
| **From:** | "Varela, Felipe Alberto" <FELIPEV@Iadb.org> |
| **To:** | <Daniel.Chambel@cgd.pt> |
| **Cc:** | "Dale Prusinowski (E-mail)" <dale.prusinowski@cdgus.com>; "Max Zelmanowicz (E-mail)" <max.zelmanowicz@cgd.ky>; "Jorge Vila (E-mail)" <j.r.vila@btinternet.com>; "Reed, Steven L." <STEVENR@iadb.org> |
| **Sent:** | 03 July 2003 20:12 |
| **Attach:** | Caixa Geral Depositos.pdf; Attachments.zip |
| **Subject:** | Invertec Pesquera - Waiver request |

Dear Mr. Chambel:

As discussed with Mr. Jorge Vila, we would like to inform you of our continued support for the Invertec Pesquera Mar de Chiloe project. Please find attached a letter from Mr. Steven Reed with respect to the waiver request from .

Please let me know if I can be of further assistance.

Kind regards,

Felipe Varela

<<Caixa Geral Depositos.pdf>> <<Attachments.zip>>

# Mail 224
# Letter Page 1



STEVEN L. REED
Manager,
Corporate Finance and
Financial Institutions

**INTER-AMERICAN INVESTMENT CORPORATION**
1300 New York Avenue, NW – Stop W0208
Washington, DC 20577
Tel: (202) 623-3981 Fax: (202) 623-3802
E-mail: stevenr@iadb.org

www.iic.int

July 3, 2003

Mr Daniel Chambel
Caixa Geral de Depositos, S.A.
Lisbon, Portugal

Dear Mr Chambel:

Further to our letter of May 8, 2003, reference is made to the Participation Agreement signed between Caixa Geral de Depositos, S.A. (the "Participant"), and the Inter-American Investment Corporation ("IIC") (the "Participation Agreement"), and the Loan Agreement signed between Invertec Pesquera Mar de Chiloe S.A. (the "Borrower"), and the IIC (the "Loan Agreement"), both dated May 17, 2002.

The Borrower is requesting a disbursement of USD 4 million under the B Loan. Such disbursement would require a disbursement of USD 2.4 million from the Participant, determined pro-rata to its Relevant Participation in the B Loan.

The funds will be used to finance the expansion plan. Annex 4, already sent to you, includes a list of the assets to be incorporated to the project, together with the adjusted financial projections presented by the Borrower.

Under the provisions of the Loan Agreement, in order to receive disbursement, the Borrower must comply with various financial ratios, including a debt to equity, a current and a debt service coverage ratio, as well as present evidence of approval of 4 new concessions for grow-out centers at sea.

With respect to the debt to equity ratio, the Loan Agreement specifies that after December 2002, the Borrower must achieve a 1.5 ratio. The latest information provided by the Borrower confirms that as of last April this ratio amounts to 1.7, with the Borrower estimating that it should reach 1.5 by the end of 2003. While not a significant deviation, and notwithstanding that this ratio has been steadily declining from 1.9 in last December to the present 1.7, we must, pursuant to the provisions of the Loan Agreement and the Participation Agreement, request your waiver before making any disbursement under such agreements.

With respect to the current and debt service coverage ratios, the information presented by the Borrower confirms that both comply with the provisions of the Loan Agreement.

# Mail 224
# Letter Page 2

With respect to the 4 new concessions for grow-out centers at sea, the Borrower has provided evidence confirming that 2 have already been approved and the remaining 2 are in the final stages of approval. While these 2 concessions are not essential to the implementation of the project in the short term, as in the previous case, under the provisions of the Loan Agreement and the Participation Agreements we must request your waiver before making any disbursement under such agreements.

The latest information provided by the Borrower confirms that the departure from the debt to equity ratio and the pending approval of the last 2 concessions for the project, are now much less significant issues.

Moreover, the positive results achieved by the Borrower as of April 2003, the steady salmon price recovery evident since the middle of last year, and certain recent commercial developments related to a new sales contract with a very large US client and free trade agreements with US and Europe which open very substantial opportunities to increase exports, indicate that the Borrower continues their strong export-oriented, growth trend.

Finally, the IIC continues to support this project. The IIC "A" loom is fully disbursed. We do not believe the Borrower's waiver request to be a significant departure from the terms and conditions agreed upon in the Loan Agreement, nor should it materially affect the project or the performance by the Borrower of its obligations under the Loan Agreement.

Attached you will find commercial and financial information provided by the company.

Please let us know if you need further information or clarifications.

Sincerely,

*Steve Reed*

Steven Reed

Attachments:

1. Commercial and Financial Report as of June 2003
2. Financial Statements April 2003
3. Commercial results 2002-2003
4. IntraFish Report

**JRVila**

| | | |
|---|---|---|
| **From:** | "Varela, Felipe Alberto" <FELIPEV@iadb.org> | **Mail 226** |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> | |
| **Cc:** | "Barsantini, Javier" <JAVIERB@iadb.org> | |
| **Sent:** | 04 July 2003 11:56 | |
| **Subject:** | RE: Invertec B Loan - Sudameris - Caixa Geral | |

Jorge:

Yo no voy a estar la semana próxima. Si necesitas algo puedes hablar con Javier Barsantini aquí en Montevideo. Yo regreso el 14 a la oficina.

Un abrazo,

Felipe

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]          **Mail 225**
**Sent:** Friday, July 04, 2003 5:20 AM
**To:** Varela, Felipe Alberto
**Subject:** Invertec B Loan - Sudameris - Caixa Geral

Felipe: acabo de llamar a Sudameris. Francois Lion se tomo el dia, vuelve el lunes. Julio es un mes complicado para encontrar gente. Lo llamare el lunes a primera hora. Tambien llamare a Caixa NY y Lisbon el lunes para tratar de lograr la decision mas rapida posible. Me comunico contigo en cuanto tenga novedades. Buen fin de semana.
Saludos, Jorge

**JRVila**

| | | |
|---|---|---|
| **From:** | "Varela, Felipe Alberto" <FELIPEV@iadb.org> | **Mail 227** |
| **To:** | "Jorge Vila (E-mail)" <j.r.vila@btinternet.com> | |
| **Sent:** | 04 July 2003 13:26 | |
| **Subject:** | Caixa | |

Jorge:

Tú sabes si Daniel Chambel recibió el mail con la carta de Steve? Sé que hoy no podés verificar con la gente de NY, pero me queda la duda si recibieron o no el mail.

De cualquier manera tú tenés la copia si fuera necesario.

Felipe

# Mail 228

__JRVila__

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Barsantini, Javier" <JAVIERB@iadb.org>; "Varela, Felipe Alberto" <FELIPEV@iadb.org>; "'Ricardo Merino'" <rmerino@invertec.cl>; "Magdalena Glenz" <mglenz@invertec.cl> |
| **Sent:** | 08 July 2003 14:24 |
| **Subject:** | IIC B Loan - Caixa Geral waiver |

Daniel Chambel (Caixa Lisbon) me confirmo esta manana que habia recibido la informacion y la estaban "procesando". Me llamara en cuanto tenga algo para comentarme. Dale Prusinowski (Caixa New York) **NO** habia recibido nada, por lo que le hice un forward de la presentacion. Le subraye las grandes diferencias con respecto a la solicitud de hace 3 meses y le pedi su apoyo frente a Lisbon. Me prometio que leeria la presentacion y apoyaria si la presentacion lo convencia. Me llamara en los proximos dias. No veo que se pueda hacer mas por el momento. Los mantendre informados.
Saludos, Jorge

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | "Apel, Michael" <MICHAELA@iadb.org> | |
| **Sent:** | 10 July 2003 16:46 | |
| **Subject:** | Re: B Loan description | |

# Mail 231

I have indeed. I was planning to mail you something tonight. Apologies for the delay, I just walked in.
Saludos, Jorge

----- Original Message -----
**From:** Apel, Michael
**To:** 'J R Vila'
**Sent:** Thursday, July 10, 2003 3:27 PM
**Subject:** FW: B Loan description

# Mail 230

Hello Jorge,

I've been having some trouble with my emails, and I don't know if you already received this. Hope all is well. Michael

-----Original Message-----
**From:**  Apel, Michael
**Sent:**  Wednesday, July 09, 2003 11:38 AM
**To:**   'J R Vila'
**Subject:**   B Loan description

# Mail 229

Hello Jorge!

How is everything in London? We are still waiting with Safra, as you probably know.

I am starting to speak with several other banks now for similar A/B loans, just to make sure that you keep busy... A couple of the banks have asked me for a description of this set-up, in terms of what does such a structure do for them, how do they benefit, what are the processes like, tax implications, etc. I imagine that over the years you have put some text together. Could you send me something that does this so I can share it (very selectively, of course)?

Thanks and regards

Michael

**JRVila**

From:     "Apel, Michael" <MICHAELA@iadb.org>
To:       "'J R Vila'" <j.r.vila@btopenworld.com>
Sent:     11 July 2003 11:39
Subject:  RE: B Loan selling points

**Mail 233**

Thank you very much, Jorge. Very helpful. I´ll let you know if this deal develops. Michael

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Friday, July 11, 2003 7:38 AM
**To:** Apel, Michael
**Subject:** B Loan selling points

**Mail 232**

Dear Michael: I cannot offer anything "off the shelf". However, I would recommend the following arguments in selling B Loans to Brazilian banks **under present market conditions**.

1) B Loans enhance syndication possibilities for two main reasons: a) participating banks from IIC member countries do not have to provision; and b) they are generally not included in country exposure and, since they do not affect country limits, borrowing under a B Loan from a given bank should not "occupy the line". In this sense, B Loans tend to "create new credit".

2) Under present market conditions, B Loans are the Libor-world vehicle with the best possibilities of extending currently prevailing tenors as well as easing terms and condtions of international credit to Brazilian borrowers. At the present time, as you know, there is no Libor-world private credit to Brazil beyond 1 yr, and even 1 yr credit is generally achieved only if it refers to trade related transactions, or B Loans. Some bond issues are testing 2 yr tenors with some success, and my opinion it is a matter of time before the Libor world follows, and this is where a B Loan offers better chances of success.

3) B Loans tend to capture a larger participating "audience" because banks view them as cheaper risk mitigators than the alternative of a usually costly country risk insurance.

4) B Loans today are market based, offering competitively attractive all-in (B Loan spread plus fees) and blended (A-B Loan spreads and fees) costs to borrowers. **TOGETHER WITH 2) ABOVE THIS IS IN MY VIEW ONE OF THE MOST IMPORTANT ARGUMENTS TODAY IN FAVOUR OF B LOANS.** Nobody can "play" with the A and B Loan tenors and respective prices as multinationals can to offer borrowers an all-in competitive, attractive product.

5) A-B Loans offer flexibility, allowing borrowers to extend A Loan tenors beyond what the market would accept, while scheduling B Loans to meet their local financing requirements.

6) B Loans tend to be cheaper for participating banks, and therefore preferable, because they are generally deemed a more effective risk mitigator than a usually costly country risk insurance.

7) Fast-track processing, fairly flexible in terms of qualifying domestic transactions.

8) Develop a closer relationship with multinationals, always looking at potential projects in the country which generally involve multinational contractors from member countries.

9) I do not see any particular tax implications for borrowers.

Hope the above is useful. I will send you an updated report on current prices for Brazilian debt next week. On a slightly separate note, do you think Safra will go for their B Loan soon? September? Bond spreads stopped shrinking, they remain stable.... so far.
Saludos, Jorge

**JRVila**

| | | |
|---|---|---|
| **From:** | "Apel, Michael" <MICHAELA@iadb.org> | |
| **To:** | <j.r.vila@btopenworld.com> | |
| **Sent:** | 16 July 2003 12:40 | |
| **Subject:** | FW: B Loan selling points | |

# Mail 238

Hello Jorge,

Just to let you know that Cesar is back and we are reviewing the Loan Agreement. The project goes to our Board next Tuesday.

Did you notice my second sentence below in the email? Do you have any such document? If you do, it would be very helpful.

Regards,

Michael
-----Original Message-----
**From:** Apel, Michael
**Sent:** Friday, July 11, 2003 8:42 AM
**To:** 'J R Vila'
**Subject:** RE: B Loan selling points

# Mail 234

Sorry, I didn't answer your question at the end. Cesar Purgato is back from his extended vacation next week, so I will ask him for his expectation. By the way, do you have any document that outlines the process of a B Loan? In other words, not so much the benefits (as you've described so well below) but the process and procedures that explain the mechanics for B lenders?

Thanks,

Michael

    -----Original Message-----
    **From:** J R Vila [mailto:j.r.vila@btopenworld.com]
    **Sent:** Friday, July 11, 2003 7:38 AM
    **To:** Apel, Michael
    **Subject:** B Loan selling points

    Dear Michael: I cannot offer anything "off the shelf". However, I would recommend the following arguments in selling B Loans to Brazilian banks **under present market conditions**.

