## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JORGE VILA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06-CV-02143 (RBW) |
| | ) | |
| INTER-AMERICAN INVESTMENT CORPORATION, | ) ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Defendant Inter-American Investment Corp. ("IIC") respectfully submits this

reply memorandum of points and authorities in support of its motion to dismiss the

complaint of Plaintiff Jorge R. Vila ("Vila").

## INTRODUCTION

The IIC moved to dismiss this action based on the IIC's immunity under the

International Organizations Immunities Act, 22 U.S.C. §§ 288-288k (2001) ("IOIA").

Because the IOIA grants the IIC absolute "immunity from suit and every form of judicial

process," *id*. § 288a(b), the IIC moved to dismiss for lack of subject matter jurisdiction

under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

As additional grounds for its motion, the IIC moved under Rule 12(b)(6) for

dismissal for failure to a state a claim upon which relief could be granted, arguing that (1)

Vila had failed to present a cognizable claim for breach of implied contract; (2) Vila's

claims for both breach of implied contract and unjust enrichment were barred by the

statute of limitations, and (3) Vila had failed to allege facts that could support either a claim of defamation or of tortious interference with prospective advantage.

In response, Vila has submitted, as exhibits to his opposition brief, a vast quantity of material purportedly demonstrating that the IIC has waived its immunity to his lawsuit, that his claims are not time-barred, and that his complaint has alleged facts to support cognizable claims. The Court may properly consider this material in analyzing the IIC's immunities defense: as this Court has noted, "in deciding a 12(b)(1) motion, it is well established in this Circuit that a court is not limited to the allegations in the complaint but may consider material outside of the complaint in an effort to determine whether the court has jurisdiction in the case." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 195 (D.D.C. 2002) (Walton, J.). However, "because the plaintiff has the burden of proof to establish jurisdiction, the plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id*. (internal quotation marks and citation omitted).

Nothing in Vila's opposition brief or the voluminous exhibits to it alters the conclusion that this action should be dismissed. The Court lacks subject matter jurisdiction over the action and, for the reasons stated in the IIC's moving papers and discussed further in Part II below, Vila's complaint fails to state claims upon which relief could be granted. Because these infirmities are inherent in the fundamental nature of Vila's suit, they could not be cured by amendment of the complaint, and thus, the complaint should be dismissed with prejudice.

**ARGUMENT**

**I.     The IIC Has Not Waived Its Immunity from Vila's Claims.**

Vila concedes (*see* Opp. at 2), as he must, that the IIC, as an international

organization designated by the President of the United States under the IOIA, enjoys

"immunity from suit and every form of judicial process."  22 U.S.C. § 288a(b).  He

contends, however, that "the IIC has waived its immunity to the type of claim Mr. Vila

files here."  (Opp. at 2.)  That contention is wrong.

Under the IOIA, the immunity of international organizations such as the IIC is

absolute "except to the extent that such organizations may *expressly* waive their

immunity for the purpose of any proceedings or by the terms of any contract."  22 U.S.C.

§ 288a(b) (emphasis added).[1]  *See Mendaro v. World Bank*, 717 F.2d 610, 613-14 (D.C.

Cir. 1983).  Thus, as is true with respect to a waiver of sovereign immunity, a waiver of

immunity under the IOIA "cannot be implied but must be unequivocally expressed."  *P &

V Enters. v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 2d 134, 140-41 (D.D.C. 2006)

(Walton, J.) (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95 (1990) (internal

quotation marks and citation omitted in original)); *see also Sierra Club v. Leavitt*, 355 F.

Supp. 2d 544, 547 (D.D.C. 2005) (Walton, J.) ("[A] waiver of . . . immunity may not be

implied, but rather, there must be an 'unequivocal expression' of . . . intent to waive.")

(quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)).

---

[1]     As noted in the IIC's moving papers, although the President has the power to restrict an
international organization's immunity under the IOIA, 22 U.S.C. § 288, no such restriction has
been imposed on the immunities of the IIC.  *See* Exec. Order No. 12,567, 51 Fed. Reg. 35,495
(Oct. 2, 1986) (designating the IIC as immune under the IOIA without limitation).

Because an "[e]xpress waiver requires a clear unambiguous manifestation of the intent to waive," *United States v. Chalmers*, No. S5 05 CR 59(DC), 2007 WL 624063, at *2 (S.D.N.Y. Feb. 26, 2007), the courts may not construe ambiguous language as a waiver of immunity.  With respect to the absolute immunity from judicial process provided under the IOIA, which exists in order to enable designated international organizations to perform their functions without interference, "[t]he requirement of an express waiver suggests that courts should be reluctant to find that an international organization has inadvertently waived immunity when the organization might be subjected to a class of suits which would interfere with its functions."  *Mendaro*, 717 F.2d at 617 (citing Restatement (Second) of the Foreign Relations Law of the United States ("Restatement") § 84 cmt. b (1965)).