    1) B Loans enhance syndication possibilities for two main reasons: a) participating banks from IIC member countries do not have to provision; and b) they are generally not included in country exposure and, since they do not affect country limits, borrowing under a B Loan from a given bank should not "occupy the line". In this sense, B Loans tend to "create new credit".

    2) Under present market conditions, B Loans are the Libor-world vehicle with the best possibilities of extending currently prevailing tenors as well as easing terms and conditions of international credit to Brazilian borrowers. At the present time, as you know, there is no Libor-world private credit to Brazil beyond 1 yr, and even 1 yr credit is generally achieved only if it refers to trade related transactions, or B Loans. Some bond issues are testing 2 yr tenors with some success, and my opinion it is a matter of time before the Libor world follows, and this is where a B Loan offers better chances of success.

    3) B Loans tend to capture a larger participating "audience" because banks view them as cheaper risk mitigators than the alternative of a usually costly country risk insurance.

    4) B Loans today are market based, offering competitively attractive all-in (B Loan spread plus fees) and blended (A-B Loan spreads and fees) costs to borrowers. **TOGETHER WITH 2) ABOVE THIS IS IN MY VIEW ONE OF THE MOST IMPORTANT ARGUMENTS TODAY IN FAVOUR OF B LOANS.** Nobody can "play" with the A and B Loan tenors and respective prices as multinationals can to offer borrowers an all-in competitive, attractive product.

# Mail 235

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Barsantini, Javier" <JAVIERB@iadb.org>; "Varela, Felipe Alberto" <FELIPEV@iadb.org>; "'Ricardo Merino'" <rmerino@invertec.cl>; "Magdalena Glenz" <mglenz@invertec.cl> |
| **Sent:** | 11 July 2003 16:21 |
| **Subject:** | Invertec B Loan - Caixa Geral waiver |

Acabo de hablar con D. Prusinowski (Caixa NY). El comite de credito analizo la nueva presentacion y nuevamente se decidio enviarla a Lisboa para que alli se tome la decision, pero ahora con recomendacion negativa por dos razones: 1) insisten con lo que ven como una cuestion de principio, no es bueno iniciar una relacion con un waiver antes del primer desembolso; y 2) temen que el desembolso sea usado para pagar las acciones de la Corporacion (de acuerdo a Dale, previstos en el cash flow para 2003 que analizaron).

Por supuesto volvi a subrayar lo poco significante del incumplimiento, agregando que probablemente se cumpliera con el ratio deuda-capital de 1.5 en Diciembre, y que ciertamente se iba en esa direccion. Tambien explique que las dos aprobaciones pendientes no son esenciales para el proyecto en este punto y que de todas maneras dependen de un proceso administrativo que esta en sus etapas finales.
Sobre el tema del pago de las acciones de la Corporacion, le comente que no conocia el esquema de repago, ni los montos, y que miraria el cash flow, pero le asegure que no estaban conectados de ninguna manera al desembolso de Caixa, ofreciendole la informacion aclaratoria que fuera necesaria. Le pregunte si cualquier informacion que desvirtuara esta impresion podria hacerles cambiar al menos la recomendacion negativa; me contesto que era una decision de un comite, dejandome con la sensacion de que habia opinion formada, aunque no utilizo estas palabras.

No esta perdido, de cualquier manera NY nunca apoyo esto. Como el mismo Dale reconocio, no seria la primera vez que Lisbon aprueba algo contra la recomendacion de NY. Sugiero los siguientes pasos:

1. Confirmarle a Caixa NY, con los elementos del cash flow necesarios, la falta de conexion entre su desembolso y el pago de las acciones de la Corporacion, tratando de lograr que al menos retiren o suavicen su recomendacion negativa.
2. "Adecuada" presion sobre Lisboa (D. Chambel) a partir del lunes, insistiendo en la poca relevancia del incumplimiento y en que la unica conexion del desembolso es con el proyecto. Tambien recomiendo insistir, ahora si fuertemente, con una presentacion personal en Lisbon y recurrir a Roldan Trujillo para pedirle que presione por su lado (Caixa es socia de CIFI).

Estoy a su disposicion hoy hasta la hora que sea para darles mas impresiones de mi conversacion con Caixa NY y discutir alternativas.
Saludos, Jorge

**JRVila**

| | |
|---|---|
| **From:** | "Barsantini, Javier" <JAVIERB@iadb.org> |
| **To:** | "J R Vila" <j.r.vila@btopenworld.com>; "Varela, Felipe Alberto" <FELIPEV@iadb.org>; "'Ricardo Merino'" <rmerino@invertec.cl>; "Magdalena Glenz" <mglenz@invertec.cl> |
| **Sent:** | 15 July 2003 17:25 |
| **Subject:** | RE: IIC B Loan - Caixa Geral waiver |

**Mail 237**

Muchas gracias Jorge. Quedamos a la espera de tus novedades.

**JAVIER BARSANTINI**
*Oficial de Inversiones*
*CORPORACIÓN INTERAMERICANA DE INVERSIONES*
*Tel. 598 (2) 901-6063*
*Fax. 598 (2) 900-8899*
*E-Mail: javierb@iadb.org*

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Tuesday, July 15, 2003 2:32 PM
**To:** Barsantini, Javier; Varela, Felipe Alberto; 'Ricardo Merino'; Magdalena Glenz
**Subject:** IIC B Loan - Caixa Geral waiver

**Mail 236**

Hoy lo llame 3 veces a Daniel Chambel, siempre en reunion. No creo que se este escondiendo, seguramente esta muy ocupado Quede con la secretaria en intentar nuevamente manana a primera hora (que en Lisboa en Julio significa a eso de las 10.00). Los mantendre informados.
Saludos, Jorge

**JRVila**

**From:**   "Apel, Michael" <MICHAELA@iadb.org>
**To:**     "'J R Vila'" <j.r.vila@btopenworld.com>
**Sent:**   21 July 2003 13:18
**Subject:** RE: B Loan selling points

# Mail 240

Ok, Jorge, I understand. I look forward to the info when time permits.

Regards,

Michael

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Wednesday, July 16, 2003 10:22 AM
**To:** Apel, Michael
**Subject:** Re: B Loan selling points

# Mail 239

Hi Michael: I did notice your second sentence, and I have been trying to find or alternatively put together some form of outline on B Loans. Hope to have it soon. Sorry again for being slow, but you may have heard that we are fighting a little battle for Invertec on the Caixa Geral front.
Saludos, Jorge

—— Original Message ——
**From:** Apel, Michael
**To:** 'j.r.vila@btopenworld.com'
**Sent:** Wednesday, July 16, 2003 1:40 PM
**Subject:** FW: B Loan selling points

Hello Jorge,

Just to let you know that Cesar is back and we are reviewing the Loan Agreement. The project goes to our Board next Tuesday.

Did you notice my second sentence below in the email? Do you have any such document? If you do, it would be very helpful.

Regards,

Michael

-----Original Message-----
**From:** Apel, Michael
**Sent:** Friday, July 11, 2003 8:42 AM
**To:** 'J R Vila'
**Subject:** RE: B Loan selling points

Sorry, I didn´t answer your question at the end. Cesar Purgato is back from his extended vacation next week, so I will ask him for his expectation. By the way, do you have any document that outlines the process of a B Loan? In other words, not so much the benefits (as you´ve described so well below) but the process and procedures that explain the mechanics for B lenders?

Thanks,

Michael

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Friday, July 11, 2003 7:38 AM

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Barsantini, Javier" <JAVIERB@iadb.org>; "Varela, Felipe Alberto" <FELIPEV@iadb.org>; "'Ricardo Merino'" <rmerino@invertec.cl>; "Magdalena Glenz" <mglenz@invertec.cl> |
| **Sent:** | 16 July 2003 12:30 |
| **Subject:** | Fw: IIC B Loan Invertec Pesquera |

# Mail 242

No tuve suerte cuando llame esta manana, pero se que leyo mi mail debajo. Quede en volver a llamar a eso de las 17.00. Los mantendre informados. Como conversamos hace un par de dias, recomiendo tratar de acelerar el desembolse de Sudameris, just in case..... Saludos, Jorge

—— Original Message ——
**From:** J R Vila
**To:** Daniel.Chambel@cgd.pt
**Sent:** Wednesday, July 16, 2003 9:57 AM
**Subject:** IIC B Loan Invertec Pesquera

# Mail 241

Estimado Daniel: como conversamos hace unas semanas, hemos actualizado el pedido de waiver para el proyecto Invertec sobre la base de la ultima informacion de mercado y los resultados mas recientes de la empresa, que como comentaramos, han mejorado mucho desde que presentamos el pedido original en Marzo.

El waiver actual se reduce a un solo ratio, que va camino de cumplirse, y dos exigencias administrativas que tambien estan en proceso de cumplirse. Dos puntos de muy baja significacion, en mi opinion, y con la cual estuvo de acuerdo el otro banco participante, que ya otorgo su waiver.

Asimismo, veras en la carta de presentacion el fuerte respaldo que esta operacion tiene por parte de la IIC. La aprobacion de Caixa es obviamente fundamental para el proyecto asi como para contribuir al esfuerzo que viene haciendo la IIC por esta empresa desde hace anos, con resultados muy satisfactorios.

Por estas razones, te agradeceria mucho la oportunidad de conversar contigo el tema.
Un cordial saludo,
Jorge Vila

# Mail 243

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Barsantini, Javier" <JAVIERB@iadb.org>; "Varela, Felipe Alberto" <FELIPEV@iadb.org> |
| **Sent:** | 16 July 2003 18:29 |
| **Subject:** | Invertec B Loan - Caixa Geral Lisbon |

El numero de Daniel Chambel es 351-21-790-5149. Si no complica demasiado operativamente, me gustaria participar para ver como reacciona Chambel, pero si es una complicacion adelante Uds. Mi numero es 44-1483-548-460 (linea fija).
Saludos, Jorge

**JRVila**

From:     "Apel, Michael" <MICHAELA@iadb.org>
To:       "'J R Vila'" <j.r.vila@btopenworld.com>; "Moscoso, Victor Hugo" <VICTORHM@iadb.org>
Sent:     17 July 2003 16:45
Subject:  RE: Safra TR B Loan

# Mail 245

Hello Jorge:

Sounds like good news for Brazilian banks. I guess it's too late to offer 18-month B money, since we have already gone to the Board saying it would be 12-month. I just hope Safra doesn't bail out of Libor + 3% for 2 years...

Hope all is well. I await your description of the B Loan process and procedures that I sent to you in a separate email.

-----Original Message-----
From: J R Vila [mailto:j.r.vila@btopenworld.com]
Sent: Thursday, July 17, 2003 9:20 AM
To: Moscoso, Victor Hugo; Apel, Michael
Subject: Safra TR B Loan

# Mail 244

Prices for TR Brazilian debt have slowly continued to tighten. There is still plenty of short-term liquidity, but only for top Brazilian banks and these do not appear to be keen takers. Still nothing done beyond 1 yr, but everybody agrees that longer financing (18 months or 2 yrs) is just around the corner.

Top Brazilian banks are bidding 1.50% to 1.75% all-in for 1-yr TR funds, and 1.0% for 180 days. A European bank closed a TR 1-yr USD 1.6M two days ago with Itau at 2.0% all-in, and considered themselves lucky. Most top names, 1-yr TR deals appear to be done at 1.875% all-in.

ABN closed their Bradesco 1-yr TR unfunded USCP, originally for USD 100, oversuscribed at USD 190M, at L+2.50% plus fees. I understand from reliable sources that there was a last minute stampede to participate.

I suppose a Safra 1-yr TR B Loan should be priced today at L+1.75% plus fees. Would it not be a good idea to offer Safra 18 months? I think the market is ready, it would be a good match with the A Loan and we would be the first to break the 1-yr barrier, huge market visibility. Perhaps at 2.0% plus fees?

No Brazilian bank A-B Loan secondary market activity. No news about the BCP issue.

Best regards,
Jorge

**JRVila**

| | |
|---|---|
| **From:** | "Max Zelmanowicz" <max.zelmanowicz@cgd.ky> |
| **To:** | <FELIPEV@iadb.org> |
| **Cc:** | <j.r.vila@btinternet.com>; <dale.prusinowski@cgdus.com> |
| **Sent:** | 17 July 2003 15:28 |
| **Subject:** | Re: Invertec Pesquera Mar de Chiloe |

**Mail 246**

Dear Mr. Varela,

I refer to the waiver requested by the above mentioned company that we received last May 15, 2003, and all relevant messages exchanged since then.

After careful consideration by our international credit committee in Lisbon, I regret to say that the subject request was declined.