Vila contends that the IIC has waived its immunity to his claims by virtue of the provision in the Agreement Establishing the Inter-American Investment Corporation ("IIC Charter"), T.I.A.S. No. 12087, 1986 WL 324556 (Nov. 19, 1984), stating that "[a]ctions may be brought against the Corporation only in a court of competent jurisdiction in the territories of a member country in which the Corporation has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities."  IIC Charter art. VII, § 3(a).  As the IIC explained in its moving papers, the courts have found that this language, which also exists in the charters of the Inter-American Development Bank ("IDB") and the World Bank (the International Bank for Reconstruction and Development), may be interpreted as an express waiver of the international organization to suit, but only in very limited circumstances where such a construction would clearly be consistent with the intentions of the organization's member

nations, as signatories to the charter, with respect to the purposes and mission of the organization. *See, e.g.*, *Atkinson v. IDB*, 156 F.3d 1335, 1338 (D.C. Cir. 1998) ("[T]he [organization]'s immunity should be construed as *not waived* unless the particular type of suit would *further* the [organization]'s objectives.") (emphasis in original); *Mendaro*, 717 F.2d at 617 (a waiver may be inferred only where "an insistence on immunity would actually prevent or hinder the organization from conducting its activities").

Vila argues that the courts' construction of the pertinent charter language as a waiver of immunity, which the D.C. Circuit has characterized as already "generous" to potential plaintiffs, *id.* at 614 (internal quotation marks and citation omitted), "should be applied even more broadly to permit" his lawsuit, *id.*, because his claims are ones to which the IIC presumably would wish to be subject. (*See* Opp. at 6.)  In support of his position, Vila cites *Lutcher S.A. Celulose e Papel v. Inter-American Development Bank*, 382 F.2d 454 (D.C. Cir. 1967), contending that *Lutcher* is "the case most directly on point for this issue." (Opp. at 2.)  *Lutcher*, however, is distinguishable on its facts and, more importantly, it does not reflect the D.C. Circuit's current approach to interpreting the pertinent charter language.

As this Court has observed:  "While some older decisions may have intimated a broader scope to the waiver of immunity represented by [the pertinent charter language], . . . the D.C. Circuit has most recently adopted an interpretation of the [charter] waiver effectively narrowing its scope to a minimum." *Atl. Tele-Network Inc. v. IDB*, 251 F. Supp. 2d 126, 132 (D.D.C. 2003) (citation omitted).  Indeed, between the time *Lutcher* was decided and today, the courts in this Circuit have consistently found the charter language *not* to provide a waiver of an international organization's immunity,

- 5 -

recognizing that *Lutcher*'s initial finding that such a waiver could be read into the language at all is reasonable only to the extent that such a waiver is demonstrably and unequivocally in the best interests of the organization. *See, e.g.*, *Atkinson*, 156 F.3d at 1338; *Mendaro*, 717 F.2d at 615; *Aguado v. IDB*, 85 F. App'x 776, 777 (D.C. Cir. 2004); *Fazzari v. IDB*, 254 F.3d 315 (Table), 2000 WL 1838237, at *1 (D.C. Cir. Nov. 16, 2000); *Atl. Tele-Network Inc.*, 251 F. Supp. 2d at 132; *cf. Weinstock v. Asian Dev. Bank*, No. Civ.A 105CV00174RMC, 2005 WL 1902858 (D.D.C. July 13, 2005).[2]

Even under *Lutcher* itself, Vila's claims would not qualify for coverage under the identified charter waiver. Lutcher was a borrower of the IDB who sued based on loans made by the IDB. As the D.C. Circuit recognized in that case and has confirmed thereafter, the very mission of an international lending organization would be impeded if borrowers of the organization had no recourse against the organization in connection with the credit extended to them. *See Lutcher*, 382 F.2d at 460; *see also Atkinson*, 156 F.3d at 1338; *Mendaro*, 717 F.2d at 615. Vila's claims here, however, are not related to either debt accrued or loans made by the IIC, and Vila himself, despite his alleged role in assisting the IIC in connection with its function of obtaining participants in and structuring loans to potential Latin American borrowers (*see* Compl. ¶ 6), could not

---

[2]     Vila suggests that cases such as *Atkinson* and *Mendaro* are not relevant here because the claims in those cases arose either directly or indirectly from an employment relationship between the plaintiffs and the international organization defendant. (*See* Opp. at 4-5.) However, the principles established in those cases are by no means limited to employment-related actions, as demonstrated by later cases such as *Atlantic Tele-Network Inc., supra*, and *Ashford International, Inc. v. World Bank Group*, No. 1:04-CV-3822-JOF, 2006 WL 783357 (N.D. Ga. Mar. 24, 2006), in which there were no employment-related claims and, yet, the courts relied on *Mendaro* and *Atkinson* to find that there had been no waiver of immunity. *See Atl. Tele-Network Inc.*, 251 F. Supp. 2d at 132; *Ashford*, 2006 WL 783357, at *2-3.

reasonably be viewed as personally and individually so indispensable to the IIC such that

it "would *have* to subject itself to [this] suit in order to achieve its chartered objectives."