Best regards,
Max Zelmanowicz <max.zelmanowicz@cgd.ky>
Caixa Geral de Depositos S.A., Grand Cayman Branch
Safehaven Corporate Centre, Windward One
Second Floor, P.O. Box 32307 SMB
Grand Cayman, Cayman Islands
Telephone: +1 (345) 946.4344
Facsimile: +1 (345) 946.4345


On Fri, 20 Jun 2003 18:02:21 -0400, Varela, Felipe Alberto wrote:
> INTER-AMERICAN INVESTMENT CORPORATION
>
> REGIONAL OFFICE - MONTEVIDEO/URUGUAY
>
> Tel: (598-2) 901-6063
>
> Fax: (598-2) 900-8899
>
> felipev@iadb.org
>
>
> June 20, 2003
>
> Mr. Dale Prusinowski
> Caixa Geral de Depositos, S.A.
> New York
>
>
> Dear Mr. Prusinowski:
>
> Mr. Jorge Vila informed me of the contacts he has been maintaining
> with Caixa Geral with respect to the waiver request for the
> disbursement of the loan to Invertec Pesquera. I understand that
> such request is currently pending confirmation from your
> headquarters in Lisbon.
>
> Based on the operational and financial performance of the Company,
> the IIC approved this waiver to be distributed to the participant

**JRVila**

| | | |
|---|---|---|
| **From:** | "Apel, Michael" <MICHAELA@iadb.org> | **Mail 248** |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> | |
| **Sent:** | 24 July 2003 14:38 | |
| **Subject:** | RE: B Loan information | |

Yes, just something that a bank could send informally to a correspondent bank. Like you mention, a 1-2 pager. I told this Brazilian bank that we handle the syndication stuff (actually, you) but he just wanted to speak with his own correspondent banks to let them know of this idea.

By the way, Safra was approved! A Loan of up to US$15 million for 2 years, and B Loan of US$35 million up to 1 year, renewable. We will be speaking with Safra about when they want to move on the B Loan, and under what conditions (which were left flexible for our Board of Directors).

Thanks.

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]          **Mail 247**
**Sent:** Thursday, July 24, 2003 11:24 AM
**To:** Apel, Michael
**Subject:** B Loan information

Hi Michael: many apologies for not reverting earlier, but it has been a busy period. With respect to the description of the structure and mechanics of a B Loan, would you like to receive something that you can present to potential clients or just 3rd party information for your own "consumption"? If it's the first, will a 1 or 2-pager do? Please let me know.
Saludos, Jorge

# Mail 249

**JRVila**

| | |
|---|---|
| **From:** | "Barsantini, Javier" <JAVIERB@iadb.org> |
| **To:** | "'Magdalena Glenz'" <mglenz@invertec.cl> |
| **Cc:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 25 July 2003 13:48 |
| **Attach:** | Caixa.pdf |
| **Subject:** | Caixa |

Hola Magdalena,

Adjunto carta recibida del Caixa.

Saludos,

**JAVIER BARSANTINI**
*Oficial de Inversiones*
*CORPORACIÓN INTERAMERICANA DE INVERSIONES*
*Tel. 598 (2) 901-6063*
*Fax. 598 (2) 900-8899*
*E-Mail: javierb@iadb.org*

<<Caixa.pdf>>

Jul.25. 2003  8:23AM    CGD-New York Branch                No.4887    P. 1

## ⊛ Caixa Geral de Depositos

**GRAND CAYMAN BRANCH**

# Mail 249
# Letter

Mr. Javier Barsantini                                        July 25, 2003
Inter-American Investment Corporation
Regional Office-Montevideo
Uruguay

Fax no. 5982-900-8899

                Re:    Invertec Prequera Mar de Chiloe S.A. ("Borrower")
                       Participation Agreement between Inter-American Investment Corporation
                            & Caixa Geral de Depositos dated May 17, 2002

Dear Sir:

We refer to the above referenced Participation Agreement, and to your letter dated July 23, 2003
regarding a waiver of certain covenants and other conditions of the Loan Agreement dated as of
May 17, 2002 between Inter-American Investment Corporation and the Borrower ("Loan
Agreement").

Caixa Geral de Depositos hereby informs you that it does not consent to the requested waiver of
the disbursement conditions set forth in Article IV of the Loan Agreement.

We would like to remind you that no disbursements can be made by any party while the
Borrower is not in compliance with the convenants. Nevertheless, commitment fees do continue
to accrue.

The Borrower's failure to comply with financial convenants and other conditions are, as you
point out, serious departures from the requirements of the Loan Agreement and preclude Caixa
Geral de Depositos from agreeing to any waivers or any disbursements.

Caixa Geral de Depositos is, however, willing to discuss with you the possibility of terminating
its participation. Such termination would permit Inter-American Investment Corporation and
Banque Sudameris to continue their relationship with the Borrower and to make the requested
disbursements.

Thank you for your cooperation.

Very truly yours,

Francisco N. Graca
Executive Vice President
  & General Manager

SAFEHAVEN CORPORATE CENTRE, WINDWARD ONE, SECOND FLOOR, P. O. BOX 32307 SMB      TEL.: +1 (345) 946.4344
GRAND CAYMAN, CAYMAN ISLANDS, B.W.I.                                            FAX: +1 (345) 946.4345

                    25/07 2003 VIE 09:34  [# TX/RX 7128]

# Mail 250

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Barsantini, Javier" <JAVIERB@iadb.org> |
| **Cc:** | "'Ricardo Merino'" <rmerino@invertec.cl>; "Magdalena Glenz" <mglenz@invertec.cl> |
| **Sent:** | 25 July 2003 18:54 |
| **Subject:** | Invertec Pesquera B Loan - Sudameris disbursement |

Javier: de acuerdo a lo conversado hoy, he estado pensando un poco sobre Sudameris. Con Francois Lion de vacaciones hasta el 18 de Agosto, la persona indicada para hablar seria su jefe, Robert Richemond (que no se si no estara tambien fuera de Paris). Hay un par de alternativas laterales a Lion, pero serian solo un camino mas largo y al final igual va a terminar en Richemond. Sudameris Panama no me parece una alternativa, le van a preguntar a Paris.

Pero llamarlo a Richemond tiene sus riesgos. Yo le presente la operacion originalmente a Lion y a Richemond, y ambos fueron los que la aprobaron (no estoy seguro que tan formal fue el comite de credito que tambien aprobo, tiendo a creer que no demasiado). Cuando se les presento el waiver recientemente, hable con Lion para empujarlo sin agitar las aguas, pero me consta que fue aprobado tambien por los dos, por lo que Richemond seguramente tiene presente la operacion. El tema es que no la tenga **demasiado** presente, y que cuando reciba tu llamado y perciba que es una explicacion, por leve o natural que suene, de algo que esta "fuera del mainstream", no empiece a hacer preguntas que generen turbulencia o prefiera esperar a que vuelva Francois.

Sugiero que tal vez lo mejor seria enviarle una carta lo mas "standard" posible a las personas de contacto indicadas en el contrato pidiendo el desembolso como consecuencia natural de que hayan otorgado su waiver, que cuando se refiera a que Caixa no va a participar lo haga en la forma mas corta posible, sin mencionar el nombre (sugiero "el otro participante"), que no haga hincapie en ninguna circunstancia especial de Caixa para no participar (por ejemplo, que cambiaron su vision de America Latina, porque despues de todo Sudameris tambien esta en una circunstancia especial relacionada con su vision de America Latina), y remarcando que la IIC ya ha desembolsado y que el proyecto avanza con todo el apoyo de las "financial institutions involved". Si Sudameris ve algun issue, llamara, y ahi, de acuerdo a lo que pregunten, sugiero ver que responder.
Que te parece?
Saludos, Jorge

**JRVila**

| | |
|---|---|
| **From:** | "Apel, Michael" <MICHAELA@iadb.org> |
| **To:** | <j.r.vila@btopenworld.com> |
| **Sent:** | 28 July 2003 13:33 |
| **Attach:** | Moodys Fibra 2002.pdf |
| **Subject:** | FW: Banco Fibra Moodys Rating |

# Mail 251

-----Original Message-----
**From:** Moscoso, Victor Hugo
**Sent:** Thursday, May 01, 2003 6:48 PM
**To:** Apel, Michael
**Subject:** FW: Banco Fibra Moodys Rating
**Importance:** High

FYI
-----Original Message-----
**From:** silvio.prado@bancofibra.com.br [mailto:silvio.prado@bancofibra.com.br]
**Sent:** Wednesday, April 23, 2003 3:45 PM
**To:** silvio.prado@bancofibra.com.br
**Subject:** Banco Fibra Moodys Rating
**Importance:** High


Silvio Luiz Bérgamo Prado
Banco Fibra S/A
phone: (55-11) 3847-6780
fax: (55-11) 3847-6770
email: silvio.prado@bancofibra.com.br

**JRVila**

| | | |
|---|---|---|
| **From:** | "Apel, Michael" <MICHAELA@iadb.org> | **Mail 253** |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> | |
| **Sent:** | 29 July 2003 12:01 | |
| **Subject:** | RE: If you pardon, we will mend | |

Ha! Me ganaste...Great, I'll have to remember that one...
Thanks.

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Tuesday, July 29, 2003 8:55 AM
**To:** Apel, Michael
**Subject:** If you pardon, we will mend

**Mail 252**

Michael: I got all the basic information needed, but I am still working on it, trying to be accurate while staying clear of any misrepresentation. Apologies for the delay, I will mail it as soon as it's finished today. Meanwhile, let's enjoy some more Old English from WS

"Gentles, do not reprehend:
If you pardon, we will mend.
And, as I am an honest Puck,
If we have unearned luck
Now to 'scape the serpent's tongue,
We will make amends ere long:
Else the Puck a liar call:"

Robin

----- Original Message -----

**From:** Apel, Michael
**To:** 'j.r.vila@btopenworld.com'
**Sent:** Monday, July 28, 2003 9:40 PM
**Subject:** "Guilt"

Interestingly enough, this word comes either from Old English, where it was originally spelled "gilt" or "gult", or (even before that) from the Anglo-Saxon word "gylt".

Interesting, the etymology of some of these words...

Hope all is well,

Michael
-----Original Message-----
**From:** Apel, Michael
**Sent:** Thursday, July 24, 2003 11:39 AM
**To:** 'J R Vila'
**Subject:** RE: B Loan information

Yes, just something that a bank could send informally to a correspondent bank. Like you mention, a 1-2 pager. I told this Brazilian bank that we handle the syndication stuff (actually, you) but he just wanted to speak with his own correspondent banks to let them know of this idea.

By the way, Safra was approved! A Loan of up to US$15 million for 2 years, and B Loan of US$35 million up to 1 year, renewable. We will be speaking with Safra about when they want to move on the B Loan, and under what conditions (which were left flexible for our Board of Directors).

Thanks.

**JRVila**

| | | |
|---|---|---|
| **From:** | "Apel, Michael" <MICHAELA@iadb.org> | **Mail 255** |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> | |
| **Sent:** | 29 July 2003 17:53 | |
| **Subject:** | RE: A-B Loan Summary | |

Thanks, Jorge. It looks very helpful. I'll let you know if the bank has any specific questions I can't answer. By the way, is there any sense of what a bank like Banco Fibra could get in terms of pricing? This would be a loan to Banco Fibra that would be on-lent to SMEs for any productive purpose (working capital, trade finance, etc). The bank would have to show how the money was used, as per our typical requirements. IIC loan would be 2 years, but the B wouldn't have to be that long. I need to price this both for the A and B loans, and am looking for some sort of range. Any input?

Regards,

Michael

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]     **Mail 254**
**Sent:** Tuesday, July 29, 2003 2:55 PM
**To:** Apel, Michael
**Subject:** A-B Loan Summary

Michael: not entirely happy with the wording, but.... it's about time to deliver. Perhaps the attached draft could benefit from your comments.
Saludos, Jorge

**Mail 254 Description Page 1**

### IIC A-B LOAN PROGRAM SUMMARY

## 1. Purpose

As a multilateral development organization, mobilizing funds from international capital markets for qualifying private sector projects in Latin America and the Caribbean is one of the IIC's most essential functions.

The main vehicle to mobilize these funds is the A-B Loan Program, under which the IIC seeks to attract international financial institutions, generally, but not limited to, commercial banks, to co-finance with the IIC through participations in B Loans. The A Loan is entirely funded by the IIC, while the B Loan is funded by these participants.

## 2. Structure

The IIC analyzes the borrower, and then negotiates, structures, syndicates and remains the lender of record for the entire loan, signing a) a Loan Agreement with the borrower that governs both the A and the B Loan, and b) a Participation Agreement with each participant that sets forth the respective roles and responsibilities under the B Loan.

Disbursements are usually pari pasu under the A and the B Loan, unless specific circumstances make a different schedule more appropriate.

The IIC responsibilities include generally managing the A-B Loan, collecting all payments of principal and interest from the borrower, and making any such payments on a pro rata basis among itself and the participants as and when they are received.

The borrower knows the identity of the participants, but they communicate with and receive information on the borrower only through the IIC. In certain circumstances however, as set forth in the Participation Agreement, specific actions from participants, such as consents, may be required.