*Mendaro*, 717 F.2d at 615 (emphasis added); *see also Dujardin v. Int'l Bank for*

*Reconstr. & Dev.*, 9 F. App'x 19, 20 (D.C. Cir. 2001) (same).  The fact that "the

mobilization of private capital, through co-financing, loan participations or syndications

and other means, is an essential component of [the IIC]'s mandate, purpose and

functions," (Opp. at 7), does not mean that allowing Vila to bring his claims in this case

is "*necessary* for the [IIC] to perform its functions."  *Mendaro*, 717 F.2d at 615.  These

"are objectives the [IIC] can well pursue on its own without help from private litigants."

*Atl. Tele-Network Inc.*, 251 F. Supp. 2d at 132.

   Vila's claims -- for breach of implied contract, unjust enrichment, defamation,

and tortious interference with prospective advantage -- are not of the nature that the

*Atkinson*, *Mendaro*, and *Lutcher* courts had in mind in finding that the pertinent charter

language could be read as a waiver of immunity.  Rather, a waiver that would "*further*

[the IIC]'s objectives" is one that would "enhance the marketability of its securities and

the credibility of its activities in the lending markets."  *Mendaro*, 717 F.2d at 618 (citing

Restatement § 84, Rptrs.' Note at 175 (1965)).  Because "[p]otential investors would be

much less likely to acquire the [IIC]'s own securities if they could not sue the [IIC] to

enforce its liabilities," and because "the commercial reliability of the [IIC]'s direct loans

and private loan guarantees would be significantly vitiated if its debtors and beneficiaries

were required to accept the [IIC]'s obligations without recourse to judicial process," it is

reasonable to conclude that the IIC would want to waive its immunity to suits by its

creditors and debtors with respect to the financing arrangements among them.  *Mendaro*,

717 F.2d at 618.  But Vila is neither a creditor nor a debtor of the IIC and does not assert rights based on a loan obtained or made by the IIC.  Permitting Vila to proceed on the claims he presents in this case would only distract the IIC and divert its resources from its capital-raising and lending functions, without providing the IIC with any "corresponding benefit which would further the organization's goals."  *Id.* at 617.

Vila attempts to refute this logical conclusion by pointing to the Standard Terms and Conditions for Consulting Services ("Standard Terms") that were a part of his contracts with the IIC.  (*See* Opp. at 10.)  As he notes, those Standard Terms include a paragraph on "Jurisdiction" which states that " '[j]urisdiction and venue for all legal actions which may arise as a result of any question, matter or dispute concerning this Agreement shall in the first instance be with the United States District Court for the District of Columbia . . . .' "  (Opp. at 10 (quoting Doc. 8-5 filed with Pl.'s Opp.[3]).)  But Vila conveniently omits the final phrase in this paragraph, which is:  "provided that the parties have complied with the provisions of the Arbitration clause of this Agreement." (Doc. 8-5, at 8, ¶ 9.)  Under the agreement's Arbitration clause:

> If any dispute shall arise between the Consultant and the Corporation as to the performance of this Agreement, or any matter or thing arising therefrom or in connection therewith, which cannot be settled by amicable agreement; then upon either party's giving notice of the difference or dispute to the other, the same shall be referred to arbitration and final determination by a single arbitrator in accordance with the rules of the American Arbitration Association.

*Id*. at 7.

---

[3]    Because it is difficult to discern which documents correspond to the exhibit numbers cited in Vila's opposition brief, we refer herein to the document numbers assigned to those exhibits by the Court's Electronic Case Filing system.

Accordingly, with respect to the contracts that Vila had with the IIC, any waiver of immunity to judicial process granted by the Jurisdiction clause applied only to the extent that Vila had "complied with the Arbitration clause" -- *i.e.*, it was a waiver only to permit the Court to enforce the Arbitration clause. Such waiver would, for example, have given the Court jurisdiction to rule on a motion by Vila to compel arbitration of a claim arising under the contract, provided that Vila had given the IIC notice of arbitration and the IIC had refused to submit to arbitration. It also would have given the Court jurisdiction to enforce an arbitral award against the IIC based on such claim if the IIC had failed to abide by the award. It would not, however, have given the Court jurisdiction to entertain argument on or make any ruling regarding the *merits* of the contract-related dispute. *See*, *e.g.*, *Howard Univ. v. Metro. Campus Police Officers' Union*, Civil Action No. 06-0270 (RBW), 2007 WL 842959, at *3 (D.D.C. Mar. 19, 2007) ("Since it is the arbitrator who determines whether the moving party's position is correct, the court 'ha[s] no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim.' " (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960); *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.*, 789 F.2d 1, 5 (D.C. Cir.1986)); 9 U.S.C. § 11 (describing the limits of judicial review of arbitral decisions). Thus, the Jurisdiction clause in the Standard Terms of Vila's contract did not waive immunity to suit for breach of the contract, and there is no

indication that the IIC ever otherwise expressly waived its immunity to any suit by Vila whatsoever.[4]