## 3. Main terms

The terms and conditions of the A and the B Loan are usually identical. Sometimes however, the A has a longer maturity than the B Loan, and this will be reflected in the price. But in any case, both will rank pari passu, with cross default clauses protecting all lenders.

Participants receive the same treatment given by the borrower and the host country to the IIC, including immunity from taxation.

They particularly benefit from the de facto preferred creditor status enjoyed by multilaterals such as the IIC, due to their preferred access to foreign exchange for A-B

# Mail 254
# Description Page 2

Loan repayment purposes. This mitigates the country risk, but not the commercial risk, which is assumed by all lenders.

Recognizing the importance of this status as a country risk mitigator and the statistical evidence supporting its success (historically, a very low percentage of A-B Loans had to be restructured), banking regulators in IIC member countries generally exempt their financial institutions from country risk provisioning requirements when they participate in B Loans.

The IIC target the largest possible global audience of potential sources of B Loan funds in their syndications. Since the objective is to attract new capital however, financial institutions incorporated or conducting business primarily in the country of the borrower are not eligible as participants. Ordinarily, eligible lenders include international commercial and investment banks as well as U.S., European and Asian institutional investors.

## 4. Costs

Pricing (spread over Libor) of the A and the B Loan will be competitive by private market standards, depending mainly on market conditions for the respective tenors in light of the country risk mitigation implicit in the de facto preferred creditor status.

Fees usually include A and B Loan up-front fees payable to the IIC and each participant respectively, a commitment fee payable to the IIC and each participant, and a syndication fee payable to the IIC.

## 5. Other considerations

Specifically, the IIC contact a database of about 200 "end-buyer" financial institutions globally every time a B Loan is syndicated, reaching well beyond ordinary correspondent banking channels. We are constantly building on existing relationships as well as identifying new potential sources of funds.

From a commercial point of view, borrowers tend to obtain better market terms, mainly average tenor (A plus B) and price, as well as a larger number of lenders under a B Loan than under ordinary facilities. A significant number of financial institutions that are emerging country risk averse, will only provide financing under an A-B Loan Program.

**JRVila**

| | |
|---|---|
| **From:** | "Apel, Michael" <MICHAELA@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 29 July 2003 18:17 |
| **Subject:** | RE: A-B Loan Summary |

**Mail 257**

Ok, your answer makes sense. Best regards, Michael

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Tuesday, July 29, 2003 3:26 PM
**To:** Apel, Michael
**Subject:** Re: A-B Loan Summary

**Mail 256**

I have not seen anything for a bank / corporate that would be comparable to Fibra. But knowing that the top three Brazilian banks (each about USD 30bn in assets) are paying roughly 1.75% for 1-yr trade related funds, a Banco Fibra (almost USD 1bn in assets, although not the only consideration), should pay in my view 3% plus for 1-yr trade related funds.
We see plenty of liquidity, but so far only for top banks and their trade related needs up to 1 year, nothing South of those names or North of that tenor, so I would advice to limit any Banco Fibra B Loan onlending to 1-yr trade related deals, perhaps even structuring any onlending. It is likely to be tough otherwise, it is not a bank with a bad name, it is a bank with no name, relatively speaking.
The market is in summer mode, but I will let you know if I see anything relevant.
Good luck with Cesar.
Saludos, Jorge

----- Original Message -----
**From:** Apel, Michael
**To:** 'J R Vila'
**Sent:** Tuesday, July 29, 2003 6:53 PM
**Subject:** RE: A-B Loan Summary

Thanks, Jorge. It looks very helpful. I'll let you know if the bank has any specific questions I can't answer. By the way, is there any sense of what a bank like Banco Fibra could get in terms of pricing? This would be a loan to Banco Fibra that would be on-lent to SMEs for any productive purpose (working capital, trade finance, etc). The bank would have to show how the money was used, as per our typical requirements. IIC loan would be 2 years, but the B wouldn't have to be that long. I need to price this both for the A and B loans, and am looking for some sort of range. Any input?

Regards,

Michael

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Tuesday, July 29, 2003 2:55 PM
**To:** Apel, Michael
**Subject:** A-B Loan Summary

Michael: not entirely happy with the wording, but.... it's about time to deliver. Perhaps the attached draft could benefit from your comments.
Saludos, Jorge

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Barsantini, Javier" <JAVIERB@iadb.org> |
| **Sent:** | 31 July 2003 14:24 |
| **Subject:** | Re: Malas Noticias |

**Mail 259**

Sugiero que le informes a Invertec cuanto antes..... Estoy a tu disposicion para cualquier alternativa que quieran explorar.
Saludos, Jorge

—— Original Message ——
**From:** Barsantini, Javier
**To:** 'J R Vila'
**Sent:** Thursday, July 31, 2003 2:50 PM
**Subject:** Malas Noticias

**Mail 258**

Jorge,

El Sudameris tampoco quiere desembolsar. Hablé ocn Panamá y me dijeron que sería bueno mandar un fax con nuestros comentarios del proyecto para ver si se puede revertir la decisión. La persona a la que me refirieron en Paris es el Sr. Natale Arculeo (Director Central Adjunto).

Todavía no hablé con Invertec.

Te llamo en un rato.

Saludos,

**JAVIER BARSANTINI**
*Oficial de Inversiones*
*CORPORACIÓN INTERAMERICANA DE INVERSIONES*
*Tel. 598 (2) 901-6063*
*Fax. 598 (2) 900-8899*
*E-Mail: javierb@iadb.org*

<<Banco Sudameris.pdf>>

__JRVila__

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 04 August 2003 15:29 |
| **Subject:** | RE: Sunset Beach - Scotiabank Toronto |

# Mail 260

Jorge:

La relevancia de la relación de Scotiabank Kingston con el cliente es implícita ya que Scotiabank Toronto solo aprueba lo que sus subsidiarias u oficinas en la región le presentan. Por lo tanto, tarde o temprano, Scotiabank Jamaica hubiera tenido que presentar la continuación del financiamiento del proyecto Sunset Beach a Scotiabank Toronto, ya que es este último el que da su aprobación final. En tu proceso de búsqueda de participantes de B Loans, tu identificaste a Scotiabank Toronto como un potencial participante debido a tu conocimiento de que ellos considerarían el financiamiento de hoteles en el Caribe. Sin embargo, este interés de financiar hoteles en el Caribe implica que la subsidiaria local de Scotiabank esté interesada en el proyecto propuesto. Tu claramente indicas esto en tu e-mail del 20 de marzo en el que dices "I discussed Sunset Beach with Scotiabank Toronto a couple of nights ago. Initially, a good reaction, particularly after they learned that Scotiabank Jamaica are keen on financing the project". Como ves, la relevancia de la relación de Scotiabank Jamaica con el cliente es muy importante. Para ilustrar esto, pudo haber ocurrido lo siguiente: Samer nos pudo haber presentado la operación en abril de este año, o sea después de que Scotiabank Jamaica ya le hubiera indicado su interés a Scotiabank Toronto de financiar el proyecto Sunset Beach. En ese caso, pudo haberse dado que el propio Scotiabank Toronto nos hubiera indicado su interés de participar a través de un B loan y tal vez no hubiéramos necesitado de tus servicios. O tal vez, igual te hubiéramos invitado pero tu esfuerzo hubiera sido limitado ya que ya te habríamos indicado a Scotiabank Toronto como potencial participante en el préstamo B.

No quiero menospreciar tus esfuerzos en ayudar en la operación pero obviamente la relación entre Scotiabank Toronto y Scotiabank Jamaica ya existía y tarde o temprano Scotiabank Toronto se hubiera tenido que enterar de la continuación de l financiamiento de proyecto Sunset Beach por parte de Scotiabank Jamaica y el interés de Toronto por participar se concretizaría con el interés Scotiabank Jamaica en financiar Sunset Beach.

Lamentablemente, no creo que haya espacio para una comisión en este caso. En el futuro, cuando quede claro que un B Loan no va a ser necesario porque el o los banco identificados por ti, deciden no participar o participar en forma paralela, entonces tu compromiso con la CII terminaría allí. Así nos evitamos esta situación que nos es agradable para nadie.

Saludos,

Víctor Hugo

> -----Original Message-----
> **From:** J R Vila [mailto:j.r.vila@btopenworld.com]
> **Sent:** Monday, August 04, 2003 6:52 AM
> **To:** Moscoso, Victor Hugo
> **Subject:** Sunset Beach - Scotiabank Toronto
>
> Victor: como seguramente recuerdan, respondiendo a una amable invitacion tuya y de David, contacte una media docena de bancos a los que les podia interesar Sunset Beach, antes de dar con Scotiabank Toronto.
>
> Como seguramente tambien recuerdan, la "relacion existente", de la que nos enteramos **despues** de que yo encontrara Scotiabank Toronto, era con Scotiabank Kingston, que, como siempre tuvimos claro, no podia hacer nada sin Scotiabank Toronto. Si esta "relacion existente" hubiera sido relevante, Scotiabank Kingston no hubiera necesitado a nadie, PWC no hubiera llamado ni al IIC a nadie, y yo no hubiera sido invitado a colaborar.
>
> Pero no fue asi. Como la "relacion" del proyecto con Scotiabank Kingston no era suficiente, hubo que encontrar bancos dispuestos a cofinanciar un proyecto que se presentaba muy dificil (por la industria, las circunstancias post Sep 11, el relativo alto monto, el largo plazo requerido, el hecho que fuera un sponsor local y lo dificil que fue tratar con PWC), y luego que encontre a Scotiabank Toronto (por coincidencia), todavia hubo que "venderle" el proyecto.
>
> Como saben, fue un trabajo de un buen par de meses. Yo fui el que prepare el summary presentation para Scotiabank Toronto, sobre la base de la informacion recibida de PWC, que envie a Toronto luego de que Uds la aprobaran. Yo fui el que los convencio de participar y tambien fui yo el que logro que superaramos, dos

## JR Vila

| | |
|---|---|
| **From:** | "Reed, Steven L." <STEVENR@iadb.org> |
| **To:** | "'JR Vila'" <j.r.vila@btinternet.com> |
| **Sent:** | 28 August 2003 19:36 |
| **Subject:** | RE: Sunset Beach |

# Mail 262

Dear Jorge,

I reviewed your file with human resources and the contract that we had with you expired at the end of last year.  My understanding was that the IIC was working with you on a case on case basis when we had a mandate for a B loan.  In this case, Sunset Beach, there is no mandate, there is no B loan and we don't have a contract with you.  I have no reason or basis to pay you a fee for placing a B loan because none exists.

In order to avoid any future problems and misunderstandings, I have instructed IIC staff to have no contact with you unless explicitly authorized by me for the purposes of discussing a specific consulting assignment.

You have done a considerable amount of work on Safra and I want to make sure your assignment is clarified and documented.  We expect to sign the Safra agreement soon.  I will ask Michael Apel to prepare terms of reference and a contract for this assignment so that when Safra instructs us to go to market, an agreement with you will be in place.  I need to confirm this with Jacques but I don't see a problem.  You will be compensated based on a success fee.

Regards,

Steve

-----Original Message-----
**From:** JR Vila [mailto:j.r.vila@btinternet.com]
**Sent:** Tuesday, August 26, 2003 10:05 AM
**To:** Reed, Steven L.
**Subject:** Sunset Beach

# Mail 261

Dear Steve: further to our conversations on Sunset Beach, please find below a recent exchange of mails with Victor about my compensation request. It is clear that my contribution was material in identifying, presenting the project, negotiating initially and finally obtaining the participation of Scotiabank Toronto.

On a larger note, as you know, I have been contributing to your operations on a consulting basis for over a year, substantially, successfully and to the IIC's benefit. I then fail to understand why an opportunity to compensate me is taken with so little "enthusiasm", to understate it. Victor's arguments are based on "after the fact" interpretations about our agreement as well as on what "would have been". Considering all I have done for the IIC, they leave me with a sense of unfairness and disappointment.

Please let me know your thoughts.
Best regards,
Jorge

—— Original Message ——

**From:** J R Vila
**To:** Moscoso, Victor Hugo
**Sent:** Tuesday, August 05, 2003 3:52 PM
**Subject:** Sunset Beach

Victor: soy al que menos le agrada y mas le perjudica encontrarme con esta situacion, pero mi trabajo y mi derecho a una compensacion deben quedar claros.