Notably, Vila does not address the particular nature of his claims when arguing that the IIC has waived its immunity to suit -- rather, he simply contends that the IIC "must waive its immunity when it deals with external parties such as consultants . . . ." (Opp. at 10.)  But the courts have not broadly found a waiver to any and all suits brought by certain types of persons; rather, they have found a waiver with respect to *particular claims* by particular types of persons.  *See, e.g.*, *Atkinson,* 156 F.3d at 1338 ("[T]he Bank's immunity should be construed as *not waived* unless the *particular type of suit* would *further* the Bank's objectives.") (second emphasis added).  Vila does not even attempt to argue that allowing former consultants of the IIC to sue it for defamation or tortious interference could possibly be deemed to further the organization's objectives. Indeed, such an argument would be directly at odds with the D.C. Circuit's holding that "[a] defamation suit neither furthers [an international organization]'s objectives nor enhances the [organization]'s ability to participate in commercial transactions." *Dujardin*, 9 F. App'x at 20.  And, as the D.C. Circuit explained, even when such a suit is

---

[4]    As discussed further in Part II(A) below, Vila argues that he has alleged the existence of an implied contract and unjust enrichment by asserting that the IIC "agreed . . . to retain Plaintiff under the same terms as he had been retained, for work on a new project."  (Opp. at 12.) According to Vila, "[t]he Complaint's allegation is that each time a request was made, the parties agreed to extend the terms of the p[re]vious agreement for the same type of work, to a new project."  (*Id*. at 14.)  Although Vila has failed to allege facts that could support his breach of implied contract and unjust enrichment claims, to the extent that he could do so based on his "extension of the previous agreements" theory, he would defeat his own grounds for suit in this Court, as the Arbitration clause in the Standard Terms of those agreements would then apply with respect to his claims.  The IIC reserves its rights to invoke the Arbitration clause as a basis to compel arbitration should the Court find that Vila's complaint states a cognizable claim for relief.

brought in connection with a *borrower* of an international lending organization (which, of course, Vila is not), that fact "does not affect the [organization]'s immunity." *Id*.

The IIC has not waived its immunity to any of Vila's claims in this case. To the extent that the IIC ever waived its immunity to any action by Vila, such waiver permitted him to do no more than seek to enforce his rights under the Arbitration clause of the Standard Terms. It clearly did not permit him to bring a breach-of-contract action in this Court, much less an action for breach of implied contract, unjust enrichment, defamation, or tortious interference. No waiver of IIC immunity currently exists with respect to any claim by Vila. Because the IIC is absolutely immune from judicial process in this case, the Court should dismiss for lack of subject matter jurisdiction.

**II.    Vila's Complaint Fails To State Any Cognizable Claims for Relief.**

    **A.    Vila Has Not Alleged an Implied Agreement on All Material Terms.**

The IIC moved to dismiss Vila's claim for breach of implied contract on the ground that Vila fails to allege an agreement on the material contractual element of compensation. (*See* Mot. at 12-15.) Vila attempts to counter this aspect of the IIC's motion by arguing that there was a pattern of behavior between himself and the IIC that would allow an implied contract to be inferred from past interaction. (*See* Opp. at 12-15.) In support of this argument, Vila describes at length the terms and conditions of his prior written agreements with the IIC. (*See id*.)

As Vila expressly acknowledges, however, each of the four contracts between him and the IIC sets forth specific and distinct compensation terms, which varied from contract to contract. (*See id*. at 13-14.) As he states, those contracts provided that he would be compensated as follows:

- <u>Contract 1, covering the period February 7 to March 7, 2001</u>: A success fee of approximately 50%;

- <u>Contract 2, covering the period June 1 to December 31, 2001</u>: A success fee of approximately 33%, plus $28,000 in monthly retainer fees;

- <u>Contract 3, covering the period January 1 to March 31, 2002</u>: A success fee of approximately 30%, plus $12,000 in monthly retainer fees; and

- <u>Contract 4, covering the period May 1 to December 31, 2002</u>: A success fee of approximately 40%.

(Opp. at 13-14; Doc. 8-5.)

Vila asserts that the IIC, "[b]y requesting the work [allegedly performed after 2002] and agreeing to 'document' the contract later, [was] agreeing to the same terms of compensation the parties had previously used." (Opp. at 12.) But Vila has not alleged that there was agreement on *which* "same" terms of compensation would apply to any work he performed after 2002. Due to the distinct and different payment terms set forth in their various previous contracts, the parties could not have reached a meeting of the minds on any new contract absent an agreement as to *specific* compensation terms. They certainly could not have agreed upon Vila's current claim for compensation, which is based on a *daily consulting fee* of $847 -- a compensation structure that had *never* been used in the past. (*See* Doc. 8-8, "Mail 266" at 2.) Vila is requesting compensation calculated by using terms that are different from any of these provided for under his prior contracts. There could not, therefore, have been an "agreement" based on the "same terms" as his prior agreement. (Opp. at 12.)

There is, moreover, considerable irony in Vila's contention that this Court can somehow create a contract based on "[a]ll these written agreements in 2001 and 2002 [that] included Terms of Reference establishing the scope of services to be performed by

Plaintiff as well as compensation terms." (Opp. at 14.) As Vila has emphasized (*see id.* at 10), those contracts included the IIC's "Standard Terms and Conditions for Consulting Services," which, as discussed in Part I above, include an Arbitration clause. Even if, therefore, the Court were empowered to try to create a new contract drawn from the previous four -- which it is not -- the Arbitration clause could not be ignored. Thus, even if Vila's theory of an implied contract could be credited, his remedy, if any, would not lie in this Court but, rather, through arbitration.