01/04/2005

**JR Vila**

From:      "Jorge Vila" <vilajr@hotmail.com>
To:        <j.r.vila@btinternet.com>
Sent:      12 September 2003 22:51
Subject:   Fwd: RE: Consulting services

>From: "Reed, Steven L." <STEVENR@iadb.org>
>To: "'Jorge Vila '" <vilajr@hotmail.com>
>CC: "Rogozinski, Jacques" <JACQUESRO@iadb.org>
>Subject: RE: Consulting services
>Date: Fri, 12 Sep 2003 15:10:40 -0400
>
> Jorge,
>
>Your contract expired last year. I don´t understand how you expected
>compensation on any basis other than a success fee for cofinancing services
>when a deal was closed. The retainer was eliminated and the compensation
>after that was based exclusivley on a success fee basis. However, even that
>contract expired in 2002.
>
>I know from my own conversations directly with you that this was the clear
>understanding. I am in Uruguay but will be back in Washington next week. I
>would like to speak with you when I return because I am competely
>confounded
>by your position.
>
>Steve
>
>-----Original Message-----
>From: Jorge Vila
>To: stevenr@iadb.org
>Cc: jacquesro@iadb.org
>Sent: 9/10/2003 7:11 AM
>Subject: Fwd: Consulting services
>
>Steve: I had to use my hotmail address to send you this mail. For some
>reason since yesterday morning I cannot communicate with the iadb.org
>domain
>from my btinternet address. But I can receive your mails there, so would
>you
>mind using j.r.vila@btinternet in your mails to me? Sorry for any
>inconvenience. Many thanks,
>Jorge
>
>
>
> >From: "JR Vila" <j.r.vila@btinternet.com>
> >To: <vilajr@hotmail.com>
> >Subject: Consulting services
> >Date: Wed, 10 Sep 2003 12:12:27 +0100
> >
> >Dear Steve: I also reviewed my files and I could not find in the
>numerous

**Mail 264
Page 1**

**Mail 263
Page 1**

01/04/2005

**Mail 263**
**Page 2**

Page 2 of 14

> >Date: Wed, 10 Sep 2003 12:12:27 +0100
> >
> >Dear Steve: I also reviewed my files and I could not find in the
>numerous
> >mails received from the various IIC officers that requested my
>consulting
> >services during the last year or so, any reference to compensation for
> >those services on the basis of a success fee.
> >
> >Those requests involved a number of specific on-going as well as
>potential
> >projects, and included preparing external IIC documentation -some for
>your
> >signature-, preparing presentations and delivering them to IIC
> >counterparties on behalf of IIC, meeting with IIC counterparties
> >representing IIC, negotiating terms and conditions with IIC
>counterparties
> >also on behalf of IIC, and others.
> >
> >I cannot comment on your understanding of your operations, but the IIC
> >officers that requested my services did not give me any reason to think
>
> >that they were acting under any "misunderstanding", and there was
>certainly
> >none on my part when I delivered the requested services promptly,
> >professionally and to everybody's satisfaction. It is only logical then
>
> >that I should claim and expect compensation.
> >
> >Based on the evidence available, I disagree with your analysis of
>Sunset
> >Beach. Additionally, please note that Safra was not the only project
>where
> >I contributed, upon IIC request, a considerable amount of work during
>the
> >last year or so.
> >
> >I thank you for your offer to discuss another assignment, which I
>accept
> >gladly. I enjoy working for the IIC, I feel that I have made a good
> >contribution so far, and I look forward to further contributing to your
>
> >operations. I suggest however, that I should first receive compensation
>for
> >my past services so that we are able to put this matter behind. I am
> >preparing a detailed invoice for my services that I will present to the
>IIC
> >very soon.
> >
> >Best regards,
> >Jorge
> >
> >

01/04/2005

**JR Vila**

| | |
|---|---|
| **From:** | "Jorge Vila" <vilajr@hotmail.com> |
| **To:** | <STEVENR@iadb.org> |
| **Cc:** | <JACQUESRO@iadb.org> |
| **Sent:** | 09 October 2003 11:15 |
| **Subject:** | RE: Consulting services |

# Mail 265

Steve: I never received your announced call. Anyway, you are indeed "confounded". You, or any other IIC officer, and I never discussed compensation on the basis of a "success fee" for the consulting services requested by IIC in 2003. Furthermore, we never discussed extending our previous agreement in any way. As it is not the first internal "misunderstanding" (as noted in your previous mail), I suggest that perhaps you should take a closer look at your internal system of communications.

Our previous agreement expired last year. IIC requested my consulting services in 2003 with respect to completely new projects, where much of the work I did was not "distribution" but origination, administration, negotiations, reviewing and drafting internal and external documentation, and others. Hardly the basis for a "success fee" based compensation....

As I noted in a previous e-mail, I delivered the services requested by IIC promptly, professionally and to everybody's satisfaction (in fact, one of your officers defined those services as "exceptional"). I trust that I will paid for my services in the some way and that no additional discussions or actions will be necessary to receive payment.

Jorge


>From: "Reed, Steven L." <STEVENR@iadb.org>
>To: "'Jorge Vila '" <vilajr@hotmail.com>
>CC: "Rogozinski, Jacques" <JACQUESRO@iadb.org>
>Subject: RE: Consulting services
>Date: Fri, 12 Sep 2003 15:10:40 -0400
>
> Jorge,
>
>Your contract expired last year. I don´t understand how you expected
>compensation on any basis other than a success fee for cofinancing services
>when a deal was closed. The retainer was eliminated and the compensation
>after that was based exclusivley on a success fee basis. However, even that
>contract expired in 2002.
>
>I know from my own conversations directly with you that this was the clear
>understanding. I am in Uruguay but will be back in Washington next week. I
>would like to speak with you when I return because I am competely
>confounded
>by your position.
>
>Steve

01/04/2005

**JR Vila**

| | |
|---|---|
| **From:** | "Jorge Vila" <vilajr@hotmail.com> |
| **To:** | <JACQUESRO@iadb.org> |
| **Cc:** | <STEVENR@iadb.org>; <j.r.vila@btinternet.com> |
| **Sent:** | 09 October 2003 11:34 |
| **Attach:** | IIC Consulting Services 27 Jan - 4 Aug 03. Invoice letter.doc; IIC Consulting Services Feb-Aug 03.xls |
| **Subject:** | Consulting services |

**Mail 266**

Please find attached letter with invoice for consulting services and summary details.
Sincerely, Jorge R. Vila

It's fast, it's easy and it's free. Get MSN Messenger today!
http://www.msn.co.uk/messenger

01/04/2005

London, 7 October 2003

(Via e-mail jacquesro@iadb.org)

Inter-American Investment Corporation
1300 New York Avenue, N.W.
Washington, DC 20577
U.S.A.

**Mail 266
Page 1**

Attention: Jacques Rogozinski
          General Manager

Re: Consulting services Feb-Jul 03

Dear Jacques:

    Further to my recent e-mail, please find attached a summary detail of my consulting services requested by IIC between February and July 2003. As you are aware, I was requested by IIC during that period of time, among others, to:

- identify and contact, on behalf of IIC, financial institutions globally to invite them to co-finance certain IIC loans and projects;
- negotiate, on behalf of IIC, terms and conditions of IIC loans with counterparties and IIC clients;
- meet with IIC clients to discuss terms and conditions of IIC loans, as well as with potential co-financiers to discuss their participations in certain projects;
- review and draft internal and external IIC documentation related to IIC loans and projects;
- present to IIC counterparties and clients documentation on behalf of IIC;
- analyze financial and credit information on IIC clients and projects;
- participate in IIC-led conference calls with IIC clients to discuss financial and credit information, and negotiate terms and conditions of IIC loans;
- review and draft internal and external IIC documentation related to an IIC request of a waiver of conditions prior to first disbursement;
- negotiate with IIC counterparties, on behalf of IIC, terms and conditions of an IIC request of a waiver of conditions prior to first disbursement;
- analyze financial and credit information on an IIC request of a waiver of conditions prior to first disbursement;
- prepare a description of the IIC A-B Loan Programme, informing potential clients of the structure, benefits, internal processing, requirements and other aspects of this Programme, for IIC marketing purposes;
- monitor and report market conditions for Latin American debt, particularly with respect to certain countries and projects;
- advicing on convenient terms and conditions, including price and structure, of potential IIC loans.

    The attached summary provides ample evidence of my activities for and on behalf of IIC and as requested by IIC, including a detail of the large number of e-mails

1

**Mail 266**
**Page 2**

exchanged with IIC officers, counterparties and clients, phone conversations and conference calls held with them as well as internal and external IIC documentation that I reviewed and drafted, and others.

You can see in the attached summary that I have worked as a consultant to IIC a total of 105 days from 30 January to 5 August 2003. As I qualify under Level IV of the Consultant and Appointment Levels used by IIC, the applicable net consulting fee is USD 847 per day, bringing my compensation to USD 88,935 plus the USD 974 cost of my trip to the IDB Milan Annual Meeting, where I met with a large number of counterparties and IIC officers, including the Operations Manager as well as you (I will post receipts today). Please note that there is still a question about whether I would be entitled to charge my consulting fees separately to each of the 4 projects for which my consulting services were engaged.

Kindly pay the amount of USD 89,909 per the following instructions and at your earliest convenience:

| | |
|---|---|
| Bank: | JP Morgan Chase, New York |
| ABA: | 021000021 |
| FBO: | Salomon Smith Barney Inc. |
| Account: | 066-198038 |
| Reference: | Gonzalez Palau, Pablo and others |
| Sub-account: | 395-24319-1-8-602 |

Thank you for requesting my consulting services and I look forward to contributing further to your operations.

Sincerely,

Jorge R. Vila

Crossways
Wanborough Lane
Cranleigh
Surrey GU6 7DT
England

Phone: 44-1483-548-460 (work)
44-7775-587-964 (mobile)

2

**JR Vila**

| | | |
|---|---|---|
| **From:** | "JR Vila" <j.r.vila@btinternet.com> | **Mail 267** |
| **To:** | <jacquesro@iadb.org> | |
| **Cc:** | "Reed, Steven L." <STEVENR@iadb.org> | |
| **Sent:** | 22 October 2003 19:44 | |
| **Attach:** | IIC Consulting Services 27 Jan - 4 Aug 03. Invoice letter 2nd request 21 Oct 03.doc; IIC Consulting Services Feb-Aug 03.xls | |
| **Subject:** | Invoice for consulting services - Second request | |

Please find attached invoice letter (second request) for consulting services and summary details.
Sincerely, Jorge R. Vila

**JR Vila**

| | |
|---|---|
| **From:** | "JR Vila" <j.r.vila@btinternet.com> |
| **To:** | "Rogozinski, Jacques" <JACQUESRO@iadb.org> |
| **Cc:** | "Reed, Steven L." <STEVENR@iadb.org> |
| **Sent:** | 04 November 2003 14:03 |
| **Subject:** | Fw: Invoice for consulting services - Second request |

**Mail 270**

Dear Ms Vallejo: I will be grateful for the earliest possible answer to my mails.
Best regards,
Jorge R. Vila

—— Original Message ——
**From:** JR Vila
**To:** Rogozinski, Jacques
**Cc:** Reed, Steven L.
**Sent:** Thursday, October 23, 2003 1:32 PM
**Subject:** Re: Invoice for consulting services - Second request

**Mail 269**

Dear Ms Vallejo: thank you for your mail. Please note that I delivered my consulting services at the specific request of various IIC loan officers, as evidenced and detailed in my invoice letter and attachment, aware of the consulting nature of my activities and acting with clear authority and understanding of their own actions. I cannot comment on whether those officers complied with your internal regulations when they requested my services and involved me in your internal and external activities, as again detailed in my invoice letter and attachment.
I will be grateful for your prompt payment of my services as invoiced.
Best regards,
Jorge R. Vila

—— Original Message ——
**From:** Rogozinski, Jacques
**To:** 'JR Vila'
**Cc:** Reed, Steven L.
**Sent:** Wednesday, October 22, 2003 10:42 PM
**Subject:** RE: Invoice for consulting services - Second request

**Mail 268**

Mr. Vila,

We hereby acknowledge receipt of your e-mail to Mr. Jacques Rogozinski, who forwarded it to the Personnel and Administration Office for appropriate action. To this end, please provide the following documents:

1.      A copy of the consultant agreement covering the services listed in your e-mail

2.      IIC authorization for your official trip to Milan

Please address all further correspondence to this Personnel and Administration Office.

Alejandra Vallejo

Corporate Business Coordinator.

-----Original Message-----
**From:** JR Vila [mailto:j.r.vila@btinternet.com]
**Sent:** Wednesday, October 22, 2003 2:45 PM

01/04/2005

**JR Vila**

| | |
|---|---|
| **From:** | "Vallejo, Alejandra" <ALEJANDRAV@iadb.org> |
| **To:** | <j.r.vila@btinternet.com> |
| **Cc:** | "Rogozinski, Jacques" <JACQUESRO@iadb.org>; "Reed, Steven L." <STEVENR@iadb.org>; "Salazar, Susana" <SUSANAS@iadb.org> |
| **Sent:** | 04 November 2003 19:20 |
| **Subject:** | Invoice for consulting services |

Señor Vila:

La CII no puede procesar ningún pago por servicios de consultoría que no esté amparado por un contrato formalizado con términos y condiciones definidos, y que además tenga la cobertura presupuestaria correspondiente. Este procedimiento es exigido por las políticas que rigen esta institución de derecho público internacional, y que entiendo usted conoce por haber mantenido relaciones formales de contratación con la CII en distintos periodos. En nuestros registros se marca la finalización de su último periodo contractual con fecha 31 de diciembre de 2002.