Vila does not allege that, at the time his services were retained or requested, specific compensation terms, or any other terms or conditions of their "agreement," were discussed. His opposition brief contends that "the parties agreed to extend the terms of the previous agreement" (Opp. at 14), but the documents he submits include his own explicit averment to the contrary. (*See* Doc. 8-8, "Mail 265" (from Vila to the IIC) ("[W]e never discussed extending our previous agreement in any way.").) Furthermore, the previous agreement required that any modifications of terms (which would include the terms of the contract's duration) be made in writing. (*See* Doc. 8-5 at 2 ("The provisions of this Agreement are final and cannot be modified without the written consent of both parties.").) Scope of services, remuneration, and time period were all explicit terms in the contract that could not be altered absent written consent from either the General Manager or the General Counsel of IIC. (*Id.*)

As alleged by Vila, and confirmed by his exhibits, the history of the parties indicated that all contractual agreements were not final until memorialized in writing. Vila's allegations thus cannot support a claim for breach of any unwritten agreement. As the D.C. Circuit has stated:

> An otherwise valid oral agreement does not constitute a
> contract if "either party knows or has reason to know that
> the other party regards the agreement as incomplete and
> intends that no obligation shall exist . . . until the whole has
> been reduced to . . . written form." . . . *The fact that parties
> contemplate a writing is evidence, therefore, that they do
> not intend to bind themselves by an oral agreement.*

*Perles v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007) (internal citations omitted)

(emphasis added).  Particularly when the "milieu in which these parties dealt" indicated

an established history of utilizing written contracts, Vila's position that an implied

contract existed under these circumstances is simply untenable.

**B.    Vila's Claims for Breach of Implied Contract and Unjust Enrichment
Are Barred by the Statute of Limitations.**

The IIC also moved to dismiss Vila's breach-of-implied-contract claim, as well as

his claim for unjust enrichment, based on the applicable statute of limitations.  Under the

law of this Circuit, "an affirmation defense [of untimeliness] may be raised by pre-answer

motion under Rule 12(b) . . . ."  *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578

(D.C. Cir. 1998); *see also Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 109 (D.D.C. 2002)

(dismissing action on limitations grounds where "no outstanding factual issues in

dispute").

"[A]n actionable claim accrues, and the statute of limitations begins to run, when

a suit thereon could first be maintained to a successful conclusion."  *Toomey v.

Cammack*, 345 A.2d 453, 455 (D.C. 1975).  Vila alleges breach of contract and unjust

enrichment based on the IIC's refusal to pay for his alleged services.  (Compl. ¶ 27(v)-

viii).)  As alleged by Vila, the IIC made such refusal in August of 2003.  (Compl. ¶¶ 14-

16.)  The statute of limitations therefore began to run at that time, and Vila had until the

end of August 2006 to file his claims.  He failed to do so and his claims of breach of contract and unjust enrichment are thus barred.

Vila argues that he could not have brought suit in August 2003 because the IIC's repeated refusals to pay him in that month were not "definitive" and were not "the last communication between the parties on the issue."  (Opp. at 17.)  But there is no allegation that the IIC did not consider its refusals in August 2003 to be definitive (*see* Compl. ¶¶ 16-22), and the only reason those refusals were not "the last communication on the issue" is that Vila continued to "reject[]" the IIC's refusal and, repeatedly, to "reiterate[] his compensation claim."  (*Id*. ¶¶ 17, 19, 20, 21.)

Once the limitations period starts to run, it is not suspended or started anew simply because the plaintiff "reiterates" his position in a series of letters of protest in the hope that the defendant will reconsider.  As the Supreme Court stated in *Delaware State College v. Ricks*, 449 U.S. 250 (1980):  "Mere requests to reconsider . . . cannot extend the limitations period[] . . . ."  *Id*. at 261 n.15.   If the law were otherwise, the requirement for timely suit could be postponed indefinitely by a perpetual stream of protests triggering responses thereto.

The *Ricks* case well illustrates this point.  There, a college faculty member was denied tenure by vote of the college Board of Trustees based on a faculty committee recommendation.  *Id*. at 252.  He immediately filed a grievance seeking reversal of that denial.  *Id*.  During the pendency of the grievance, the Board of Trustees wrote to him stating that "we have no way of knowing what the outcome of the grievance process may be," but "[s]hould the [grievance] Committee decide to recommend that you be granted tenure, and should the Board of Trustees concur with their recommendation, then of

course, it will supersede any previous action taken by the Board." *Id*. at 253 n.2. The Court found that, by this letter, the Board did "indicate[] a willingness to change its prior decision," but that "entertaining a grievance complaining of [a] decision does not suggest that the earlier decision was in any respect tentative." *Id*. at 261. Because "[t]he grievance procedure, by its nature, is a remedy for a prior decision, not an opportunity to influence that decision before it is made," a defendant's willingness to reconsider an allegedly wrongful decision does not toll the running of the limitations period from the date of that decision." *Id*. *See also Jones v. Howard Univ.*, 574 A.2d 1343, 1347 ("[T]he availability of a grievance mechanism . . . to seek reinstatement did not covert a final termination into a temporary suspension.").