Sin otro particular,
Atentamente
Alejandra Vallejo
Coordinadora de Asuntos Institucionales
IIC

01/04/2005

Londres, 29 Diciembre de 2003

Corporación Inter-Americana de Inversiones
1300 New York Avenue, NW
Washington, DC 20577
USA

# Mail 272
# Letter IIC Page 1

Atención:    Enrique Iglesias
             Presidente

Re: Pago de servicios de consultoría

Estimado Sr Presidente:

Le escribo para pedirle que considere mi reclamo de compensación por los servicios de consultoría que le preste a la Corporación Inter-Americana de Inversiones para 4 proyectos durante 105 días de Enero a Agosto de 2003. Dichos servicios fueron expresamente requeridos por oficiales de la CII con pleno conocimiento y aprobación de senior management, coordinados en todo momento con ambos y prestados en tiempo y forma satisfactorios.

Como demuestra la documentación que acompaño, la CII me encargo las siguientes actividades para estos 4 proyectos: a) préstamo A-B para Banco Safra (Brasil), b) financiamiento para ampliar el complejo hotelero Sunset Beach (Jamaica), c) pedido de "waiver" de condiciones previas al primer desembolso de un préstamo a una empresa salmonera (Chile), y d) preparación y presentación a la CII de una descripción de su programa de prestamos A-B para uso general con futuros clientes (Global):

1.  En nombre y representación de la CII, identificar y contactar globalmente instituciones financieras para co-financiar ciertos prestamos y proyectos;
2.  En nombre y representación de la CII, presentar y negociar, telefónica y personalmente, con co-financiadores y clientes de la CII, términos y condiciones de ciertos prestamos y proyectos, incluyendo un pedido de "waiver" de condiciones previas a un primer desembolso, participando a esos efectos en conferencias telefónicas organizadas por la CII con co-financiadores y clientes;
3.  Revisar y preparar documentación interna y externa de la CII, en algunos casos para la firma de senior management, relacionada con ciertos prestamos y proyectos, incluyendo un pedido de "waiver" de condiciones previas a un primer desembolso, y presentar, en nombre y representación de la CII, la documentación externa a co-financiadores y clientes, negociando en algunos casos con estos su contenido y forma;
4.  Analizar información comercial, financiera y crediticia sobre clientes actuales y potenciales, prestamos, proyectos y procesos internos de la CII, incluyendo un pedido de "waiver" de condiciones previas a un primer desembolso;
5.  Preparar para la CII una descripción de su Programa de Prestamos A-B, explicando sus características, objetivos, estructura, beneficios, requisitos, proceso de aprobación, condiciones de mercado aplicables y otros aspectos, para que pueda ofrecer el Programa a potenciales clientes;
6.  Informar periódicamente a la CII sobre la evolución de condiciones en el mercado internacional de capitales que pudieran afectar los prestamos y proyectos para los que requirió mis servicios, y recomendar términos y condiciones para originar dichos prestamos y proyectos bajo estructuras y precios adecuados a las condiciones de mercado;
7.  En relación a uno de los 4 proyectos, con conocimiento y aprobación de oficiales y senior management, participar de la Reunión Anual de la CII en Milán en Abril 2003, para mantener reuniones, en nombre y representación de la CII, con los bancos detallados en la documentación acompañada, así como con el cliente, y negociar términos y condiciones de un préstamo e identificar co-financiadores, informando en la misma Reunión Anual a senior management de mis negociaciones con dicho cliente y de mis conversaciones con co-financiadores.

# Mail 272
# Letter IIC Page 2

Acompaño la siguiente documentación, que confirma que trabaje un total de 105 días, del 30 de Enero al 5 de Agosto de 2003:

1. copia de los numerosos e-mails intercambiados con oficiales de la CII, senior management, co-financiadores y clientes;
2. un detalle de mis numerosas conversaciones con oficiales de la CII, senior management, co-financiadores y clientes y de mis participaciones en conferencias telefónicas con los mismos, así como del contenido de dichas conversaciones y conferencias;
3. copia de documentación interna y externa que se me encargo revisar y redactar, y, en la mayoría de los casos, distribuir en nombre de la CII a co-financiadores y clientes;
4. copia de mi solicitud de pago a la CII, incluyendo una descripción detallada de los trabajos realizados, presentada el 7 de Octubre de 2003 y reiterada el 21 de Octubre de 2003, así como de la respuesta de la CII del 4 de Noviembre de 2003.

Estimo mis honorarios diarios en USD847, al calificar en el Nivel IV de los Niveles de Consultores de la CII, a lo sumo un costo de viaje a la Reunión en Milán de USD947 (detalle de gastos incluido en la documentación), para un total de USD 89,882.

Como surge de la documentación acompañada, la CII reconoce que requirió, acepto y se beneficio de mis servicios, pero se niega a pagarlos sobre la base de que, al contratarme, la CII misma no habría cumplido con sus propias "políticas" aplicables a la contratación de servicios de consultoría. No puede ser mas evidente que una institución, de cualquier naturaleza que sea, no puede negarse a pagar servicios que solicito, acepto y de los cuales se beneficio, alegando su propio incumplimiento de políticas o regulaciones internas al contratar dichos servicios.

Ni sus oficiales ni su senior management se sintieron afectados por regulaciones o "políticas" internas cuando me otorgaron, en numerosas oportunidades, la representación de la CII para negociar términos y condiciones de sus proyectos y prestamos con clientes y co-financiadores. Dichas regulaciones y "políticas" tampoco fueron un problema para entregarme documentación financiera, comercial y crediticia relacionada con sus clientes, prestamos y proyectos, por definición de carácter confidencial, para que la analizara y negociara con clientes y co-financiadores, o para solicitarme la revisión y redacción de documentación interna y externa, incluso para la firma de senior management, así como la negociación de la misma con clientes y co-financiadores y entrega a los mismos en nombre y representación de la CII.

Todo esto fue hecho repetidamente a lo largo de los 105 días, con pleno conocimiento y aprobación de senior management, no solo sin que nadie lo objetara, sino con ratificaciones expresas de mis actividades, como surge de los e-mails acompañados. Como es posible entonces que se invoquen para no pagar servicios que se solicitaron, aceptaron y de los cuales se beneficiaron, "políticas" que fueron aparentemente dejadas de lado para requerir, aceptar y beneficiarse de dichos servicios? Porque son esas "políticas" un impedimento para el pago cuando no lo fueron para requerir, aceptar y beneficiarse de mis servicios?

La CII pretende trasladarme su responsabilidad por el aparente incumplimiento de sus propias "políticas" internas sobre la base de una relación contractual previa. Lo único que mi anterior relación con la CII me confirmo, además de una necesidad importante de apoyo profesional en varias áreas que contribuí a suplir, fue la discrecionalidad con que sus oficiales y senior management se manejaban. Esto fue claramente demostrado por la gran autoridad que me concedieron para actuar en nombre y representación de la CII, negociar términos y condiciones de proyectos y préstamos y preparar documentación interna y externa, así como por la calidad y cantidad de información financiera y crediticia que me entregaron para analizar y negociar con co-financiadores y clientes.

Tanto los oficiales que requirieron mis servicios como senior management, conociendo mi actividad profesional como consultor, aparentaron en todo momento actuar con legitimidad y

# Mail 272
# Letter IIC Page 3

entendimiento de lo que hacían. Las "políticas" que hoy se invocan para no pagarme nunca parecieron ser relevantes ni les impidieron darme la autoridad y la representación que me dieron.

En un primer momento, la CII me negó el pago alegando que habíamos acordado una compensación exclusivamente sobre la base de un "success fee" (aunque no volvieron a hacer referencia a esto en su último mail del 4 de Noviembre ppdo). Nada más alejado de la realidad. Primero, porque nunca discutimos, mucho menos acordamos, como serían compensados mis servicios para estos 4 proyectos, ni hubo referencias a este tema en la extensa documentación intercambiada con oficiales y senior management. Segundo, porque los 4 proyectos fueron originados y discutidos conmigo a partir de Enero / Febrero de 2003, sin vinculación con anteriores años, en que mi relación con la CII incluyo diferentes tipos de compensación. Y, finalmente, porque es mas que evidente que la naturaleza de gran parte del trabajo que hice para estos 4 proyectos impide pensar que podría haber sido compensado con un "success fee" (negociaciones a nivel de originacion que no necesariamente implicaban co-financiamiento, incluyendo un gran numero de actividades no relacionadas con sindicacion, pedido de "waiver" de un préstamo ya aprobado, presentación de un trabajo para uso general y global sin relación a proyectos determinados).

En definitiva, esta claro a) que respondí a un requerimiento profesional expreso de la CII en el marco de mis actividades usuales como consultor, b) que le preste servicios substanciales a lo largo de un periodo prolongado, en tiempo y forma satisfactorias y con conocimiento y aprobación de autoridades que, de haberlo considerado necesario, podrían haber invocado un incumplimiento de "políticas" internas mucho antes de llegar el momento de pagar mis servicios, pero eligieron no hacerlo, y c) que la CII recibió un beneficio por mi trabajo, que equivaldría a un enriquecimiento injusto si no se compensara el mismo.

Lamento infinitamente verme forzado a llevar mi reclamo al nivel más alto de la CII. Apelo a todo su sentido de la equidad cuando le pido que comprenda y comparta mi lógica resistencia a aceptar que se me imponga, con arbitrariedad y manifiesta injusticia, asumir toda la responsabilidad por un supuesto incumplimiento de regulaciones o "políticas" internas que fueron concientemente dejadas de lado para requerir, aceptar y beneficiarse de mis servicios por quienes eran los primeros responsables de actuar bajo las mismas.

Estoy a su disposición para enviarle mayor información sobre el trabajo que hice para la CII, si lo creyera necesario o conveniente. Le agradeceré la atención que le preste a este tema, asi como una oportunidad de conversarlo con el funcionario que Ud considere apropiado.

Atentamente,


Jorge R. Vila
Consultor – Mercados Emergentes


| Crossways | Teléfonos: | 44-1483-548-460 (oficina) |
| Wanborough Lane | | 44-7775-587-964 (móvil) |
| Cranleigh | E-mail: | j.r.vila@btinternet.com |
| Surrey GU6 7DT | | |
| England | | |


cc:    Sra Marta Blanco
       Directora Ejecutiva de la CII por España

# Mail 273

**JR Vila**

| | |
|---|---|
| **From:** | "Rebollo, Alvaro" <ALVAROREB@iadb.org> |
| **To:** | <j.r.vila@btinternet.com> |
| **Cc:** | "Rogozinski, Jacques" <JACQUESRO@iadb.org>; "Bobb, Euric Allan" <EURICB@iadb.org> |
| **Sent:** | 10 March 2004 22:17 |
| **Subject:** | Solicitud de compensación por servicios de consutoria |

Estimado Sr. Vila:


Por este medio, informamos a usted que con fecha 26 de Febrero de 2004, fue recibida en esta Corporación copia de su comunicación dirigida a la Presidencia, así como la documentación adjunta a la misma.

A este respecto, nos es grato hacer de su conocimiento que estamos llevando a cabo un análisis detallado de su solicitud, con objeto de que la CII pueda proponer oportunamente la decisión sobre el particular.

Atentamente,

Alvaro Rebollo
Analista Gerencial Principal
Corporación Interamericana de Inversiones

01/04/2005

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | |
| **To:** | "Levy, David" <DAVIDL@iadb.org> | **Mail # 11** |
| **Cc:** | <Victorhm@iadb.org> | |
| **Sent:** | 06 March 2003 22:05 | |
| **Subject:** | Jamaica Sunset Beach | |

David: I received by e-mail today from PWC the Sunset Beach Preliminary Information document dated 27 Feb 03, followed by a call from Paolo offering to post additional information including various annexes. I told him that I had enough information for an initial presentation to banks like Scotiabank, not needing anything else for the moment. I am reading the document, I will call you tomorrow before the conference call to discuss.

On a related note, I learned today that the IFC is presently distributing a B Loan for a tourism hotel project in Mexico, Allegro Cozumel (Occidente Hoteles, Spain). Total cost is USD70M, including a USD40M B Loan. The A Loan is "a little over 10 yrs", according to my source. The B Loan was supposed to be 10 yrs, but will be "slightly reduced", probably meaning 8, at L+3.0% plus 1.0% up-front. I got the impression that they are finding distribution harder than they thought.
A little remote as a reference for purposes of pricing and evaluating Sunset Beach, but a reference at the end of the day. I am not sure that this is information that I would recommend to share with PWC at this time, but just FYI.