The IIC was not obliged to respond at all to Vila after its initial refusal to compensate him in August 2003. Neither Vila himself, by repeatedly "reiterating" his demands, nor the IIC, by responding to them as a professional courtesy, tolled the running of the limitations period. *See Ricks*, 449 U.S. at 261 ("The existence of careful procedures to assure fairness . . . should not obscure the principle that limitations periods normally commence when the [allegedly wrongful] decision is made.").

**1. The Breach of Implied Contract Claim Is Time-Barred.**

"It is a long-established principle of law that fees for services rendered, in the absence of an agreement to the contrary, are due and payable at the time performance is completed or of breach by one of the parties." *Cunningham & Assocs. v. Dugan*, 909 A.2d 1001, 1002 (D.C. 1996). In this case, performance -- as well as subsequent request for payment -- allegedly occurred in August 2003. (Compl. ¶¶ 10, 14.) The IIC's alleged

failure to remit payment then, despite "acknowledg[ing] Plaintiff's work" (*id*. ¶ 14), triggered the running of the limitations period.

Vila nevertheless argues that, despite the IIC's plain refusal to compensate him on August 4 and 28, 2003 -- and again on September 12, 2003 -- he "could not have known the IIC was refusing to compensate him prior to November 4, 2003." (Opp. at 20.) To start the accrual of a claim, however, a plaintiff needs no more than "some evidence of wrongdoing." *Capitol Place I Assoc. L.P. v. George Hyman Constr. Co*., 673 A.2d 194, 199 (D.C. 1996); *see also Pardue v. Ctr. City Consortium Schs. of the Archdiocese of Washington, Inc*, 875 A.2d 669, 679 (D.C. 2005) (holding that the limitations period ran from the time asserted by appellees where "[a]ppellant does not contend that she could not have reasonably discovered the claim at that time."). Vila had ample evidence of the wrongdoing he alleges when he received the IIC's refusals to compensate him on August 4, August 28, 2003 -- and again on September 12, 2003.

Moreover, even if the IIC had said nothing in August 2003, it clearly was in breach of the alleged implied contract when it failed to compensate him by October 24, 2003. As noted, it is Vila's contention that "the parties agreed to extend the terms of the previous agreement," making these terms applicable to his breach of contract claim. (Opp. at 14.) Those terms provided for payment within fifteen calendar days after receipt of Vila's invoice. (*See* Doc. 8-5, at 1, ¶ 3.) Vila sent his invoice to Jacques Rogozinski (General Manager) and Mr. Reed demanding compensation for his allegedly rendered consulting services on October 9, 2003. (*See* Doc. 8-8, "Mail 266.") Therefore, under the terms of the alleged contract, payment was due by October 24, 2003. The IIC's failure to remit payment by that date breached the alleged implied contract. Therefore,

even under the most generous interpretation of Vila's allegations, his breach-of-implied-contract claim is barred by the statute of limitations.

### 2.    The Unjust Enrichment Claim Is Time-Barred.

An unjust enrichment claim accrues when the defendant's enrichment becomes unjust.  *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1225 (D.C. 2005). "The statute of limitations begins to run when the facts which form the basis of the claim are discovered, or reasonably should be discovered in the exercise of due diligence." *Interdonato v. Interdonato*, 521 A.2d 1124, 1135 (D.C. 1987).  Vila alleges that, prior to October 26, 2003, he conferred a benefit upon the IIC, which it retained.  (Opp. at 17.) He further alleges that the IIC refused to compensate him for these services on at least three occasions prior to October 12, 2003.

Specifically, Vila points to the following correspondence he received from the IIC:

- On August 4, 2003, Mr. Moscoso "refused to compensate" Vila for his alleged work.  (Compl. ¶ 14.)

- On August 28, 2003, Steven Reed wrote to Vila, stating that:  "I reviewed your file with human resources and the contract that we had with you expired at the end of last year. . . . [W]e don't have a contract with you.  I have no reason or basis to pay you a fee for placing a B loan because none exists."  (Doc. 8-8, "Mail 262.")

- On September 12, 2003, Steven Reed stated again that any contract they may have had with Vila had "expired in 2002."  (Doc. 8-8, "Mail 264.")

These allegations plainly show that Vila knew or should have known, at least in August 2003, that the IIC's alleged failure to remit payment was unjust.  Indeed, he expressly refers to his statement on August 26, 2003 that, "[c]onsidering all I have done for the IIC, they leave me with a sense of unfairness and disappointment."  (Doc. 8-8,

"Mail 261.")  There is no reason why, on the facts as Vila alleges them, he could not have presented his claim of "unfairness" in August 2003 in "a suit [that] could . . . be maintained to a successful conclusion."  *Toomey*, 345 A.2d at 455.  Accordingly, Vila's claim for unjust enrichment is barred by the statute of limitations.