Saludos, Jorge

**JRVila**

| | |
|---|---|
| **From:** | "Levy, David" <DAVIDL@iadb.org> |
| **To:** | <j.r.vila@btinternet.com> |
| **Sent:** | 10 March 2003 22:19 |
| **Subject:** | FW: Sunset Beach Resort - Jamaica |

# Mail # 14

Jorge,

please check my e-mail address because I didn't receive the message mentioned below.

Thanks,

David

[Levy, David]  -----Original Message-----
**From:** samer.jumean@us.pwcglobal.com [mailto:samer.jumean@us.pwcglobal.com]
**Sent:** Monday, March 10, 2003 3:49 PM
**To:** j.r.vila@btopenworld.com
**Cc:** Levy, David; Samer.Jumean@us.pwcglobal.com
**Subject:** Re: Sunset Beach Resort - Jamaica
**Importance:** High

# Mail # 13

Jorge

For the pledging of receivables, how much and how will it mitigate risk? Can we discuss?
<Removed files: SBR  Scotiabank.doc>

| | | |
|---|---|---|
| "J R Vila" <j.r.vila@btopenworld.com><br>03/10/2003 02:22 PM | To:<br>cc:<br>Subject: | "Levy, David" <DAVIDL@iadb.org>, Samer Jumean/US/FAS/PwC@Americas-US<br><br>Sunset Beach Resort - Jamaica |

# Mail # 12

Gentlement: draft letter to Scotiabank Toronto attached, as discussed last Friday (apologies for the delay). Look
forward to receiving your comments.
Best regards,
Jorge Vila

The information transmitted is intended only for the person or entity to which it is addressed and may contain
confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of
any action in reliance upon, this information by persons or entities other than the intended recipient is
prohibited. If you received this in error, please contact the sender and delete the material from any computer.

London, 10 March 2003

**Mail # 12**
**Letter**
**Page 1**

Scotiabank
44 King Street West
Toronto
Ontario M5H 1H1
Canada

Attn:  Jim Liddell
       Head of International Project Finance

Re: Jamaica project

Dear Jim:

As discussed today, Sunset Beach Resorts and Spa Limited ("SBR"), is seeking to expand its existing facilities in Montego Bay and simultaneously expand its operations into Negril, the premier resort area of Jamaica. Please note the following information on this project as provided by SBR.

With 431 rooms and 380 staff, SBR, the only revenue earning company of the Grand Bay Group ("GBG"), is the fifth largest hotel in Jamaica and the largest independently owned, accounting for 3.0% of the total available rooms in Jamaica and 8.5% in Montego Bay. SBR is managed by Ian Kerr, Cathy Hendrickson-Kerr, and a 12-member senior management team with a 14-year average experience in the travel/leisure industry. GBG is owned by Karl Hendrickson (71.5%), a well-known Jamaican businessman, Ian and Cathy Kerr (11.4%), and National Continental Corporation (17.1%).

The Montego Bay facilities include the Seawind Towers, with 307 rooms and suites in 6.52 acres (the building and land are owned by SBR's affiliate Flexnon Ltd), and the adjacent Beach Inn, with 124 rooms and suites in 14.10 acres, leased from a third party. When the project is completed, SBR will be able to offer 605 rooms and suites at Montego Bay and 250 at Negril.

For the financial year ending May 31, 2002, with total assets of USD 26.4M, GBG generated gross revenues of USD 17.7M and a USD 2.7M profit. Total equity for the same year was USD 20.4M and long term debt USD 6.0M. The average daily room rate was USD 153.50, with a net revenue per room for the last couple of years over 85% of that average daily room rate. SBR has managed to maintain a 0.8 to 1 staff to guest ratio, whereas the Jamaican market average is about 1.2 to 1.

In view of its historically high occupancy levels, its success at managing the business by providing a wide range of products and services while maintaining low cost ratios, and further considering the excellent growth prospects in its market segment, as confirmed by the high occupancy rate projected for the first quarter of 2003, SBR is keen on expanding in Montego Bay and Negril.

**Mail # 12**
**Letter**
**Page 2**

This would allow SBR to strengthen its market position as the largest independently owned hotel, reach the most sought after tourist destination in Jamaica, increase profitability by gaining significant economies of scale and leveraging existing management and marketing infrastructure, and diversify the risk in case of nature related localized adverse situations.

At Montego Bay the project involves a) purchasing, refurbishing and upgrading the existing 124-room Beach Inn and 14.10 beachfront acres currently leased; b) acquiring the adjoining 8.55 beachfront acres and constructing an additional 174 rooms; and c) constructing additional facilities and infrastructure such as conference and banqueting facilities, a swimming pool, new gift shops, covered walkways, driveway, parking area and others.

At Negril the project involves a) purchasing and refurbishing the 86-room Negril Cabins presently owned by a third party, together with 8.57 acres, and constructing 14 suites; b) acquiring 4.96 beachfront acres, constructing 150 rooms and an underpass to qualify as a "beachfront" resort; and c) constructing additional infrastructure.

The total cost of the project, to be completed by December 2004, is USD 57.4M, with Montego Bay taking USD 25.5M, Negril USD 23.4M and USD 8.5M allocated to debt refinancing, up-front financing costs, and professional and commitment fees. SBR has already contributed USD 5.48M.

As a result of the project, BGB revenues should increase from USD 17.6M in 2003 (projected), to USD 34.5M in 2006 (projected), as well as BGB's cash flow, which is expected to increase from USD 7.0M in 2003 to USD 13.1M in 2006.

In order to finance 69.7% of this total cost, SBR and the Inter-American Investment Corporation are discussing a possible USD 40M A-B Loan, including a 5-6 year USD 30M B Loan and a USD 10M A Loan. SBR would contribute the remaining USD 17.4M in the form of new equity or internally generated cash.

SBR is a 3-star resort focusing on the widest cross-section of the mass market, including singles, couples and families, thus selling a large range of products to a broad client base. The geographic market target is North America, the United Kingdom and Europe, as well as local Caribbean.

The very high occupancy rates achieved since 1999 (85% in 99-00, 93% in 00-01 and 80% in 01-02, as opposed to current industry averages of about 68% for hotels larger than 100 rooms) would confirm the attractiveness of its products and the soundness of its marketing strategy and managing policies. SBR has achieved a strong reputation for a solid mid-market all-inclusive resort with a strong "value for money" concept, including good product and service delivery.

SBR relies heavily on tour operators to sell package deals including air travel and ground transportation, with no operator accounting for more than 30% of package revenue. SBR is firmly positioned with all major wholesale tour operators and retail

**Mail # 12**
**Letter**
**Page 3**

travel agents in North America and the UK/Europe, including Air Jamaica Vacations, Apple Vacations, Air Canada Vacations, Virgin Holidays and others.

These partnerships generate over 85% of all SBR bookings. The objective of SBR's marketing efforts is to achieve a minimum of 95% average yearly occupancy with tour operators representing 85% of the business mix and direct and local business contributing 10% and 5% respectively.

Subject to terms under an appropriate B Loan structure, SBR would be prepared to pledge these receivables in order to mitigate project risk and reduce financial costs.

As discussed today, Scotiabank in Jamaica has already expressed a strong interest in financing part of this project. I believe that an appropriately structured and successfully distributed IIC A-B Loan could provide not only the necessary funds to complete the entire project under a risk mitigating structure, but also the long sought opportunity for Scotiabank and the IIC to cooperate in an area of such a strong mutual interest as the Caribbean.

Please let me know if you would like additional information. I look forward to hearing your initial views on the above.

Best regards,


Jorge R. Vila


Crossways
Wanborough Lane
Cranleigh, Surrey GU6 7DT
England

Phone: 44-1483-548-460 (and fax)
        44-7775-587-964 (mobile)
E-mail: j.r.vila@btinternet.com


cc:    David Levy
       IIC Loan Officer – Washington D.C.

**JRVila**

| | |
|---|---|
| From: | <samer.jumean@us.pwcglobal.com> |
| To: | <j.r.vila@btopenworld.com> |
| Cc: | "Levy, David" <DAVIDL@iadb.org> |
| Sent: | 11 March 2003 12:44 |
| Subject: | Re: Sunset Beach Resort - Jamaica |

# Mail # 15

Will call you later today to discuss the approach with Scotiabank.
**<Removed files: SBR  Scotiabank.doc>**

"J R Vila" <j.r.vila@btopenworld.com>
03/10/2003 02:22 PM

To:     "Levy, David" <DAVIDL@btopenworld.com>, Samer Jumean/US/FAS/PwC@Americas·US
cc:
Subject:     Sunset Beach Resort - Jamaica

Gentlement: draft letter to Scotiabank Toronto attached, as discussed last Friday (apologies for the delay). Look forward to receiving your comments.
Best regards,
Jorge Vila

The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

**JRVila**

| | | |
|---|---|---|
| **From:** | "Levy, David" <DAVIDL@iadb.org> | **Mail # 16** |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> | |
| **Sent:** | 11 March 2003 19:01 | |
| **Subject:** | RE: Sunset Beach Resort - Jamaica | |

Looks good to me. Saludos. David

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Monday, March 10, 2003 2:23 PM
**To:** Levy, David; Samer.Jumean@us.pwcglobal.com
**Subject:** Sunset Beach Resort - Jamaica

Gentlement: draft letter to Scotiabank Toronto attached, as discussed last Friday (apologies for the delay). Look forward to receiving your comments.
Best regards,
Jorge Vila

**JRVila**

| | |
|---|---|
| **From:** | "Kuehl, Stefanie" <Stefanie.Kuehl@dbla.com> |
| **To:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **Sent:** | 11 March 2003 10:40 |
| **Subject:** | english/ german lesson :-) |

# Mail # 18
# Page 1

Dear Jorge,

your contact in Brazil for the Safra transaction is Mr. Klaus vom Bauer, phone: 55 11 51 88 69 83.

What I heard today is that we do not intend to participate in the IIC-B-Loan, but if Safra would have problems to close the deal, and Safra itself would ask us to help, we could be prepared to look into the transaction for 1 or 2 mn USD.

I will not participate in Milan, but our board of directors and head of corporate banking, Karsten Reinhard (also responsible for specialized Finance Department) will be there. Sorry, again we have to find another place to meet.

Jorge,

I looked into my files and might have some good contacts for you:
If these are not the right persons, I am sure that they can help you to find them:
1) Roberto Lampl

Investment Officer

Latin America & the Caribbean

FMO-Netherlands Development Finance Company

Tel: 31 70 314 9524

Fax. (31 70) 314 9757

2) Deutsche Bank Frankfurt:

Dagmar Linder, Vice President, unfortunately I do not have the phone number, but she is the person, always attending the IFC meetings.

3) HypoVereinsbank, München

Klaus Kathmann, former colleague of mine in Dresdner Lateinamerika, where he has been couple of years in Argentina.

Global Project Finance / Industries

Bayerische Hypo- und Vereinsbank AG

Am Tucherpark 1

D-80538 Munich

Phone: +49 89 378 42815

Fax: +49 89 378 3342815

Mail: klaus.kathmann@hvb.de <mailto:klaus.kathmann@hvb.de>

**Mail # 18**
**Page 2**


Good luck,

Best regards,


Stefanie Kuehl

Dresdner Bank Lateinamerika AG
Specialized Finance
Head Office Hamburg
Tel.:   (+49 40) 3595 3614
Fax:    (+49 40) 3595 3237

E-Mail:stefanie.kuehl@dbla.com
Internet:    http://www.dbla.com <http://www.dbla.com/>

This message contains confidential information and is intended only for the
individual named. If you are not the named addressee you should not
distribute or copy this e-mail. Please notify the sender immediately by
e-mail if you have received this e-mail in error and delete this e-mail from
your system. Thank you.


-----Ursprüngliche Nachricht-----
Von: J R Vila [mailto:j.r.vila@btopenworld.com]
Gesendet am: Dienstag, 11. März 2003 10:24
An: Kuehl, Stefanie
Betreff: Guten morgen!

**Mail # 17**
**Page 1**

Dear Stefanie: guten morgen!! (I'm getting better at this!). Thank you for
offering a hard copy of the information discussed. My address is as follows:

Crossways
Wanborough Lane
Cranleigh

**Mail # 17**
**Page 2**

Surrey GU6 7DT
England

Look forward to talking to your people in Brazil! Hopefully we will have
Dresdner on board! Are you going to Milan? I plan to be there, perhaps we
could meet. Let me know.
Many thanks,
Jorge Vila

**JRVila**

| | |
|---|---|
| **From:** | "Detterer, Günter" <GDE@westfalenbank.de> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 12 March 2003 09:40 |
| **Subject:** | AW: IIC B Loan Banco Safra SA Brazil |

**Mail # 33**

dear mr. vila,

much to our regret we have to inform you that for the time being the offered transaction does not suit our books and we have to let this transaction pass.

nevertheless, we appreciated that you have approached us also in this financing and look forward to discussing further business opportunities wit you on next occasion.

kind regards
ralf theile   guenter detterer

-----Ursprüngliche Nachricht-----
**Von:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Gesendet:** Dienstag, 11. März 2003 16:31
**An:** Detterer, Günter
**Betreff:** IIC B Loan Banco Safra SA Brazil

**Mail # 19**

Dear Mr Deterer: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very attractive project.
Best regards,
Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <Yvonne.kurkowski@vuw.de> |
| **Sent:** | 11 March 2003 14:24 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC B Loan Banco Safra SA Brazil |

# Mail # 20

Dear Yvonne: as discussed today, I syndicate B Loans from London for the Inter-American Investment Corporation in Washington DC. Attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very attractive project.