### 3.    The IIC Is Not Equitably Estopped from Asserting the Statute of Limitations Defense.

"A defendant is estopped from raising the statute of limitations as a defense if that defendant has 'done anything that would tend to lull the plaintiff into inaction and thereby permit the statutory limitation to run against him.' "  *P'ships Placements, Inc. v. Landmark Ins. Co.*, 722 A.2d 837, 842 (D.C. 1998) (quoting *Prop. 10-F, Inc. v. Pack & Process, Inc.*, 265 A.2d 290, 291 (D.C. 1970)).  Vila appears to suggest that this doctrine of "equitable estoppel" applies in this case because the IIC allegedly communicated with him after October 25, 2003 about his "reiterated" compensation claim, thereby "lulling" him into inaction with respect to suit on his claim.

However, as this Court has noted:  "District of Columbia courts 'have interpreted [the equitable estoppel] principle narrowly.' "  *Martinez v. Hartford Cas. Ins. Co.*, 429 F. Supp. 2d 52, 58 (D.D.C. 2006) (Walton, J.) (quoting *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986)).  For such estoppel to apply, the defendant must have done something to *affirmatively induce* plaintiff to delay bringing action.  *Id*.  "Equitable estoppel in the statute of limitations context 'comes into play if the defendant takes *active steps* to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations.' "  *Smith-Haynie*, 155 F.3d at 580 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990)) (emphasis added); *see also Chung v. U.S. Dep't of*

*Justice*, 333 F.3d 273, 278 (D.C. Cir. 2003) (stating that equitable estoppel "precludes a defendant, because of his own inequitable conduct -- such as promising not to raise the statute of limitations defense" -- from benefiting from his misconduct). Vila has not alleged that the IIC ever promised, or even suggested, that it would not raise the statute of limitations defense. Nor has he alleged that the IIC engaged in any other "affirmative misconduct" that prevented him from suing within the statutory period.

Consistent with the Supreme Court's reasoning in *Ricks*, *supra*, an allegation that a defendant continued to negotiate regarding a grievance asserted by the plaintiff does not constitute a claim of "affirmative misconduct" for purposes of establishing equitable estoppel. For example, in an action for wrongful employment termination, an employee does not present a claim of equitable estoppel by alleging that his employer promised him a "fair and impartial investigation," advised him to "hang tight," and assured him that "it's not over yet." *Moore v. Chertoff*, 424 F. Supp. 2d 145, 151 (D.D.C. 2006) (quoting *Currier v. Radio Free Europe*, 159 F.3d 1363, 1368 (D.C. Cir.1998)) (internal quotation marks omitted). Thus, if Vila can be understood as arguing that, because the IIC was "considering his compensation request" after October 25, 2003 (Opp. at 18), the IIC is estopped from raising a statute of limitations defense, his argument is meritless. Such consideration clearly does not constitute "affirmative misconduct" by the IIC. *See Brown v. Lamb*, 414 F.2d 1210, 1212 (D.C. Cir. 1969) (finding no inducement for equitable estoppel purposes despite informal assurances to pay and requests not to sue); *cf. Ricks*, 449 U.S. at 261. Vila cannot overcome the statute of limitations bar in this case.

### C.    Vila Effectively Concedes That He Has No Claim for Defamation.

As the IIC stated in its moving papers, the qualified "common interest privilege" applies to the statements that are the basis for Vila's claim of defamation. (*See* Def.'s Mem. at 22-25.) Vila does not attempt to refute the applicability of the common interest privilege on the facts as alleged his complaint. Rather, he asserts that there is an issue of "fact" that should preclude dismissal of his defamation claim because one of the alleged "defamatory" statements was made to a "former IDB manager" who was "clearly no longer in the realm of a Common Interest privilege." (Opp. at 21.) Not only does Vila thereby implicitly concede that the common interest privilege *does* apply to the other allegedly defamatory statement, but his assertion is simply incorrect. Whether the manager is a current IDB employee is irrelevant; the deciding factor is whether the manager *was* an IDB employee when the allegedly defamatory statement was made. Vila alleges that this comment was made to Mrs. Beatriz Harretche "sometime in 2004, *while she headed the IDB Arbitration Tribunal.*" (Compl. ¶ 25 (emphasis added).) Thus, on the facts as alleged byVila, and not disputed by the IIC, the alleged statement was made to a *then-current* IDB employee, placing the statement squarely "in the realm" of the common interest privilege.[5]

Vila also argues that there is a "factual" issue as to whether the allegedly defamatory statements were indeed "defamatory." (Opp. at 21.) But "[w]hether a statement is capable of defamatory meaning is a *question of law for the court to*

---

[5]    Vila's vague assertion that there is a "factual issue" with respect to "others who received these statements" (Opp. at 21) is baseless. There are no facts alleged with sufficient particularity respect to such "others" to possibly support a claim of defamation. (*See* Compl. ¶¶ 24, 25, 31, 32.)

determine." *Kreuzer v. George Washington Univ.*, 896 A.2d 238, 248 (D.C. 2006)

(internal quotation marks and citations omitted) (emphasis added). The statements

allegedly made by the IIC simply are not "reasonably capable of defamatory meaning."

*Jankovic v. Int'l Crisis Group*, 429 F. Supp. 2d 165, 174 (D.C. 2006) (Walton, J.).