Best regards,

Jorge R. Vila

**JRVila**

| | |
|---|---|
| From: | "J R Vila" <j.r.vila@btopenworld.com> |
| To: | <ingo.gerding@bhf.ing.com> |
| Sent: | 11 March 2003 09:54 |
| Attach: | Safra Summary Terms & Conditions.doc |
| Subject: | IIC B Loan Banco Safra SA |

# Mail # 21

Dear Ingo: per our conversation today, attached is a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this project.

Best regards,

Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <dagmar.linder@db.com>; <Andreas.thomasius@db.com> |
| **Sent:** | 11 March 2003 11:42 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC B Loan Banco Safra |

# Mail # 22

Dear Dagmar: as discussed today, I syndicate B Loans from London for the Inter-American Investment Corporation in Washington DC. Attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this project.

Best regards,
Jorge R. Vila

**JRVila**

| From: | "J R Vila" <j.r.vila@btopenworld.com> |
|---|---|
| To: | <Andreas.schenkcaviezel@csfb.com> |
| Sent: | 11 March 2003 22:50 |
| Attach: | Safra Summary Terms & Conditions.doc |
| Subject: | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 23

Dear Andreas: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very attractive project.
Best regards,
Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <lfernandez@sabmia.com>; <fjimenez@sabmia.com> |
| **Sent:** | 11 March 2003 22:00 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 24

Dear Luis and Francisco: per conversation with Luis today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very attractive project.
Best regards,
Jorge R. Vila

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 25** |
| **To:** | <Marcia.vorona@abnamro.com> | |
| **Sent:** | 12 March 2003 16:42 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Marcia: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very attractive project.

With respect to the other issue discussed, I would be delighted to put you in contact with Victor Moscoso in order to explore possibilities, particularly potential B Loan "trade related geographical tranches", with a view to distributing the B Loan on a regionally targetted basis. Please look at www.iadb.org for more information on the Inter-American Investment Corporation.

Best regards,
Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "Raderschall, Waltraud" <Waltraud.Raderschall@Dresdner-Bank.com> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 13 March 2003 07:31 |
| **Subject:** | AW: IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 41

Dear Mr Vila,
at this point we are not in a position to consider the transaction.
Thank you for contacting us.

**Mit freundlichen Grüßen / Best regards**

**Waltraud Raderschall**

Dresdner Bank AG
Corporates & Markets
Corporate Banking
Internationales Geschäft
Strukturierte Export - und Handelsfinanzierung

Phone: ..49 69 263 46 90 - Fax: ..49 69 263 43 79
Mailto:Waltraud.Raderschall@Dresdner-Bank.com

-----Ursprüngliche Nachricht-----
**Von:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Gesendet:** Mittwoch, 12. März 2003 11:52
**An:** Waltraud.raderschall@dresdner-bank.com
**Betreff:** IIC Trade Related B Loan Banco Safra SA Brazil

# Mail # 26

Dear Waltraud: per our conversation today, attached please find a Summary of Terms and Conditions for the
discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact
Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460
or 44-7775-587-964 mobile) if you need further information. We look forward to having you on board for this very
attractive project.
Best regards,
Jorge R. Vila

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 27** |
| **To:** | <rolf.buchholz@saarlb.de> | |
| **Sent:** | 12 March 2003 11:50 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Mr Buchholz: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. Kindly see www.iadb.org for information on the Inter-American Investment Corporation.

We look forward to having you on board for this very attractive project.

Best regards,
Jorge R. Vila

**JRVila**

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 28** |
| **To:** | <Michael.Hennecke@lbbw.de> | |
| **Sent:** | 12 March 2003 14:33 | |
| **Attach:** | Safra Summary Terms & Conditions.doc | |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil | |

Dear Mr Hennecke: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information. We look forward to meeting you in Milan by the end of this month. I will call you next week to discuss possible arrangements. Kindly see www.iadb.org for information on the Inter-American Investment Corporation.

We also look forward to having you on board for this very attractive project.

Best regards,

Jorge R. Vila

**JRVila**

| | |
|---|---|
| From: | "J R Vila" <j.r.vila@btopenworld.com> |
| To: | <Cefas.van.den.Tol@ingbank.com> |
| Sent: | 12 March 2003 15:35 |
| Attach: | Safra Summary Terms & Conditions.doc |
| Subject: | IIC Trade Related B Loan Banco Safra SA Brazil |

**Mail # 29**

Dear Cefas: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.

I look forward to meeting your colleagues in Milan by the end of this month. I am fully available to meet from Friday 21 March evening until Thursday 27 March in the afternoon, anytime and place at your convenience.

We also look forward to having you on board for this very attractive project.

Best regards,
Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | <Raymond_Spring@america.hypovereinsbank.com> |
| **Sent:** | 12 March 2003 14:59 |
| **Attach:** | Safra Summary Terms & Conditions.doc |
| **Subject:** | IIC Trade Related B Loan Banco Safra SA Brazil |

# Mail # 30

Dear Ray: per our conversation today, attached please find a Summary of Terms and Conditions for the discussed IIC USD 40M 1-year Trade Related B Loan to Banco Safra, Brazil. Please do not hesitate to contact Victor Moscoso, IIC Regional Head, in Washington DC at 202-623-3918 or myself in London (44-1483-548-460 or 44-7775-587-964 mobile) if you need further information.

We look forward to having you on board for this very attractive project.

Best regards,
Jorge R. Vila

**JRVila**

| | |
|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> |
| **To:** | "Levy, David" <DAVIDL@iadb.org> |
| **Sent:** | 11 March 2003 23:40 |
| **Subject:** | Re: Sunset Beach Resort - Jamaica |

# Mail # 32

David: Samer did not call today, in spite of his early e-mail. I guess he will call tomorrow. I will let you know.
Saludos, Jorge

—— Original Message ——
**From:** Levy, David
**To:** 'J R Vila'
**Sent:** Tuesday, March 11, 2003 11:13 PM
**Subject:** RE: Sunset Beach Resort - Jamaica

# Mail # 31

Jorge,

did you have the conf. call you Samer w/ regard strategy to approach Scotia Bank. How did it go?

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Monday, March 10, 2003 2:23 PM
**To:** Levy, David; Samer.Jumean@us.pwcglobal.com
**Subject:** Sunset Beach Resort - Jamaica

Gentlement: draft letter to Scotiabank Toronto attached, as discussed last Friday (apologies for the delay).
Look forward to receiving your comments.
Best regards,
Jorge Vila

**JRVila**

| | |
|---|---|
| **From:** | "Moscoso, Victor Hugo" <VICTORHM@iadb.org> |
| **To:** | "'J R Vila'" <j.r.vila@btopenworld.com> |
| **Sent:** | 12 March 2003 23:40 |
| **Subject:** | RE: IIC Trade Related B Loan Banco Safra SA Brazil |

**Mail # 36**

Jorge:

The terms and conditions of the A Loan are as follows:

Amount: US$10 million (please change the indicative terms to reflect this amount);
Term: 2 years
Spread: 3.125% over LIBOR, payable semi-annually
Front-end fee: .625%
Commitment Fee: 0.5% p.a.

Saludos,

VHM

-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Wednesday, March 12, 2003 5:39 PM
**To:** victorhm@iadb.org
**Subject:** Fw: IIC Trade Related B Loan Banco Safra SA Brazil

**Mail # 35**

Victor: I understand that the A Loan is trade related, 2 years, bullet, at L+2.875% payable semi-annually. Would you please confirm and let me know up-front fee (he will want to know and it is a fair question, in my opinion, to compare all-in prices, not only against our B Loan, but against Bradesco's)?
I'll try to send tonight the list of correspondent banks with my contacts.
Saludos, J.

----- Original Message -----
**From:** Raymond_Spring@america.hypovereinsbank.com
**To:** J R Vila
**Sent:** Wednesday, March 12, 2003 8:43 PM
**Subject:** Re: IIC Trade Related B Loan Banco Safra SA Brazil

**Mail # 34**

Jorge,

It was nice speaking with you and I thank you for sending me the summary of terms and conditions for the Safra deal. While we're evaluating this transaction internally, I would appreciate receiving more details (i.e. the terms) of IIC's A-loan.

Best regards,
Raymond M. Spring
Director
Structured Finance/Risk Mitigation - Latin America
Bayerische Hypo- und Vereinsbank AG.
150 East 42nd Street
New York, NY 10017-4679
Tel. (212) 672-6203
Fax (212) 672-5597
E-mail: Raymond_Spring@hvbamericas.com

*********************************************************************************

JRVila
_____

**From:**     "Moscoso, Victor Hugo" <VICTORHM@iadb.org>
**To:**       "'J R Vila'" <j.r.vila@btopenworld.com>     **Mail # 39**
**Sent:**     12 March 2003 23:27
**Subject:**  RE: IIC Trade Related B Loan Banco Safra SA Brazil

The latest rating of the IIC done by S&P was in August 2002 and the rating was still "AA".
The latest rating of the IIC done by Moody's was in  February 2003 and the rating was Aa2

Saludos,

VHM


-----Original Message-----
**From:** J R Vila [mailto:j.r.vila@btopenworld.com]
**Sent:** Wednesday, March 12, 2003 5:40 PM     **Mail # 38**
**To:** Victorhm@iadb.org
**Subject:** Fw: IIC Trade Related B Loan Banco Safra SA Brazil

Would you please let me know?
Saludos, J.

----- Original Message -----
**From:** Raymond_Spring@america.hypovereinsbank.com
**To:** J R Vila     **Mail # 37**
**Sent:** Wednesday, March 12, 2003 10:23 PM
**Subject:** Re: IIC Trade Related B Loan Banco Safra SA Brazil

Jorge,

Could you please confirm the ratings of IIC from S&P and Moody's? The latest I have is a S&P
rating of "AA", but that dates back to Dec. 2000.

Thanks

Raymond M. Spring
Director
Structured  Finance/Risk Mitigation - Latin America
Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Tel. (212) 672-6203
Fax (212) 672-5597
E-mail: Raymond_Spring@hvbamericas.com

*********************************************************************
This e-mail contains information which may be confidential or proprietary and is solely for the use
of the intended recipient. Unauthorized disclosure, use, dissemination or copying of this email and
its attachments (if any) are prohibited.  E-mails are susceptible to alteration and their integrity can
be compromised. The sender is not responsible for any such alteration.  If you are not the
intended recipient or are not a named recipient, please delete this e-mail immediately from your
system and notify the sender immediately by reply e-mail of the mailing error and your deletion.
*********************************************************************

## JRVila

| | | |
|---|---|---|
| **From:** | "J R Vila" <j.r.vila@btopenworld.com> | **Mail # 40** |
| **To:** | <Raymond_Spring@america.hypovereinsbank.com> | |
| **Sent:** | 12 March 2003 23:59 | |
| **Subject:** | Re: IIC Trade Related B Loan Banco Safra SA Brazil | |

Raymond: the latest rating of the IIC done by S&P was in August 2002 and the rating was still "AA". The latest rating of the IIC done by Moody's was in February 2003 and the rating was Aa2.

Saludos, Jorge

----- Original Message -----

**From:** Raymond_Spring@america.hypovereinsbank.com
**To:** J R Vila
**Sent:** Wednesday, March 12, 2003 10:23 PM
**Subject:** Re: IIC Trade Related B Loan Banco Safra SA Brazil

Jorge,

Could you please confirm the ratings of IIC from S&P and Moody's? The latest I have is a S&P rating of "AA", but that dates back to Dec. 2000.

Thanks

Raymond M. Spring
Director
Structured Finance/Risk Mitigation - Latin America
Bayerische Hypo- und Vereinsbank AG
150 East 42nd Street
New York, NY 10017-4679
Tel. (212) 672-6203
Fax (212) 672-5597
E-mail: Raymond_Spring@hvbamericas.com

********************************************************************
This e-mail contains information which may be confidential or proprietary and is solely for the use of the intended recipient. Unauthorized disclosure, use, dissemination or copying of this email and its attachments (if any) are prohibited. E-mails are susceptible to alteration and their integrity can be compromised. The sender is not responsible for any such alteration. If you are not the intended recipient or are not a named recipient, please delete this e-mail immediately from your system and notify the sender immediately by reply e-mail of the mailing error and your deletion.
********************************************************************