There is no "factual" issue that precludes dismissal of Vila's defamation claim.

Accordingly, this Court should grant Defendant's motion to dismiss Vila's claim for

defamation.

      **D.**    **No Factual Dispute Bars Dismissal of Vila's Tortious Interference Claim.**

With respect to his claim of tortious interference, Vila similarly attempts to

counter the IIC's motion by asserting that it raises a "factual" issue about intentional

interference. (Opp. at 21.) Contrary to Vila's contention, the IIC does not argue that

dismissal should be granted "based on Plaintiff's inability to specifically divine" the IIC's

intent when the alleged statements were made. (*Id.*) The IIC argues that Vila has failed

to allege *any facts* that would support the finding of intentional interference. Vila alleges

the existence of a general intent to "cause injur[y] to Plaintiff's professional and personal

reputation." (Compl. ¶ 35) This allegation cannot support a claim for intentional

inference. "Plaintiff cannot establish liability without a 'strong showing of intent' to

disrupt ongoing business relationships; *a general intent to interfere or knowledge that*

*conduct will injure the plaintiff's business dealings is insufficient to impose liability*."

*Bannum, Inc. v. Citizens for a Safe Ward Five*, *Inc*., 383 F. Supp. 2d 32, 45 (D.D.C.

2005) (emphasis added) (citing *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422

(D.D.C. 1988) ("Mere use of the word 'intent,' however, does not constitute a *factual allegation* of specific intent.")).

Furthermore, Vila has failed to plead properly a claim for tortious interference with a *prospective advantage* as he has not alleged any facts as to the existence of such an advantage. *See Ali v. Medstar Health*, No. Civ. A. 99CA1753, 2003 WL 22005014, at *9 (D.C. Super. Ct. Aug. 15, 2003) ("Plaintiffs' failure to sufficiently identify the relevant business expectancy is a failure to satisfy the first two elements of the claim."); *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003) ("Failure to allege any specific, existing economic interest is fatal to the claim."); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F. Supp. 2d 385, 391 (E.D. Va. 2002) ("Because plaintiffs do not identify the specific business relationships with which defendant has interfered, plaintiffs' tortious interference claim fails.").

The IIC cannot be liable for interfering with a business expectancy that did not exist. Vila's failure to identify any specific business relationships or expectancies that were terminated or breached due to the IIC's allegedly defamatory statements is fatal to his tortious interference claim. Consequently, the claim should be dismissed.

### III. Vila's Claims Should Be Dismissed with Prejudice.

Vila has conceded that, if the Court determines that the IIC is immune from his claims or that his claims are barred by the statute of limitations, "dismissal with prejudice would be appropriate." (Opp. at 22.) He suggests, however, that the Court should otherwise grant leave to amend because " '[e]ach of the cases [c]ited by defendant[]s point to an issue of law, not of fact." (*Id*.) To the extent that this suggestion is an argument, it is inapposite with respect to the IIC's motion. It is axiomatic that a motion

to dismiss is properly based on issues of law, not of fact.  *See Sierra Club*, 355 F. Supp. 2d at 546 (Walton, J.) ("In reviewing such a motion, this Court must accept as true all the factual allegations contained in the complaint.").

Vila is correct in stating that "[w]hen a complaint suffers from minor factual deficiencies which could be cured by amendment, the Court should freely allow such Amendment."  (Opp. at 22.)  Now that Vila has effectively put his entire evidentiary case before the Court as exhibits to his opposition brief, apparently intending that those exhibits be treated as part of the complaint, it strains credulity to imagine that there are any "minor factual deficiencies" he could cure through further amendment.  Whatever linguistic changes Vila could possibly make to his complaint would not cure the inherent absence of a cognizable claim in this case.  An attempt to amend the complaint would therefore be futile.  Vila's claims should be dismissed with prejudice.

## CONCLUSION

For all the foregoing reasons, the IIC's Motion to Dismiss should be granted, and the complaint should be dismissed without leave to amend.

## REQUEST FOR ORAL ARGUMENT

Defendant requests oral argument on its Motion.

Respectfully Submitted,

*Of Counsel:*                                    /Nancy L. Perkins_____
                                                 Nancy L. Perkins (D.C. Bar No. 421574)
Sarah Fandell                                    Jennifer Risen (D.C. Bar No. 486559)
Rafael Díaz Loyola                               ARNOLD & PORTER LLP
Inter-American Investment Corporation            555 Twelfth Street, N.W.
1300 New York Ave., N.W.                         Washington, D.C.  20004
Washington, D.C.  20577                          (202) 942-5000
(202) 623-3947

                                                 *Counsel for Defendant*
April 16, 2007                                   *Inter-American Investment Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 16th day of April, 2007, a copy of the forgoing

Reply in Support of Defendant's Motion to Dismiss was filed and served by operation of

the Court's Electronic Case Filing system on:

F. Douglas Hartnett
Elitok & Hartness, LLC
2428 Wisconsin Ave., NW
Washington, D.C.  20007

*Attorney for the Plaintiff*

                    /s/ Nancy L. Perkins
                    Nancy L. Perkins